**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC.,<br><br>*Plaintiff*,<br>v.<br><br>SHELL OIL COMPANY, EQUILON ENTERPRISES LLC D/B/A SHELL OIL PRODUCTS US, SHELL PETROLEUM, INC., TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC,<br><br>*Defendants*. | Civil Action No. 3:21-cv-00933-VDO<br><br>September 15, 2026 |

**PLAINTIFF CONSERVATION LAW FOUNDATION'S PRELIMINARY LOCAL RULE 56(a)(2) STATEMENT OF FACTS IN OPPOSITION TO EQUILON ENTERPRISES AND TRITON TERMINALING, LLC'S AMENDED DRAFT MOTION FOR SUMMARY JUDGMENT**

# I. TABLE OF CONTENTS

I. TABLE OF CONTENTS ..... ii

I. Introduction ..... 1

II. Plaintiff's Responses to Equilon and Triton's Rule 56(a)(1) Statement ..... 1

III. Plaintiff's Statement of Additional Material Facts ..... 48

## I. INTRODUCTION

Plaintiff Conservation Law Foundation, Inc. ("CLF" or "Plaintiff") respectfully files this Preliminary Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment, to Defendants Equilon Enterprises ("Equilon") and Triton Terminaling LLC ("Triton") (collectively, "Defendants") Preliminary Statement of Undisputed Material Facts (ECF 994)[1] pursuant to Judge Oliver's Pre-Trial Instructions and Federal Rule of Civil Procedure 56. CLF reserves its rights to amend, add to, and otherwise change its statement of facts in opposition when filing any authorized motions. Depending on the Court's grant of motions for summary judgment, CLF may need to request leave to exceed pages for this opposition statement pursuant to Local Civil Rule 56(a)(2).

## II. PLAINTIFF'S RESPONSES TO EQUILON AND TRITON'S AMENDED DRAFT RULE 56(A)(1) STATEMENT

1. This case primarily concerns stormwater permit compliance at an onshore petroleum bulk storage and distribution terminal located at 481 East Shore Parkway, New Haven, Connecticut (the "Terminal"). ECF 47, Plaintiff's Amended Complaint ("Am. Compl.") at ¶ 2. Plaintiff also brings claims under the Resource Conservation and Recovery Act.

**Response:** Plaintiff objects to this fact because Defendants failed to support this fact with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.*, 2 F.R. D. 305, 306 (S.D.N.Y. Jan. 20, 1942) ("The pleadings are not evidence."). Plaintiff objects that "primarily concerns" is vague and not sufficiently specific. *See* D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits

[1] Defendants purport to incorporate by reference the statements and supporting record citations contained in the Statements of Undisputed Facts filed by Motiva Enterprises, LLC. To the extent such incorporation is permissible, Plaintiff also incorporates by reference its responses in opposition to Defendants statements and supported record citations contained in the Statement of Undisputed Facts filed by Motiva Enterprises, LLC.

in part and denies in part. Plaintiff admits the terminal is located at this address and this suit involves a stormwater permit and RCRA claims, but otherwise denies the characterization of the case and claims.

2. The Terminal consists of 21 above-ground storage tanks of various sizes located within diked containment areas. Ex. D, Bayles & Pace Report at 6. All 21 tanks are on a regular inspection and maintenance program that meets or exceeds the requirements of the American Petroleum Institute's standard 653. *Id.* at 9.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff admits in part and denies in part. The SWPPP identifies 48 tanks with over half outside diked areas. 2026 SWPPP. Plaintiff denies the diked containment areas are adequate or any implication the API 653 standard is related to containment adequacy. Plaintiff admits the Bayles and Pace report asserts there are 21 storage tanks that are inspected and maintained with reference to some aspects of API 653.

3. The Terminal is located approximately 1,500 feet from the nearest shoreline. Ex. D, Bayles & Pace Report at 19.

**Response:** Plaintiff admits.

4. Since 2017, Triton has owned and Equilon has operated the Terminal under numerous permits including a General Permit for Discharge of Stormwater Associated with Industrial Activity issued by the Connecticut Department of Energy and Environmental Protection ("CT DEEP"). *Id.* at ¶¶ 29-32.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Defendants failed to support this fact with citation

to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.*, 2 F.R. D. 305, 306 (S.D.N.Y. Jan. 20, 1942) ("The pleadings are not evidence."). Subject to and without waiving these objections, Plaintiff admits.

5. CT DEEP has issued various General Permits for the Discharge of Stormwater Associated with Industrial Activity since October 1, 2011. Ex. A. At the time Plaintiff filed this action in July 2021, the operative stormwater permit was the 2019 (the "2019 Permit"). ECF 1-2, Exhibit A to Plaintiff's Complaint at 8.

**<u>Response</u>:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff admits.

6. The 2019 Permit expired on September 30, 2021, and was replaced in October 2021 with a new General Permit (the "2021 Permit"). The 2021 Permit was in effect from October 1, 2021 until October 31, 2025. Ex. Q, CT DEEP, 2021 Permit; Ex. R, CT DEEP, 2025 Permit.

**<u>Response</u>:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff admits in part and denies in part. Plaintiff denies the Permits expired and were replaced, the agency stated before expiration that the 2016, 2018, 2019, and 2021 Permits would be reissuances without modification of the 2011 Permit. Plaintiff otherwise admits the dates of permit effectiveness. Plaintiff denies any implication that a permit "expired" in any way limits Defendants' liability for ongoing violations.

7. Plaintiff did not submit any comments to CT DEEP and did not administratively challenge the 2019 Permit or the 2021 Permit. See Ex. G, S. Mahoney Dep. at 153:19-154:4. Plaintiff did not submit any comments to CT DEEP and did not administratively challenge any of the

Defendants' registrations and submissions in connection with any permit. See Pl.'s Written Discovery Resps.

**<u>Response</u>:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects to "any of the Defendants' registrations and submissions in connection with any permit" is vague and not sufficiently specific. *See* D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits it did not administratively challenge CT DEEP's issuance of the 2019 or 2021 Permits, which were reissuances without modification. Plaintiff denies the second sentence as so vague and unclear as to prevent Plaintiff from forming a judgment; there is no process for Plaintiff to comment on Defendants' registrations and submissions in relation to most permits as they are not put out for public comment in draft form as they are not actions of a government subject to notice and comment rulemaking. Defendants' citation to all of Plaintiff's written discovery responses is sufficiently vague that Plaintiff is unable to discern what registration, submission, or permit Defendants purports to refer.

8. Defendants were also registered and covered under the 2021 Permit. After the 2021 Permit took effect, the 2019 Permit ceased to govern the terminal. *See* Ex. G, June 4, 2025. S. Mahoney Dep. at 111:21-112:6 (stating "the 2021 permit is the permit that is governing today . . ." and "there was little change" between the 2021 Permit and pervious permits); Ex. 0, 2011 Permit, Ex. P, 2019 Permit, Ex. Q, 2021 Permit.

**<u>Response</u>:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff admits in part and denies in part. Plaintiff admits that Defendants sought coverage under the 2021 Permit after CT DEEP reissued the 2019 Permit without modification. Plaintiff denies

any implication that "ceased to govern the terminal" in any way limits Defendants' liability for ongoing violations.

9. The 2019 Permit regulated stormwater discharges from industrial facilities engaged in certain identified activities. *See* Ex. P, 2019 Permit, at 1. The 2019 Permit imposed various regulatory restrictions on those facilities, including control measures, the creation of a SWPPP, and monitoring and recordkeeping tasks, among others. Ex. P, 2019 Permit, at 2.

**Response:** Plaintiff admits.

10. The 2019 Permit did not expressly reference or require consideration of "climate change," "storm surge," "resiliency," "resilience," "adaption," "sea level rise," "increased precipitation," or similar terms suggesting that a permittee was required to conduct some kind of climate change risk analysis. *See generally id.* Similarly, the 2019 Permit does not expressly require a 100-year or a 500-year flood analysis, or use of secondary containment berms as flood barriers. Nor does the 2019 Permit mention sea level rise, storm surge, flooding, hurricanes, increasing frequency or severity of storm events, or other adverse weather events, let alone a purported requirement to conduct a climate change risk assessment. *See* Ex. P, 2019 Permit.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff denies. Whether the Permit requires consideration of "climate change" "storm surge," "sea level rise," "increased precipitation," a "100-year" or "500-year" flood standard, or use of secondary containment berms as flood barriers are included in the 2018, 2019, or 2021 Permit is a question of fact. The Permit contains a number of requirements tied to 100-year metrics. Judge Meyer has already ruled that the Best Industry Practice requirement of the permit includes

consideration of climate change factors if "the best industry practice is to require consideration of climate change factors." ECF 305, at 86:8–16.

11. The 2019 Permit imposed obligations, including "Control Measures" such as the creation of a Stormwater Pollution Prevention Plan ("SWPPP"). *Id.* at 17-71. The purpose of the SWPPP is to describe the necessary control measures at the Terminal to reduce the stormwater runoff pollutants discharged into the environment. *See id.* at 22-29.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that "including 'Control Measures'" and "purpose of" and "the necessary" are vague and not sufficiently specific. D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits that the Permit sets forth requirements including implementation of control measures applicable to all facilities. Plaintiff denies the SWPPP is an example of a control measure. *Compare* Permit § 5(b) *with* § 5(c). Plaintiff denies that the purpose of the SWPPP is limited to the description of necessary control measures. The creation of the SWPPP includes as part of its purpose a mandate for engineers and environmental managers to identify risks, conduct analysis, design and implement control measures.

12. Section 5(b) of the 2019 Permit defines "Control Measures" as "best management practices (BMP) that the permittee must implement to minimize the discharge of pollutants from the permitted facility; and defining "minimize" as "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice," and sets forth 13 explicit BMPs. *Id.* at 17-22. For example, BMPs in the 2019 Permit include "good housekeeping" requiring permittees to "maintain a clean, orderly facility (e.g. sweeping at regular intervals, appropriate storage

practices, proper garbage and waste management, dust control measures, etc.) in all areas that are exposed to rainfall and are potential sources of pollutants," "vehicle or equipment washing" requiring permittees to "provide, at a minimum, that no washing or rinsing of equipment, buildings or vehicles shall be allowed at the site which would allow wash or rinse waters to enter any storm drainage system or surface waters of the State without a permit. . .", and "sediment and erosion control," requiring permittees to "ensure that all employees whose activities may affect stormwater quality receive training within ninety (90) days of employment and at least once a year thereafter to make them familiar with the components and goals of these control measures and the Plan. Training shall address topics such as emergency equipment location, spill response management, control measures, inspection requirements, good housekeeping and materials management practices . . . ." *Id.*

**Response:** Plaintiff admits that the language from the Permit is quoted correctly although with mistakes in the use of quotation marks, only includes some of the 13 listed BMPs, and describes "sediment and erosion control" with the requirements for employee training.

13. Section 5(e)(1)(B)(v) of the 2019 Permit provides a procedure for addressing exceedances at the Terminal if the exceedance of a benchmark is attributable to the presence of a pollutant in the natural background or in "run-on" entering from "off-site." *Id*. at 34.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits the 2019 Permit provides procedures for addressing exceedances at the Terminal. Plaintiff denies the remaining fact as misrepresenting the language in the Permit. The Permit states:

> Following the first semiannual samples of benchmark monitoring (or sooner if the exceedance is triggered by less than 4 monitoring events), if the average concentration of a pollutant exceeds a benchmark value, and the permittee determines that exceedance of the benchmark is attributable solely to the presence of that pollutant in the natural background or in 'run on' entering from off-site, the permittee is not required to perform corrective action or additional benchmark

> monitoring provided all of the following conditions are met: [listing 5 conditions]. Natural background pollutants include those substances that are naturally occurring in rainfall, soils or groundwater. Natural background pollutants do not include legacy pollutants from earlier activity on the site.

Permit § 5(e)(1)(B)(v).

14. Defendants prepared SWPPPs for the Terminal with the assistance of Triton Environmental Inc. ("Triton Environmental"). Ex. S, SWPPP.

**Response:** Plaintiff admits.

15. Triton Environmental is an environmental and engineering services consulting company. Ex. M. Triton Environmental has provided stormwater management and other environmental consulting services to various Connecticut regulated entities, including at coastal bulk fuel oil terminals such as the Pike terminal in New Haven. Ex. V, *Conservation Law Foundation, Inc. v. Pike Fuels Limited Partnership,* No. 21-cv-00932 (D. Conn) ECF 356-8 at 2-4. Triton Environmental's services include the preparation of SWPPPs and it employs individuals who can certify SWPPPs for its clients. Ex. K, Simonetta Dep. at 18:8-11, 135:10-23.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff admits in part and denies in part. Plaintiff admits that Triton Environmental is an environmental and engineering services consulting company and has been engaged at various Connecticut entities to provide services related to SWPPPs. Plaintiff denies that the testimony from the Simonetta Deposition establishes anything regarding Triton's services or employees from the date of the deposition in 2023 to present.

16. As of 2023, Triton had developed approximately one hundred SWPPPs in Connecticut and advised companies about how to comply with the 2019 Permit. Ex. K, Simonetta Dep. at 135:17-23. Triton did not understand the 2019 Permit to require consideration of climate change.

Ex. K, Simonetta Dep. at 136:8-140:3.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving that objection, Plaintiff admits in part and denies in part. Plaintiff admits the witness testified he did not understand the 2019 Permit to require consideration of climate change. Plaintiff denies Triton has developed approximately 100 SWPPPs in Connecticut.

17. Triton Environmental had previously communicated with CT DEEP, and in those conversations, CT DEEP never indicated that the 2019 Permit required consideration of climate change. Ex. K, Simonetta Dep. at 139:4-13.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that this fact mischaracterizes Mr. Simonetta's testimony. Plaintiff further objects that Mr. Simonetta's statement is hearsay as to what CT DEEP has or has not indicated. Fed. Rules Evid. 801(c). Plaintiff admits that Mr. Simonetta testified he had previously communicated with CT DEEP. Plaintiff denies the cited passage supports this fact and denies Mr. Simonetta testified that CT DEEP indicated anything about what the 2019 Permit required or did not require.

18. Defendants disclosed a number of expert witnesses in this case, three of whom are certified professional engineers ("P.E.")-Russell Parkman, Renee Bourdeau, and Thomas Battles. Specifically, Mr. Parkman and Mr. Battles are P.E.s, licensed in the State of Connecticut.

**Response:** Plaintiff admits.

19. Defendants' Connecticut P.E.s experts are the only disclosed experts in this case for either party to have prepared and certified SWPPPs under the 2019 Permit. Ex. J, Parkman Report at 73; Ex. W, Battles Report at 1.

**<u>Response</u>:** Plaintiff admits in part and denies in part. Plaintiff admits Defendants have disclosed experts who have prepared and certified SWPPPs in Connecticut. Plaintiff denies this is true for all of Defendants' experts or their Connecticut professional engineer experts. Plaintiff denies the cited passages indicate Defendants' experts have prepared or certified the described SWPPPs.

20. Defendants' expert witnesses testified similarly to Triton Environmental—based on their experience with stormwater permits, the 2019 Permit did not require permittees to consider climate change and implement changes at the Terminal as a result. Ex. J, Parkman Report at 16, 56; Ex. J, Parkman Dep. at 62:3-19; Ex. T, Bourdeau Report at 2-4. Ex. W, Battles Report at 5-6.

**<u>Response</u>:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects to the inclusion of facts from prior paragraphs. Plaintiff objects that this fact mischaracterizes Mr. Simonetta's testimony. Plaintiff further objects that Mr. Simonetta's statement is hearsay as to what CT DEEP has or has not indicated. Fed. Rules Evid. 801(c). Subject to and without waiving those objections, Plaintiff denies the citations to Defendants' experts testimony references the 2019 Permit.

21. For example, Ms. Bourdeau's opinions were derived (in part) through her direct communications with CT DEEP regarding the issues in this matter. Ex. X, Bourdeau Dep. 2023 at 23:24-24:7.

**<u>Response</u>:** Plaintiff objects that this fact mischaracterizes Ms. Bourdeau's testimony. Plaintiff further objects that Ms. Bourdeau's statement is hearsay as to what CT DEEP has or has not indicated. Fed. Rules Evid. 801(c). Subject to and without waiving those objections, Plaintiff admits in part and denies in part. Plaintiff admits that Ms. Bourdeau talked to a CT DEEP employee while gaining access to a file room at CT DEEP. Plaintiff denies Ms. Bourdeau's

opinions were derived in part through direct communications with CT DEEP regarding the issues in this matter.

22. In 2022 and 2023, P.E. Renee Bourdeau spoke to CT DEEP environmental analyst, Karen Abbott. Ms. Abbot informed Ms. Bourdeau that over the approximately 15 years that she worked for CT DEEP, she was not aware of any SWPPP containing language regarding, or of any permittees considering, the impacts of climate change in the SWPPPs. Ex. X, Bourdeau Dep. 2023 at 23:24-24:7. Ms. Abbott also indicated that she had never prepared a Notice of Violation for any permittees for failure to contain language with respect to climate change in their SWPPPs. Ex. X, Bourdeau Dep. 2023 at 24:8-13.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that this fact mischaracterizes Ms. Bourdeau's testimony. Plaintiff further objects that Ms. Bourdeau's statement is hearsay as to what CT DEEP has or has not indicated. Fed. Rules Evid. 801(c). Subject to and without waiving those objections, Plaintiff admits in part and denies in part. Plaintiff admits that Ms. Bourdeau talked to a CT DEEP employee while gaining access to a file room at CT DEEP. Plaintiff denies Ms. Bourdeau's testimony indicates what Ms. Abbot is not aware of or has not prepared.

23. The United States Environmental Protection Agency ("EPA") also issues a Multi- Sector General Permit ("MSGP") for Stormwater Discharges from Industrial Activities that serves as the general permit for jurisdictions that do not issue their own permits under the CWA National Pollutant Discharge Elimination System ("NPDES") program. *See* EPA, Stormwater Discharges from Industrial Activities, *available at* https://www.epa.gov/npdes/stormwater- discharges-industrial-activities.

**Response:** Plaintiff objects that this fact contains legal conclusions. Subject to and

without waiving this objection, Plaintiff denies the legal conclusions regarding the reasons for and where the MSGP applies, Plaintiff admits as to the fact that EPA issues a MSGP that can serve as the general permit for stormwater discharges from industrial activities in states.

24. During the notice and comment period for EPA's most recent MSGP in 2021, Plaintiff submitted comments to EPA, including comments on the draft MSGP's "climate change" measures, which, like the requirements in CT DEEP's 2025 Permit, require permittees to consider implementing measures to minimize impacts from major storm events. Ex. Y, EPA, MSGP. Plaintiff claimed that the new requirements constituted "prohibited backsliding" because they supposedly narrowed the scope of the 2015 MSGP-arguing that the 2015 MSGP already required consideration of such factors. Ex. Z, 2021 EPA MSGP Response to Comments at 397- 398.

**<u>Response</u>:** Plaintiff denies as stated. Defendants' contention only partially quotes the response to a comment. Plaintiff admits the complete quote was the following: "EPA disagrees that the requirement that operators consider implementing mitigation measures to minimize impacts from major storm events constitutes backsliding. This is a new effluent limitation or condition over the previous permit, and as such not 'effluent limitations which are less stringent' as specified in section 402(o) of the Act or the regulations at 40 CFR 122.44(l)."

25. EPA confirmed that the "requirement that operators consider implementing mitigation measures to minimize impacts from major storm events" was "a new . . . condition over the previous permit . . . ." See Ex. AA, EPA Response to Cmts. (Jan. 15, 2021), at 3397-98. (emphasis added). EPA further stated that "[t]he 2021 MSGP includes this provision . . . for the first time as the 2015 MSGP did not include a similar provision." *Id.* (emphasis added).

**<u>Response:</u>** Plaintiff denies as stated. Defendants' contentions only partially quote the response to a comment. Plaintiff admits the complete quote for sentence one was the following:

"EPA disagrees that the requirement that operators consider implementing mitigation measures to minimize impacts from major storm events constitutes backsliding. This is a new effluent limitation or condition over the previous permit, and as such not 'effluent limitations which are less stringent' as specified in section 402(o) of the Act or the regulations at 40 CFR 122.44(l)." Plaintiff admits that the complete quote for sentence two was the following: "The 2021 MSGP includes this provision to consider implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures for the first time as the 2015 MSGP did not include a similar provision."

26. Other states have recently updated or are updating their NPDES permits to require some consideration of climate change, but these do not apply to the Terminal. Ex. J, Parkman Report at 16-19. For example, the 2023 NY MSGP expressly states that climate change must be considered when designing best management practices to minimize pollutant discharges. Ex. J, Parkman Report at 28. As another example, Rhode Island's 2019 MSGP had no provisions addressing "major storm events," but the 2024 version now does. *Compare* Ex. BB, RIDEM 2019 *with* Ex. CC, RIDEM 2024 at 17-18, Appendix E. Additionally, the Los Angeles Region of the California Regional Water Quality Control Board's 2024 individual NPDES permits include clear requirements for preparing site-specific climate action plans whereas previous ones did not. Ex. J, Parkman Report at 28, 34-35.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects to this statement as presenting legal conclusions about what NPDES permits require in other states, not facts. Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits the New York MSGP, Rhode Island MSGP, and Los Angeles regional permitting authority require

permittees to address climate change and major storm events. Plaintiff denies that requirements to address climate change and major storm events were not within previous or other permits.

27. On October 1, 2025, CT DEEP issued a new General Permit to update and replace the 2019 Permit. The 2025 Permit became effective on November 1, 2025. Ex. R, 2025 Permit. Regulated entities had 180 days to bring their facilities into compliance with the new permit's requirements. *See* CT DEEP, Industrial Stormwater General Permit, https://portal.ct.gov/deep/water-regulating-and-discharges/stormwater/commercial-stormwater.

**Response**: Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits as to the issuance date, effective date, and existence of a period of 180 days of interim permit coverage. Plaintiff denies as to the phrase "to bring their facilities into compliance with the new permit's requirements" to the extent this implies any safe harbor for ongoing violations.

28. On March 11, 2024, in its draft of the new General Permit, CT DEEP described what it referred to as "significant changes" to the 2019 Permit and invited public comment. *See* Ex. EE, November 2024 Fact Sheet at 5. The 2021 Permit was set to expire on September 30, 2024, but the permit was administratively continued until the new 2025 Permit went into effect. Ex. R, 2025 Permit.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits that CT DEEP stated that "There are significant changes to the draft IGP including its format and transition to electronic reporting." Plaintiff admits that CT DEEP invited public comment. Plaintiff denies that these statements were

made "[o]n March 11, 2024, in its draft of the new General Permit."

29. Following publication of the draft permit in 2024, Plaintiff submitted comments to CT DEEP. On May 10, 2024, Plaintiff submitted written comments to CT DEEP stating that "[t]he increase in the minimum acceptable volume requirement for secondary containment areas is a positive change that should remain in the 2025 Permit, and the Undersigned appreciate DEEP's acknowledgement that the minimum volume requirement in the Current Permit is insufficient to guarantee that no overtopping will occur during extreme storm events." Ex. DD, Pl.'s Cmts. at 11.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff denies. The quote provided is not identical to any passage in CLF's May 10, 2024 comments.

30. Plaintiff also proposed "additional changes to the new permit to further protect Connecticut's waters and members of the public" in its comments, which CT DEEP considered and did not adopt in the 2025 Permit. Ex. DD, Pl.'s Cmts. at 13-18; Ex. B, 2025 Permit. For example, Plaintiff requested that CT DEEP require the use of precipitation data to design SWPPPs and stormwater control measures to specifically account for "climate change," recognizing that CT DEEP's draft permit did not require that. Ex. GG, CLF Comments to CT DEEP re: Draft Permit at 514-15. Plaintiff also specifically requested that CT DEEP require consideration of retreat of facilities entirely from the coastline. *Id.* at 15-16. Plaintiff requested the enlargement of the secondary containment areas surrounding storage areas, tanks, and containers. *Id.* at 15.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this

objection, Plaintiff admits in part and denies in part. Plaintiff admits the quote regarding "additional changes…" was in CLF's comments and that CLF proposed additional changes. Plaintiff denies the statement that CT DEEP considered and did not adopt those changes. CT DEEP adopted many of CLF's proposed changes. Plaintiff denies the statement that CLF's comments recognized anything about CT DEEPs draft permit.

31. CT DEEP reissued the draft permit on December 30, 2024 without making any of Plaintiff's suggested changes. *See* Ex. B, CT DEEP, Draft General Permit for the Discharge of Stormwater Associated with Industrial Activities. The notice and comment period lasted from May 13 to May 20, 2025. *See* Ex. F, CT DEEP, Public Notice, General Permit for the Discharge of Stormwater Associated with Industrial Activities, https://portal.ct.gov/deep/public-notices/public-notices-proposed-actions---opportunity-for-comment/proposed-general-permits/proposed-general-permits-archive---pre-2025/general-permit-for-the-discharge-of- stormwater-assoc-with-industrial-activities.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, denies as stated. Plaintiff denies the characterization of permit reissuances and notice and comment periods.

32. In accordance with the new requirements of the 2025 Permit, permittees were required to submit a SWPPP to CT DEEP by April 1, 2026. Ex. R, 2025 Permit at 5.

**Response:** Plaintiff admits.

33. The 2025 Permit for the first time requires that permittees consider "Resilience Measures" that CT DEEP characterizes as a "**new** component . . . added in response to Connecticut's commitment to prepare for ongoing climate changes." *See e.g.*, Ex. R, 2025 Permit, at 39-40; Ex.

EE, November 2024 Fact Sheet at 12; Ex. HH, December 2024 Supplemental Fact at 3; Ex. FF, March 2024 Fact Sheet at 10; Ex. II, April 2024 Supplemental Fact Sheet at 3. (emphasis added).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits that the 2025 Permit includes a section titled "Resilience Measures." Plaintiff denies that the 2025 Permit contains the quote provided by Defendants. Plaintiff denies that the 2025 Permit was the "first time" permittees were required to consider certain climate resilience measures. Whether permittees were required to consider certain climate resilience measures in the 2018 and/or 2021 Permits is a question of **fact**. Judge Meyer has already ruled on that the Best Industry Practice requirement of the permit includes consideration of climate change factors if "the best industry practice is to require consideration of climate change factors." ECF 305, at 86:8–16.

34. The new "Resilience Measures" provisions in the 2025 Permit require permittees to consider prevention and mitigation measures to account for "hurricanes, storm surge, extreme/heavy precipitation, and flood events." *See* Ex. R, 2025 Permit at 39-40.

**Response:** Plaintiff denies that the "Resilience Measures" are "new." Whether such resilience measures were in the 2018 and/or 2021 Permits is a question of fact. Judge Meyer has already ruled that the Best Industry Practice requirement of the permit includes consideration of climate change factors if "the best industry practice is to require consideration of climate change factors." ECF 305, at 86:8–16. Plaintiff admits that page 39-40 of the 2025 Permit states:

> Implementing structural improvements, enhanced/resilient pollution prevention measures, and other mitigation measures can help to minimize impacts from stormwater discharges from major storm events such as hurricanes, storm surge, extreme/heavy precipitation, and flood events. If such SCMs are already in place due to existing requirements mandated by other state, local or federal agencies, the permittee should document in their SWPPP a brief description of the controls and

a reference to the existing requirement(s).

35. CLF acknowledged that CT DEEP's guidance states the "Resilience Measures" are a "new component of the SWPPP," and that "DEEP believes [the climate resilience factors are] a new component." Ex. G, June 4, 2025 Mahoney Dep. ("CLF Dep.") at 175:12-20 and 175:21-176:1.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that the referenced deposition testimony as to what CT DEEP believes is a fact rather than speculation. Subject to and without waiving these objections, Plaintiff admits that its 30(b)(6) witnessed acknowledged that there was a draft interim fact sheet that states "The resilience measures element is a new component of the SWPPP." Plaintiff denies any draft interim fact sheets are "CT DEEP's guidance."

36. The 2025 Permit states that if a particular facility already has such measures in place "due to existing requirements mandated by other state, local or federal agencies," then the permittees should document this in their updated SWPPP. *See* Ex. R, 2025 Permit at 39-40.

**Response:** Plaintiff admits.

37. Neither the 2019 Permit nor the 2025 Permit requires secondary containment berms to serve as flood protection barriers. Ex. P, Permit; Ex. R, 2025 Permit.

**Response:** Plaintiff objects that this is a legal conclusion, not a fact. Subject to and without waiving this objection, Plaintiff denies. Whether the Permit or the 2025 Permit requires secondary containment berms to serve as flood protection barriers is a question of fact.

38. The 2025 Permit incorporates by reference the 2024 Stormwater Quality Manual's ("SQM") "structural control measures [to] help improve the resiliency of industrial facilities to climate stressors, including changing precipitation patterns and extreme weather events." *See* Ex. R, 2025 Permit Fact Sheet (dated October 2025) at 13.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits the modified quote is found in the cited Fact Sheet. Plaintiff denies the references to the date of the SQM, which is different in the Fact Sheet and not specified in the 2025 Permit.

39. The 2025 Permit emphasizes structural control measures from the updated SQM to improve resilience, but the Manual does not mandate any specific responses to any projected sea level rise. *See* Ex. U, 2024 Connecticut SQM at 52 and 555. The SQM was not in effect before 2023 and was not incorporated into the 2019 Permit.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits the 2025 Permit refers to the SQM to improve resilience. Plaintiff denies the SQM does not include specific information regarding sea level rise as it includes extensive discussion on appropriate site design parameters for a variety of contexts including at times inclusion of 50-year planning horizons for some BMPs. Plaintiff denies the SQM not being in effect before 2023 and not incorporated into the Permit. The 2021 Permit included numerous references to the 2004 SQM.

40. The 2004 SQM is the prior version of the 2024 SQM, and it did not require any consideration of climate change in connection with its guidance. Ex. JJ, 2004 SQM.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits that the 2004 SQM does not contain express descriptions of climate change evaluations. Plaintiff denies whether the 2004 SQM "did not require" "any consideration of climate change" "in connection with its guidance," as the 2004 SQM clearly states it is "guidance and are intended to augment, rather than replace, professional

judgment," 2004 SQM at 1-2.

41. The 2024 SQM has an Appendix G - Climate Change Considerations. Table G-1 includes Connecticut's Design Storm Precipitation Approach. *See* Ex. U, 2024 Connecticut SQM at 548.

**Response:** Plaintiff admits.

42. As part of its Resilience Measures, the 2025 Permit states, "If the facility may be exposed to or has previously experienced such major storm events, additional SCMs that may be considered include, but are not limited to" various enumerated measures that should be considered. *See* Ex. R, 2025 Permit at 39-40.

**Response:** Plaintiff admits.

43. One of these Resilience Measures is: "The permittee must document in their SWPPP the considerations made to select and design control measures [with respect to hurricanes, storm surge, extreme/heavy precipitation, and flood events] at their facility to minimize pollutants discharged via stormwater." *Id.* at 40.

**Response:** Plaintiff denies as stated. The bulleted list in the permit describes SCMs. The bracketed inclusion into the quoted language is a permit interpretation not a fact.

44. The 2025 Permit also requires that "The SWPPP must be representative of current site conditions and must address, at a minimum the following elements . . . ." Ex. R, 2025 Permit Fact Sheet Section 7.6.

**Response:** Plaintiff admits the quoted language is contained in the 2025 Permit Fact Sheet but not in the cited section.

45. In accordance with the 2025 Permit requirements, Defendants submitted their new SWPPP which includes a "Resiliency Measures" section. *See* Ex. KK, 2026 SWPPP at 46-54.

**Response:** Plaintiff admits.

46. Plaintiff did not submit any comments or administratively challenge Defendants' 2025 Permit submission.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits CLF did not submit comments or administratively challenge Defendants' submissions. Plaintiff denies that Defendants' submissions to regulatory agencies are agency actions subject to notice and comment rulemaking or otherwise reflect an action of an agency.

47. Not a single weather event or storm during the period of the Permits has damaged the Terminal. Ex. L, Feb. 6, 2025 M. Sullivan Dep. at 322:20-323:12. Nor has Plaintiff identified any weather event or storm that has caused an improper discharge under the CWA.

**Response:** Plaintiff denies as stated. CLF's amended complaint identified weather events that caused improper discharges and damage at the Terminal, which Defendants admitted. ECF 120 ¶¶ 260–62.

48. Neither Plaintiff nor its experts have presented evidence that the Terminal tanks are likely to fail under any particular weather event or identified a mechanism of failure. Indeed, Defendants' experts have shown that due to their ballasting practices (in accordance with EPA BMPs), no tank at the Terminal will fail even if Plaintiff's hypothetical weather events occur. Ex. D, Bayles & Pace Report at 3, 12, 16; Ex. E, Jones Report at 6 stating ("The New Haven Terminal's application of tank ballasting, consistent with EPA (2016) guidance and operational standards, effectively mitigates failure risk during coastal flood events and supports compliance with accepted engineering practice and environmental protection objectives."); Ex. LL, EPA's Region 6 RRT (2016).

**Response:** Plaintiff denies as stated. Both Parties expert reports identify scenarios where the Terminal's tanks could fail and identify various mechanisms of failure. Plaintiff denies the

Terminal has ballasting practices as a requirement of its permit terms or has including any ballasting practices as control measures under the Permit. Plaintiff denies the characterizations of expert opinions are facts or support the statements.

49. In an effort to rebut Plaintiff's chief complaints that Terminal has failed to account for certain factors related to "climate change," Defendants retained expert witness, Craig Jones, Ph.D., a coastal, ocean, and environmental engineer. Ex. E, Jones Report at Appendix A.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits that Defendants retained Dr. Jones. Plaintiff denies the characterization of his hiring, which is unsupported by Dr. Jones report.

50. Dr. Jones modeled several storms, to determine whether potential flooding at the Terminal would overtop the berms, which are at or above 12 feet from the relative datum. During previous storms, including the 2022 Nor'easter, Hurricane Irene, and Hurricane Sandy, the water levels at the Terminal were well below the 12-foot berm height. Ex. E, Jones Report at 43.

**Response:** Plaintiff denies as stated. Dr. Jones' report did not show the secondary containment berms were above 12 feet from the relative datum. Dr. Jones' report did not show modeling of the three listed storms. Of the storms Dr. Jones' purported to model, some were not "well below" a 12 foot level. It is currently the subject of a pending Daubert motion whether Dr. Jones or any of Defendants' experts may rely on modelling purported to be done by Integral Consulting as no expert has been identified as disclosing the modelling work.

51. Dr. Jones modeled a hypothetical 100-year storm, again, the potential flooding levels at the Terminal did not surpass the 12-foot berm height. Ex. E, Jones Report at 58-60. This means potential flooding at the Terminal would not reach the tanks, and therefore, would be unable to have any physical force on the tanks. Ex. E, Jones Report at 60.

**<u>Response</u>:** Plaintiff denies as stated. Dr. Jones' report did not show the secondary containment berms were above 12 feet from the relative datum. Dr. Jones' report did not show that 100-year storms would not surpass a 12 foot level. The citation to Dr. Jones' report does not support the statement regarding physical force on the tanks. It is currently the subject of a pending Daubert motion whether Dr. Jones or any of Defendants' experts may rely on modelling purported to be done by Integral Consulting as no expert has been identified as disclosing the modelling work.

52. CLF's expert, Robert Nairn, agreed with this assessment when he also modeled a hypothetical 100-year storm, finding "peak water levels" at the Terminal would be below the height of the berms that surround the tanks at the Terminal. Ex. MM. Narin at 42.

**<u>Response</u>:** Plaintiff denies as stated. Dr. Nairn's report does not show that 100-year storms would not surpass a 12 foot level.

53. Regardless of these models, the 2019 Permit had no specifically identified requirements regarding flood preparedness. *See generally* Ex. P, 2019 Permit.

**<u>Response</u>:** Plaintiff denies. Whether the Permit requires consideration of a "100-year" or "500-year" flood standard, or use of secondary containment berms as flood barriers are included in the 2018, 2019, or 2021 Permit is a question of fact. The Permit contains a number of requirements tied to 100-year metrics.

54. Because the term "climate change" is not included in the 2019 Permit, Plaintiff contends that the 2019 Permit *implied* a requirement to consider "climate change" in the general requirement that the Terminal implement best management practices that are "technologically available and economically practicable and achievable in light of best industry practice." *See* Ex. G, June 4, 2025 S. Mahoney Dep. at 136:7-21, 140:14-141:14, 148:10-149:25, 176:2-15, 189:21-

190:8.

**Response:** Plaintiff objects because this is Defendants' summary of Plaintiff's legal contentions and argument before this Court, not a statement or contention of material fact. To the extent Defendants seek to elicit facts from the statement of counsel at a hearing, Defendants are still required to provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). They have not done so here. Subject to these objections, Plaintiff denies that Plaintiff used the term "implied," the only usage of "implied" at the October 19, 2023, MPSJ hearing was by Defendants' counsel. The full quote from the hearing on whether climate change is included in the Permit was the following ruling by Judge Meyer:

> So I do conclude that the permit unambiguously imposes a minimization duty that, in turn, references and incorporates best industry practice. If the best industry practice is to require consideration of climate change factors, then the permit includes this requirement despite the absence of more explicit language in the permit about climate change factors. Whether best industry practice is to consider climate change factors is a factual question that I cannot resolve at this time.

Hearing Tr., ECF 305 (Oct. 19, 2023), at 86:8–16. Plaintiff denies that "'climate change' is not included in the Permit." Whether "climate change" is included in the Permit is a question of fact. Plaintiff denies as this is a conclusion of law, not fact.

55. Both Defendants' expert and Plaintiff's expert models show that berms at or above 12 feet are sufficient to address any risks posed by the effects of "climate change." Ex. E, Jones Report at 43, 60; Ex. MM. Nairn at 42.

**Response:** Plaintiff denies as stated. Neither Dr. Jones' report nor Dr. Narin's report state that 12 foot berms are sufficient to address any risks posed by the effects of climate change.

56. A party intending to file a citizen suit under the CWA must specify in its Notice of Intent to Sue ("NOI") the "specific standard, limitation or order alleged to have been violated, the

activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. at § 135(a).

**Response:** Plaintiff objects that this is a conclusion of law, not a fact. Subject to this objection, Plaintiff admits the fact accurately quotes a portion of 40 C.F.R. § 135(a).

57. On July 28, 2020, CLF served an NOI on Defendants. ECF 47-1, Exhibit A to Am. Compl. Plaintiff has twice supplemented its NOI without asserting any new claims, first on February 17, 2021, and again on November 21, 2024. ECF 47-2, Ex. B to Am. Compl.; Ex. M, 2d Supp. NOI.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving objections, Plaintiff admits.

58. These three substantively identical NOIs identified only 11 discrete alleged violations of the CWA, which are as follows: (i) Failure to Eliminate Non-Stormwater Discharges; (ii) Activity Inconsistent with the Coastal Management Act and Causing Adverse Impacts to Coastal Resources; (iii); Unlawful Certification; (iv) Failure to Identify Sources of Pollution Reasonably Expected to Affect the Quality of Stormwater Discharges; (v) Failure to Describe and Implement Practices to Reduce Pollutants and Assure Permit Compliance; (vi) Failure to Implement Measures to Manage Runoff; (vii) Failure to Minimize the Potential for Leaks and Spills; (viii) Failure to Submit Required Facts or Information to CT DEEP; (ix) Failure to Amend or Update the SWPPP; (x) Failure to Identify Discharges to Impaired Waters in SWPPP; (xi) Failure to Conduct Monitoring for Discharges to Impaired Waters. ECF 47-1, Ex. A to Am. Compl. at 9-13; ECF 47-2, Ex. B to Am. Compl. at 9-14; Ex. M, 2d Supp. NOI at 9-14.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph,

in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits the list of 11 alleged violations reflect the sub-headers at the cited pages of the NOIs. Plaintiff denies that the references to these 11 sub-headers fully summarize the contents of the alleged violations.

59. The only claims properly in the case are those in the NOI. The NOI does not allege permit violations based on:

a. Inadequate capacity of secondary containment
b. Permeability of secondary containment areas
c. Low points in secondary containment areas
d. Structural integrity of secondary containment berms
e. Wave attacks on secondary containment berms
f. Bare soil on secondary containment berms
g. Failure to report on secondary containment deficiencies
h. Groundwater infiltration
i. Stormwater pond liner
j. Insufficient stormwater treatment basin
k. Emergency vehicle access for ingress and egress
l. Failure to implement a corrective action plan
m. Failure to apply best industry practice in Defendants' Risk Management Program, or
n. Tank spacing.

ECF 47-1, Ex. A to Am. Compl. At 9-13; ECF 47-2, Ex. B to Am. Compl. At 9-14; Ex. M, 2d Supp. NOI at 9-14.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that "The NOI does not allege permit violations based on" because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects that this fact mischaracterizes the NOIs. Subject to and without waiving these objections, Plaintiff denies. The NOIs clearly describe and cite and quote requirements in the Permit related

to the above paraphrases of violations at the Terminal. Whether the NOIs contains specific references to various claims is a legal contention not a fact. In addition, the NOIs speak for themself.

60. In their Expert Reports and in deposition, Plaintiff's experts asserted various opinions that went beyond the violations Plaintiff alleged in its NOIs, including based on the areas listed above in Paragraph 63. As Defendants have explained, these opinions are inadmissible. *See* ECF 734-1 at 20-24; ECF 743-1 at 31-34; ECF 744-1 at 7-11.

**Response:** Plaintiff objects in that the opinion testimony of experts retained by Plaintiff or Defendants in this case are not "material facts" within the meaning of Fed. R. Civ. P. 56 or D. Conn. L. R. Civ. P. 56(a)(1). To the extent that Defendants are seeking to identify the content of Plaintiff's expert reports as "fact," Plaintiff objects to Defendants' inclusion of several such "facts" in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits that the above list includes some of the violations Plaintiff's experts identified. Plaintiff denies that the references to this list fully summarizes the contents of the alleged violations substantiated in CLF's expert reports, or otherwise established by the evidence in this case.

61. Plaintiff also served NOIs against other entities operating bulk storage facilities in New Haven at the same time. *See* Ex. V, ECF 1-2, *Conservation Law Found. v. Pike Fuels Ltd. Pship,* No. 3:21-cv-00932-SVN (D. Conn.) ("Gulf NOI"); *see also,* Ex. 00, Buckeye NOI.

**Response:** Plaintiff objects this fact is immaterial to any issue in this litigation. Subject to and without waiving this objection, Plaintiff admits in part, and Plaintiff denies in part. Plaintiff admits that Plaintiff served NOIs to other entities operating bulk storage facilities in New Haven. Plaintiff denies that such NOIs were issued "at the same time." The NOI issued to Gulf was dated

July 18, 2020. The NOI issued to Buckeye was dated July 28, 2020.

62. Unlike Plaintiff's NOIs to Defendants, Plaintiff's NOIs to Gulf and Buckeye included alleged CWA permit violations for (1) "Illegal Infiltration of Stormwater"; and (2) "failure to maintain an impervious containment area." *See* Gulf NOI at 13; Ex. 00, Buckeye NOI at 14.

**Response:** Plaintiff objects this fact is immaterial to any issue in this litigation. Subject to and without waiving this objection, Plaintiff admits the Gulf NOI and Buckeye NOI included headings titled "Illegal Infiltration of Stormwater" and "failure to maintain an impervious containment area." Plaintiff admits that the NOIs to Defendants do not contain these headings.

63. In this case, Plaintiff's NOIs were the only notice provided to EPA and CT DEEP of the alleged violations. Ex. G, Mahoney Dep. at 51:23-52:3 and 93:14-94:2.

**Response:** Plaintiff admits that Mr. Mahoney testified that the only notices *that CLF* provided to EPA and Connecticut DEEP are Exhibits 3, 4, and 5 of the deposition. Mahoney Dep. at 93:12-13. The cited deposition testimony does not support the statement that CLF's NOIs were the only notices EPA or CT DEEP has ever received of permit violations at the Terminal. Plaintiff objects that this is a legal conclusion, not a fact and mischaracterizes Mr. Mahoney's testimony. After an objection for legal conclusion, Mr. Mahoney testified that the purpose of the notice of intent letter is "to provide notice an intent to file suit under a statute, here the Clean Water Act and the Resource Conservation Recovery Act, to provide notice to the party alleged to be in violation of these acts." *Id.* at 51:18– 52:3.

64. Plaintiff's NOIs contained "the basis for all of the claims that CLF brought in the complaint." *Id*. at 46:22-47:2.

**Response:** Plaintiff admits in part and denies in part. Plaintiff admits that the quoted language from the deposition is accurate. Plaintiff denies as to "Plaintiff's NOIs contained", as

this portion of the deposition focused on one of CLF's Notice of Intent to File Suit letters, dated July 28, 2020, not all of "Plaintiff's NOIs": "Q. Okay. Now – and you have read through this Notice of Intent to Sue identified as Mahoney No. 3?" *Id.* at 46:1-3.

65. The Terminal's SWPPP outlines procedures for preventing stormwater discharges, including detailed descriptions of site inspections, Control Measures, and monitoring protocols. The SWPPP emphasizes routine inspections, good housekeeping, spill response, and the implementation of structural and non-structural Control Measures to ensure environmental compliance and effective stormwater management. Ex. S, SWPPP (July 10, 2017).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits.

66. The Terminal's Spill Prevention, Control, and Countermeasure ("SPCC") Plan details the procedures for spill prevention, response, and regulatory compliance. It also includes facility operations, storage capacities, and security measures, emphasizing personnel training, inspections, and preventive documentation to minimize oil discharge risks. Ex. PP, SPCC Plan (rev. March 2024).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits.

67. The Terminal's Emergency Response Action Plan ("ERAP"), revised in June 2024, outlines detailed procedures for managing various incidents such as natural disasters, medical emergencies, chemical releases, and spill containment, for a comprehensive emergency response. Ex. RR, ERAP (rev. June 2024).

**Response**: Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits.

68. The Terminal's Facility Response Plan ("FRP") is designed to help personnel prepare for and respond efficiently and effectively to incidents at the Terminal, ensuring compliance with federal, state, and local regulatory requirements and maintaining consistency with the National Contingency Plan and Area Contingency Plans. Ex. QQ, FRP (rev. June 2024).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits as to the general contents of the Terminal's FRP. Plaintiff denies as to the characterization that the FRP "ensuring compliance with federal, state, and local regulatory requirements" as the Terminal's compliance status is a matter of interpretation of those unnamed laws and not a fact.

69. The Terminal adopted its Business Continuity and Storm Action Plan ("BCP"), which details procedures for various operational disruptions and defining roles, responsibilities, and communication protocols. It also outlines phased steps for storm identification, Terminal shutdown, staff evacuation, employee communications, Terminal assessment and start-up, post-hurricane operations, and public relations. Ex. SS, BCP (rev. Dec. 2024).

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits

70. The Terminal's Risk Management Plan (RMP") was prepared in accordance with the EPA's Accidental Release Prevention Provisions (40 C.F.R. Part 68). The RMP identifies

potential accidental hazardous substance release scenarios and evaluates the potential impacts on public health and the environment. The RMP also includes safety measures and maintenance, monitoring, and employee training to prevent accidental releases. Ex. TT, RMP.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff denies as to the first sentence as it is a legal conclusion not fact, Plaintiff admits to the second and third sentences.

71. The Terminal does not discharge into an impaired waterbody. ECF 47, Am. Compl. at ¶ 452.

**Response:** Plaintiff objects to this fact because Defendants failed to support this fact with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2); *Sinaiko Bros. Coal & Oil Co. v. Ethyl Gasoline Corp.*, 2 F.R. D. 305, 306 (S.D.N.Y. Jan. 20, 1942) ("The pleadings are not evidence."). Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. The cited paragraph in the amended complaint states in full that "[t]he Terminal discharges to New Haven Harbor via the City of New Haven's Municipal Separate Storm Sewer System ("MS4")."

New Haven Harbor is listed under section 303(d) of the Clean Water Act as impaired for polychlorinated biphenyls (PCBs), oil and grease, nutrients, and dissolved oxygen, which negatively affect the beneficial use Habitat for Marine Fish, Other Aquatic Life and Wildlife; for enterococcus impeding the beneficial use Recreation; and for fecal coliform impacting the beneficial use Commercial Shellfish Harvesting. CT DEEP, 2022 Integrated Water Quality

Report, at Appendix B-1 (Sept. 15, 2022) https://portal.ct.gov/deep/water/water-quality/water-quality-305b-report-to-congress. Total Maximum Daily Loads ("TMDLs") have been issued for fecal coliform, dissolved oxygen, total nitrogen, and nutrient/eutrophication biological indicators. *Id.* at Appendix B-2 (Waterbodies with Adopted TMDLs (EPA Category 4a)).

The City of New Haven municipal separate storm sewer system maps trace the course of stormwater after its exit from the Terminal. These maps show the pipe in East Shore Parkway where the stormwater basin outfall 001 discharges. There is a tide gate after a turn toward the northwest, beyond which the flow is on the surface. The channel turns toward the west at once and then flows through a discharge structure into New Haven Harbor.

72. Paul Simonetta, a professional engineer licensed in the State of Connecticut, testified that CT DEEP has confirmed that unless specifically notified by CT DEEP, a permittee discharging to an MS4 is not covered by the impaired water monitoring requirements. *See* Ex. K, Simonetta Dep. at 96:10- 99:13.

**Response:** Plaintiff objects that this is a legal conclusion not a fact. Subject to and without waiving this objection, EPA has rejected the notion that a permittee does not need to monitor a discharge into an MS4.

> Finally, EPA received comments and evaluated the proposal under which operators of regulated small, medium, and large MS4s would be responsible for controlling discharges from industrial and other facilities into their systems in lieu of requiring NPDES permit coverage for such facilities. EPA did not adopt this framework due to concerns with administrative and technical burden on the MS4 operators, as well as concerns about such an intergovernmental mandate.

64 Fed Reg 68722, 68782 (12/8/1999). In addition, the permit does not contain exemptions for identifying or monitoring discharges where a discharge is not directly to an impaired water. Plaintiff further objects that Mr. Simonetta's statement is hearsay as to what CT DEEP has or has

not confirmed. Fed. Rules Evid. 801(c). In addition, Mr. Simonetta could not recall how he received this guidance.

> Q:Do you know whether that guidance was over email or phone?
> A:I don't recall.
> Q: Do you know whether that guidance was provided in another case and then you applied it in this case?
> A:It's likely. I mean, the issue is that we've been working with this permit for 11 years now, maybe 12; and I don't know that it's going to be easy to find a communication or a document that specifically details that.
> Q: So you weren't basing that statement about discharges into impaired water on any general permit guidelines; instead, you were basing it off communications several years ago with CT DEEP; right?
> A: Correct.

Simonetta Dep. at 98:25–99:13.

73. Neither CT DEEP nor EPA has ever stated that "best management practices" or "best industry practice" under the 2019 Permit required a climate change or resilience assessment for any Connecticut Terminal. Ex. G, Mahoney Dep. at 270:6-24; Ex. X, Bourdeau Dep. 2023 at 23:24-24:13; Ex. P, 2019 Permit; Ex. Q, 2021 Permit; EPA, National Menu of Best Management Practices BMPs) for Stormwater, https://www.epa.gov/npdes/national-menu-best-management-practices-bmps-stormwater.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff denies. This fact misrepresents the deposition testimony. Mr. Mahoney stated that he was not aware of any documents from EPA or CT DEEP that made reference to climate change in connection with BMPs. *Id.* at 270:6 – 24. In addition, the cited transcript does not mention "resilience assessment" at all.

74. Plaintiff has never asked CT DEEP for its interpretation of the "best management practices" or "best industry practices" language, nor has Plaintiff found any CT SWPPPs that support its interpretation of that language. Ex. G, Mahoney Dep. At 144:5-14 and 228:25-229:16.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff also objects in that this is not a statement of material fact relevant to any issue Defendants propose to brief at summary judgment. Subject to this and the below objections, Plaintiff admits that when asked if CLF ever asked CT DEEP does the term "best industry practice" include an obligation to complete a climate change assessment of a facility permitted under an industrial stormwater permit in Connecticut, Mr. Mahoney testified: "I don't believe CLF has ever asked Connecticut DEEP that question." *Id.* at 144:5–14. Plaintiff objects to the rest of the fact as it is a misrepresentation of the deposition testimony. Plaintiff denies this fact as to testimony regarding inquiries made, as Mr. Mahoney testified that he did not know if CLF had attempted to identify SWPPPs for other facilities along the coast in Connecticut. *Id.* at 228:25–229:16.

75. Neither Plaintiff nor its experts has never performed any independent industry research to support its interpretation of the 2019 Permit. There is no evidence that any company in the petroleum bulk storage industry (or any other industry) considered "climate change" in developing a SWPPP under the 2019 Permit or modified its facility based on any climate resiliency analysis. *See* Ex. G, June 4, 2025 Mahoney Dep. at 187:13-22.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P.

56(a)(1). Plaintiff objects that "independent industry research" is vague and not sufficiently specific. *See* D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving these objections, Plaintiff denies. Whether "climate change" is considered in developing a SWPPP under the permit is a question of fact. Plaintiff's expert reports are and include independent industry research. Plaintiff denies, as this fact is not supported by any evidence.

76. Plaintiff has never conducted a review of SWPPPs for facilities along the coast of Connecticut to review how those facilities analyze the impacts of climate change. *See* Ex. G, June 4, 2025 Mahoney Dep. at 239:19-240:2.

**Response:** Plaintiff denies. This fact mispresents the cited testimony. The testimony stated that somebody at CLF had reviewed SWPPPs for other facilities. Other facts in this filing state that CLF reviewed the SWPPPs and served NOIs on at least two other facilities.

77. None of the SWPPPs that CLF collected from Connecticut Facilities or from CT DEEP pertaining to the 2019 Permit contain climate change or resilience assessments. *See* Ex. G, June 4, 2025 Mahoney Dep. at 190:21-192:8.

**Response:** Plaintiff denies. This fact mispresents the cited testimony. The cited testimony does not reference the 2019 Permit, nor were there any questions or answers related to a review of SWPPPs. The testimony states that CLF has seen SWPPPs with provisions addressing climate change impacts.

78. CT DEEP has never treated failure to plan for sea level rise in a SWPPP as a violation of the 2019 Permit. *Id.* at 200:19-25.

**Response:** Plaintiff denies. This fact mispresents the cited testimony. The question asked was "Has CLF ever identified any notice of violation or notice of potential violation that CT DEEP has issued to any facility in Connecticut that relates to climate change in any way?" Mr.

Mahoney's response was: "I don't know." *Id.* Further, whether there is a violation of the Permit is a question of fact.

79. CT DEEP has taken no enforcement action for failure to conduct a climate change vulnerability assessment and has not cited any permittee for alleged climate-based stormwater violations under the 2019 Permit. Ex. I, Goldsmith Dep. at 116:3–16.

**Response:** Plaintiff denies. This fact misrepresents the cited deposition testimony of one expert witness, and is not supported by any other citation to admissible evidence regarding CT DEEP's enforcement actions. When asked about CT DEEP enforcement action against any permittee under the permit for failure to complete a climate change vulnerability risk assessment, Ms. Goldsmith responded: "I'm not aware of any --- I don't know very much about Connecticut DEEP's enforcement actions from one cause [sic] or another." *Id.*

80. Plaintiff has no evidence that any SWPPP in Connecticut has ever included a climate change risk assessment. *See* Ex. G, Mahoney Dep. at 187:13-188:15 and 215:7-21; Ex. I, Goldsmith Dep. at 55:16-24 and 55:22-56:3.

**Response:** Plaintiff objects to this contention as it is a conclusion of law, not fact. To the extent the contentions in paragraph 80 includes contentions of fact, Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that this fact is speculative as to whether there are any Connecticut SWPPPs that include climate change risk assessments. Subject to and without waiving these objections, Plaintiff denies. The Permit requires climate change risk assessments as an application of duty to minimize pollutants to the best industry practice. This fact misrepresents the deposition testimony. As to CT DEEP and climate change vulnerability analysis, Ms. Goldsmith testified that "I don't believe that Connecticut DEEP made mention of that in any emails or other

correspondence I reviewed." Goldsmith Dep. at 55:16 – 24. Ms. Goldsmith also testified that "she was not aware" if Connecticut DEEP ever asked the Terminal to change any of its practices or procedures involving stormwater at the Terminal. *Id.* at 55:22–56:3. Mr. Mahoney testified he was "not aware of any" and did not think there was a SWPPP in Connecticut that includes requirements to conduct a climate change vulnerability analysis under and industrial stormwater permit. Mahoney Dep. 187:13–22; 188:7–11. Mr. Mahoney testified that he could "not recollect" if there are other states that have such a condition in a SWPPP. Mahoney Dep. 188:12-15.

81. Publicly available Connecticut SWPPPs under the 2011, 2019, and 2021 Permit do not document climate change, storm surge, sea level rise, or extreme precipitation analyses, and CT DEEP is not aware of any such SWPPPs or related enforcement. Ex. T, Bourdeau Report, at 4; Ex. X, Bourdeau Dep. 2023 at 23:24-24:13.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff denies that Ms. Bourdeau's conclusion about publicly available Connecticut SWPPPs is not accurate, reliable, or admissible, as Defendants have not cited any evidence supporting such determinations. Plaintiff denies as hearsay "CT DEEP is not aware of any such SWPPPs or related enforcement." Plaintiff denies that the documents Ms. Bourdeau reviewed did not contain the listed information, as Ms. Bourdeau's characterization of the contents of those documents is hearsay. Plaintiff denies that the testimony is material to Defendants' motion, as Ms. Bourdeau's testimony is irrelevant to the intent of the permitting authority in promulgating the Permit.

82. Plaintiff and its experts did not conduct a survey or other analysis of bulk storage facilities' climate risk practices, and they are unaware of any objective standard requiring climate considerations in facility stormwater operations. *See, e.g.,* Ex. G, Mahoney Dep. 228:25-229:16;

Ex. I, Goldsmith Dep. at 235:19-236:3; 236:19-237:24; 238:6-19; Ex. C, Horner Dep. at 206:9-207:5.

**Response:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff admits that Ms. Goldsmith did not conduct a survey of industry practices in the bulk petroleum storage or any industry, she did not conduct a survey of all petroleum bulk storage facilities in Connecticut, and did not interview or contact other petroleum bulk storage terminals. Goldsmith Dep. 235:19–236:3; 236:12–20; 238:6–19. Plaintiff objects that this contention mispresents the deposition testimony. Mr. Mahoney stated that he did not know if CLF identified SWPPPs for other facilities along the coast and in Connecticut. Mahoney Dep. 228:25–229:16.

83. Plaintiff cannot identify a single SWPPP under the 2019 Permit that would meet the climate related permit terms it seeks to enforce. Ex. G, Mahoney Dep. at 188:7-15; *see also* See Ex. UU, CLF's Responses to Defendants' First Set of RFAs (dated Oct. 16, 2025) at 1-9.

**Response:** Plaintiff objects that this is a legal conclusion, not a fact. Subject to and without waiving this objection, Plaintiff denies. CLF's RFA Responses do not admit the stated fact. Whether a SWPPP under the Permit "would meet the climate related permit terms" is a question of permit interpretation. This fact also misrepresents the deposition testimony. Mr. Mahoney testified that he did not think there was an example of a SWPPP that CLF believes would comply with its interpretation of climate change assessment. Mahoney Dep. at 188:7-15.

84. The adjacent Pike terminal, also did not consider climate change in its SWPPP. Ex. V, *Conservation Law Foundation, Inc. v. Pike Fuels Limited Partnership,* No. 21-cv-00932 (D. Conn) (ECF 356-2).

**Response:** Plaintiff admits.

85. One of the experts in the *Pike* case prepared dozens of Connecticut SWPPPs under the permit and had never included "consideration of climate change factors." *See* Ex. ZZ, Dep. Of C. Escedy at 46:18-47:21; 126:15-129:12, *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.,* No. 3:21-cv-00932-SVN (D. Conn.); Ex. VV, Escedy Report at 2, 4-7, *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.,* No. 3:21-cv-00932-SVN (D. Conn.).

**Response:** Plaintiff objects that Mr. Ecsedy is not an expert witness disclosed in this matter and his report and testimony are not admissible at trial in this action. Fed. R. Civ. P. 26(a)(2), 37(c)(1), 56(c)(2); Fed. R. Evid. 702. Plaintiff objects that Mr. Ecsedy's report is hearsay. Subject to and without waiving those objections, Plaintiff denies. Whether addressing "climate change" risks is included in the Permit is a question of fact.

86. Plaintiff admitted that neither EPA nor CT DEEP, to Plaintiff's knowledge, has stated Defendants violated the 2019 Permit. Ex. G, Mahoney Dep. at 268:4-269:14.

**Response:** Plaintiff objects that this is a legal conclusion, not a fact. Plaintiff objects that this is hearsay as to what EPA or CT DEEP has stated. Subject to and without waiving these objections, Plaintiff denies. This contention mispresents the testimony. Mr. Mahoeny testified that he did not believe "EPA or Connecticut DEEP has communicated to CLF that the Defendants are not operating the facility in – – in compliance with the permit." Mahoeny Dep. at 268:4–16. Mr. Mahoney did not know if either "EPA or [CT] DEEP has ever indicated to defendants that defendants are not acting in accordance with best management practices." *Id.* at 268:17–22.

87. In December 2022, two inspectors from the EPA inspected the Terminal and confirmed it complies with the SPCC regulations and the CWA. Ex. WW, U.S. EPA SPCC Field Inspection and Pan Review Checklist – SOPUS_NHVN00527912.

**Response:** Plaintiff objects as this is a legal conclusion, not a fact. Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits that EPA performed an inspection of the Terminal in December 2022, but Plaintiff denies that the citation to the evidence confirms that Terminal "complies with the SPCC regulations and the CWA."

88. During the term of the permits, the Terminal has not exceeded its water quality benchmark thresholds. *See* Ex. J, Parkman Report, at 46.

**Response:** Plaintiff objects as this is a legal conclusion, not a fact. Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits as to the set of monitoring reports evaluated in the Parkman Report at 46, which states: "The discharge pollutant concentrations monitored and reported to the CT DEEP according to their permit requirements through Discharge Monitoring Reports (Exhibit 11) have all been below permit benchmark concentrations since implementation of the 2017 SWPPP." Plaintiff denies as to a fact that the Terminal "has not exceeded" in any monitoring at any time. Defendants have exceeded benchmark water quality standards in sampling for nitrogen. *E.g.*, ECF 47-9.

89. Although CLF's expert Wendi Goldsmith took samples and tested a stormwater outflow from the Gulf facility in the Port of New Haven in the *Pike* litigation, she did not take any samples or conduct any testing at the Defendants' Terminal. Ex. I, Goldsmith Dep. at 37:7- 21; Ex. H, *Pike*

Goldsmith Dep. at 27:9-14, 34:14-25 *Conservation Law Found., Inc. v. Pike Fuels Ltd. Pship.*, No. 3:21-cv-00932-SVN (D. Conn.).

**Response:** Plaintiff objects that Dr. Goldsmith's expert report and testimony in another matter is not an expert opinion that has been disclosed in this matter and is not admissible. Subject to and without waiving that objection, Plaintiff admits.

90. Plaintiff and several of its experts conducted three site visits to the Defendants' Terminal, and they did not take any samples or conduct any testing of stormwater outflows.

**Response:** Plaintiff objects because this fact is vague regarding "samples" "testing" and does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff denies as this fact does not provide any supporting evidence or define "take any samples or conduct any testing." Experts conducted visual assessments and physical measurements of site features and stormwater infrastructure. Plaintiff admits that several of its experts attended site visits at the Terminal during the litigation and did not take physical water samples to conduct subsequent laboratory testing for pollutants.

91. The stormwater testing conducted at the Terminal pursuant to its monitoring obligations under the 2025 Permit shows its stormwater discharges are still in compliance. Ex. XX, June 2026 Analytical Report; Ex. YY, July 15, 2026 Semi-Annual Benchmark Discharge Monitoring Report.

**Response:** Plaintiff objects that "still in compliance" is a conclusion of law not a fact. Subject to and without waiving that objection, Plaintiff admits in part and denies in part. Plaintiff admits that Defendants' submitted a quarterly stormwater monitoring report. Plaintiff denies that report showed monitoring for all parameters required under the 2025 Permit.

92. The 2019 Permit, the 2025 Permit, and the 2021 MSGP did not incorporate or adopt ASCE24-14 or ASCE24-24 or their "critical infrastructure" definitions. Ex. I, Goldsmith Dep. at 166:15-167:4; 167:4-9.

**Response:** Plaintiff objects that this is a legal conclusion of law, not a fact. Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Plaintiff objects that "have not incorporated" is vague. Subject to and without waiving these objections, Plaintiff denies. This fact misrepresents the deposition testimony. Ms. Goldsmith stated that she was "not aware" as to whether EPA has adopted the ASCE Policy 360 as an example of best industry practice." Goldsmith Dep. at 166:4–17. The cited evidence of deposition testimony also does not refer ASCE24-14, ASCE-24, or "critical infrastructure" definitions, the Permit, the 2025 Permit, or the 2021 MSGP. Therefore, as to these terms, this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3).

93. There is no evidence that Defendants are in any continuing violation of the CWA. *See* EPA, Detailed Facility Report, https://echo.epa.gov/detailed-facility-report?fid=110000491977.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Defendants link without explanation to a website maintained by EPA that summarizes some government actions. Defendants are in continuing violation of a variety of provisions of the Permit. For example, Defendants have never had a full engineers' certification of their SWPPP, which is a continuing violation of Permit section 5(c)(7).

The evidence of Defendants' continuing violation is at least the SWPPP Appendix G limitation on the SWPPP Appendix A certification.

94. CT DEEP has not issued a Notice of Violation to the Terminal during the term of the 2019, 2021, or 2025 Permits. *See* EPA, Detailed Facility Report, https://echo.epa.gov/detailed-facility-report?fid=110000491977.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Defendants link without explanation to a website maintained by EPA that summarizes some government actions. CT DEEP issued Notices of Violation to the Terminal on at least April 23, 2001, July 28, 2006, and May 16, 2023.

95. CT DEEP conducts training, notices, workshops, and hundreds of inspections per year. *See, e.g.,* CT DEEP, Professional Development Workshops, https://portal.ct.gov/deep/education/environmental-education-workshops; CT DEEP, Industrial Wastewater Compliance Assistance, https://portal.ct.gov/deep/water-regulating-and-discharges/industrial-wastewater /compliance-assistance/what-to-expect-from-an-inspection.

**Response:** Plaintiff admits.

96. The University of Connecticut's CIRCA program Sea Level Rise and Storm Surge Viewer shows that under various scenarios the Terminal is not at risk during any of the modelled storms on the site. *See* Ex. Ex. NN, Nairn Dep. Ex. at 19, 20; Ex. N, O'Donnell Dep. at 112:24- 118:3; Ex. N, O'Donnell Dep. Ex. 11.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that

would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Plaintiff objects that there is no foundation as to how the CIRCA program Sea Level Rise and Storm Surge Viewer for how these maps were developed or any expert report on these maps. Subject to and without waiving these objections, Plaintiff denies. When Dr. Nairn was shown screenshots from the CIRCA Mapping Tool (Exhibits 19-1 to 19 -9), he testified that he had "no idea how it [CIRCA Mapping Tool] was developed, what confidence interval they used, what data they used, et cetera, et cetera, so whether they used a model at all." Nairn Dep. 258:1–259:4. Further, Dr. Nairn testified that when he saw the CIRCA maps it was "unfathomable" as to what the maps indicated "given the elevations and the elevation of that storm." *Id*. at 262:4–15. As to Exhibit 20, the CIRCA, Connecticut Sea Level Rise and Storm Surge Viewer, Dr. Nairn testified that this tool uses an historical record to determine return periods, and that this is not common practice within the coastal engineering community. *Id.* at 268:3–269:18. Dr. Nairn testified that using NACCS,

> [T]he area of the base of the berms around this facility ranges from plus 6 to plus 9 feet in the same datum, NAVD88. So they would be under water the 100-year event, let alone the 100-year plus another 1.64 feet, and then the 500-year with 1.64 feet. So there is something seriously wrong with this [CIRCA MAP] in terms of how it has been developed, and it would be that it is just more of a regional model and it is not site-specific.

*Id.* 269:19–270:22. In addition, Exhibit 20 contained a "data disclaimer", which stated "[t]his information is provided with the understanding that it is not guaranteed to be correct or complete and the conclusions drawn from such information are the sole responsibility of the user." *Id.* at 273:17 – 274:9, Exhibit 20.

97. CIRCA published an article in a peer review journal called Coastal Engineering in June of 2021 that showed modeling for extreme storms in Connecticut that included the New Haven Harbor. The article showed no impact on the Terminal using the model they used. *See* Liu, et al.,

"Modeling nearshore dynamics of extreme storms in complex environments of Connecticut," *Coastal Eng'g* (Sept. 2021). CLF's expert James O'Donnell, Ph.D. is a co-author of the article.

**Response:** Plaintiff objects because this fact does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff admits in part and denies in part. Plaintiff admits that Dr. O'Donnell is a co-author of the described article and it was published and titled as stated. Plaintiff denies that "the article showed no impact on the Terminal using the model they used." The article presents a comparison of modeling approaches and their different strengths and weaknesses for predicting different aspects of storm wave behavior. The article does not describe or purport to analyze impacts on the Terminal.

98. There is no evidence of any alleged RCRA violation related to the Terminal. *See* 42 U.S.C. § 6903; 42 U.S.C. § 6972(a)(1)(B); Product placed into storage is not waste. *See* 40 C.F.R. § 261.2 (defining "solid waste" as "any discarded material . . . "); EPA Frequent Questions Related to Hazardous Waste Recycling, the Definition of Solid Waste and Other Exemptions and Exclusions ("Under RCRA, unused products do not become 'waste' until they become 'discarded material.' EPA believes that an unused product becomes 'discarded' when an intent to discard the material is demonstrated."), *available at* https://www.epa.gov/hw/frequent- questions-related-hazardous-waste-recycling-definition-solid-waste-and-other-exemptions.

**Response:** Plaintiff objects that this is a legal contention, not a contention of fact. Plaintiff objects to this contention because Defendants failed to support it with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Plaintiff objects because this contention does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or

(2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Defendants are allegedly in violation of RCRA at the Terminal for causing and contributing to an imminent and substantial endangerment for discarding hazardous substances into the Terminal's soil and groundwater and failing to contain and design the site to account for risks from climate change. NOI, ECF 47-2.

99. The product shipped to and stored at the Terminal is product that will be distributed to customers. For example, the Terminal stores gasoline, diesel fuel, biofuel, and ethanol. *See* Ex. L, Feb. 6, 2025 M. Sullivan Dep. at 12:21-13:21. The Terminal is a storage facility for these products, where they are safely stored and then distributed to customers and end users. *Id.* at 62:15-25.

**<u>Response</u>:** Plaintiff objects to Defendants' inclusion of several facts in a single paragraph, in violation of D. Conn. L.R. Civ. P. 56(a)(1). Subject to and without waiving this objection, Plaintiff admits in part and denies in part. Plaintiff admits that the Terminal stores gasoline, diesel fuel, biofuel, and ethanol and other chemicals, and receives and distributes these fuels and chemicals. Plaintiff denies that these fuels and chemicals are stored safely before their distribution. Defendants are allegedly in violation of RCRA at the Terminal for causing and contributing to an imminent and substantial endangerment for discarding hazardous substances into the Terminal's soil and groundwater and failing to contain and design the site to account for risks from climate change. NOI, ECF 47-2.

100. Plaintiff has not put forward sufficient evidence showing that Defendants failed to use control measures that are technologically available and economically practicable and achievable in light of best industry practice. In other words, Plaintiff has not presented sufficient evidence of what allegedly unimplemented control measures were (1) technologically available (2)

economically practicable, and (3) achievable in light of best industry practice. *See* Ex. P, 2019 Permit, Section 5(b).

**Response:** Plaintiff objects that this is a legal contention, not a contention of fact. Plaintiff objects to this contention because Defendants failed to support it with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Plaintiff objects because this contention does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Plaintiff's expert reports and Defendants' testimony in this case detail consideration of specific climate change risk evaluations, constructing flood walls, raising containment berms, creation of flood barriers, installing impermeable liner, anchoring tanks, and elevating the facility to address risks from climate change and sea level rise. These best industry practices are detailed by both Plaintiff and Defendants with regard to their technological availability, economic practicability, and achievability in light of the best industry practice.

101. There is no evidence that any of Plaintiff's members have been harmed by Defendants' alleged failure to "consider" climate change in their operation of the Terminal. Plaintiff has not submitted any evidence demonstrating that Defendants' purported failure to consider climate change or make climate-change related disclosures in its SWPPPs caused any property or environmental damage or any other tangible consequences.

**Response:** Plaintiff objects that this is a legal contention, not a contention of fact. Plaintiff objects to this contention because Defendants failed to support it with citation to admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Plaintiff objects because this contention does not provide a specific citation to: (1) the affidavit of a witness competent to testify as to the facts at trial, or

(2) other evidence that would be admissible at trial in violation of D. Conn. L.R. Civ. P. 56(a)(3). Subject to and without waiving these objections, Plaintiff denies. Plaintiff produced sworn declarations from its members describing harms due to Defendants' failure to consider and address climate change impacts on pollution and risks to the environment.

## III. PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

102. The 2018/2021 General Permit has the same requirement to implement Best Management Practices to the Best Industry Practice as the 2025 Permit. 2021 Permit § 2 & 5(b); 2025 Permit § 4.2 & 7.

103. The February 17, 2021 NOI cites to violation of the 2018 Permit § 5(b)(9), which requires "an impermeable secondary containment area." NOI, ECF 47-2 at 12; 2018 Permit § 5(b)(9)(A)(i)(2).

104. The NOI cites to violation of the 2018 Permit § 5(b)(9), which requires secondary containment volume of "at least 100% of the volume of the largest tank or container or 10% of the total volume of all tanks and containers in the area, whichever is larger, without overflow from such secondary containment area." NOI, ECF 47-2 at 12; 2018 Permit § 5(b)(9)(A)(i)(2).

105. The NOI describes the Terminal's containment areas, stating in part:

> The Terminal's bulk storage tanks are located in three "Containment Areas," which lie below the surrounding ground level and have rammed earth berms at certain locations around the periphery of the Containment Areas. The containment berms do not surround the entirety of the Containment Areas and have openings in several places. Stormwater from the Terminal flows through a series of catch-basins and pumps into a set of two retention basins. The stormwater from the basins is then manually pumped into the New Haven Municipal Separate Storm Sewer System ("MS4"). The stormwater from the tank farm is not treated before it is pumped into the retention basins. Stormwater from the truck loading rack flows through an oil/water separator before it is pumped into the retention

> basins. The stormwater from the retention basins is not treated before it is pumped to the New Haven MS4. The stormwater flows from the New Haven MS4 directly into New Haven Harbor.

NOI, ECF 47-2 at 3.

106. Triton and Equilon's 30(b)(6) witness testified that the secondary containment area is not completely impermeable. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 234:9–237:5.

107. The Terminal's SWPPP does not confirm that the containment areas are impermeable. Triton Environmental 30(b)(6) Deposition at 95:11–15 (Feb. 16, 2023); Triton Environmental Dep. Ex. 1065 (Appendix D to Facility SWPPP).

108. Section 3(b)(2) of the Permit, Coastal Management Act, which falls under requirements for authorization under the Permit section, states: "Such activity must be consistent with all applicable goals and policies in section 22a-92 of the Connecticut General Statutes, and must not cause adverse impacts to coastal resources as defined in section 22a-93(15) of the Connecticut General Statutes." Permit, ECF 248-5 at 10.

109. The Terminal discharges to the New Haven Harbor. Until 2015, the Terminal's stormwater monitoring reports to CT DEEP identified it as discharging to an impaired waterbody (New Haven Harbor) and included the required additional monitoring. *E.g.*, Stormwater Monitoring Report (Oct. 19, 2011), ECF 47-9 at 3–4.

110. The New Haven Harbor is impaired. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 31:2–15.

111. Triton and Equilon admit they generate hazardous waste at the Terminal. Answer, ECF 120 ⁋ 143, 144.

112. Triton and Equilon admit they store hazardous waste at the Terminal. Answer, ECF 120 ⁋ 145.

113. The Terminal's Remedial Action Plan divides the Terminal site into nine AOCs designated: 1, 2, 3, 4/5, 6, 7, 8, 9, 10. Sovereign Consulting, Inc. Remedial Action Plan Shell New Haven Terminal. Prepared for Shell Oil Products US at 7, 64 Fig. 3 (Dec. 18, 2023) ("2023 Remedial Action Plan") (SOPUS_NHVN00247004).

114. Pollutants in soil and groundwater are above remediation thresholds in each AOC. 2023 Remedial Action Plan at 9–13, 15–18.

115. The Terminal's Remedial Action Plan proposes removing contaminated soil in AOC 1 and 2. 2023 Remedial Action Plan at 28–29.

116. The Terminal's Remedial Action Plan proposes to not remove contaminated soil in AOCs 3-10, but instead hold removal "in abeyance until the terminal is decommissioned and all equipment is removed." 2023 Remedial Action Plan at 27–31.

117. The Terminal is abutted by residential backyards containing children's playsets. Deposition Transcript of Defendants' 30(b)(6) Witness Michael Sullivan (Feb. 6, 2025) at 191:1–16.

118. Defendants admit that in 2016, they determined that constructing flood walls around the Terminal is a "credible/practicable" measure in response to risks from extreme weather. Defs. Rev. Resp. to CLF's RFA 19 (May 6, 2026).

119. Dr. Robert Nairn's expert report includes sections titled "preliminary estimate of required berm crest elevation," "cost estimate of berm protection upgrade," and "other considerations." Nairn Rpt. at 70-74. The "other considerations" section describes a HDPE liner and bentonite clay installation to provide the secondary containment area "a

consistent impermeable system," including description of specific installation details and cost estimates. Nairn Rpt. at 74.

120. Dr. Wendi Goldsmith's and Dr. Robert Nairn's expert reports detail the "floodwall with crest elevation of +15 ft NAVD88" designed by the U.S. Army Corps of Engineers for a site in the New Haven Harbor, and the reports include discussion of applying the same methodology with cost estimates for the Shell Terminal. Goldsmith Rpt. at 48-49; Nairn Rpt. at 63, 70-73; Goldsmith Rebuttal Rpt. at 3.

121. Dr. Wendi Goldsmith's expert report and Dr. Ed Levine's and Dr. Jacqueline Michel's expert rebuttal reports detail a tank containment failure and spill during Superstorm Sandy at Motiva's oil storage facility in Sewaren New Jersey. Goldsmith Rpt. at 50-55; Levine Rebuttal Rpt. at 3, 17-19; Michel Rebuttal Rpt. at 12-14. Dr. Levine's report provides detail on additional measures Motiva took at that facility to protect against future spills. Levine Rebuttal Rpt. at 3, 17-19.

122. Professor Joshua Macey's expert report details that Shell plc "is one of the largest and most profitable energy companies in the world," with its most recent year's revenue at $284.3 billion. Macey Rpt. at 22-24; Professor Macey's rebuttal report includes the opinion that Shell "could clearly have afforded to invest in CWA and RCRA compliance." Macey Rebuttal Rpt. at 4.

Dated: September 15, 2026

Respectfully submitted,

CONSERVATION LAW
FOUNDATION, Inc., by its attorneys

*/s/ James Y. Meinert*

James Y. Meinert (ct31637)
Conservation Law Foundation, Inc.
62 Summer St
Boston, MA 02110

Tel: (617) 850-1744
E-mail: jmeinert@clf.org

Christopher M. Kilian (ct31122)
Anna Tadio (phv208827)*
Conservation Law Foundation, Inc.
15 East State Street, Suite 4
Montpelier, VT 05602
Tel: (802) 223-5992
Tel: (802) 622-3009
E-mail: ckilian@clf.org
E-mail: atadio@clf.org

Kristine S. Tardiff (phv208957)*
Conservation Law Foundation, Inc.
27 North Main Street
Concord, NH 03301
Tel: (603) 573-9144
E-mail: ktardiff@clf.org

Ana McMonigle (ct31370)
Andrea Leshak (phv208945)*
Conservation Law Foundation, Inc.
195 Church Street
Mezzanine Level, Suite B
New Haven, CT 06510
Tel: (203) 298-7692
Tel: (203) 902-2157
E-mail: amcmonigle@clf.org
E-mail: aleshak@clf.org

Chance Raymond (ct31311)
Chance the Lawyer, LLC
650 Poydras Street
Suite 1400 PMB #2574
New Orleans, LA 70130
Phone: (832) 671-6381
E-mail: chancethelawyer@gmail.com

Linda Singer (phv208339)*
Elizabeth Smith (phv208361)*
Mimi Liu (phv208839)*
Devin Williams (phv208833)*
Motley Rice LLC
401 9th St. NW, Suite 630
Washington, DC 20004

Tel: (202) 386-9626
Tel: (202) 386-9627
Tel: (202) 386-9628
Tel: (202) 386-9625
E-mail: lsinger@motleyrice.com
E-mail: esmith@motleyrice.com
E-mail: mliu@motleyrice.com
E-mail: dwilliams@motleyrice.com

Michael Pendell (ct27656)
Motley Rice LLC
One Corporate Center
20 Church St., 17th Floor
Hartford, CT 06103
Tel: (860) 218-2722
E-mail: mpendell@motleyrice.com

Ridge Mazingo (phv208402)*
Shalom Jacks (phv208834)*
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9620
Tel: (843) 216-9013
E-mail: rmazingo@motleyrice.com
E-mail: sjacks@motleyrice.com

Vincent Greene (phv208487)*
Motley Rice LLC
40 Westminster St., 5th Floor
Providence, RI 02903 US
Tel: (401) 457-7730
E-mail: vgreene@motleyrice.com

David K. Mears (ct208829)
Tarrant, Gillies, & Shems LLP
44 East State Street
Montpelier, VT 05602
Tel: (802) 223-1112
E-mail: david@tarrantgillies.com

*Attorneys for Plaintiff*
*Conservation Law Foundation, Inc.*

**Plaintiff admits as Visiting Attorney*