CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER

Conservation Law Foundation

v.

Equilon Enterprises LLC et al.

Case No. 3:21-cv-00933

**EXPERT WITNESS REPORT OF DAVID M. UHLMANN**

**June 23, 2025**

## Introduction

1. I was retained by King & Spalding to evaluate claims against their clients, Equilon Enterprises LLC ("Equilon), Triton Terminaling LLC ("Triton"), and Motiva Enterprises LLC ("Motiva") (collectively, "Defendants"), brought by the Conservation Law Foundation under the Clean Water Act and the Resource Conservation and Recovery Act ("RCRA") and, if requested to do so, to provide expert testimony on behalf of Defendants. Before agreeing to provide an expert opinion in this matter, I advised King & Spalding that I would make no promises about what my opinions would be regarding the merits and the enforceability of Plaintiff's claims against Defendants. King & Spalding and its clients agreed to retain me with that understanding at the rate of $2,250 per hour.

2. This expert witness report summarizes my opinions related to several issues raised by the Amended Complaint filed in this case, as well as expert reports submitted by Plaintiff. My review has focused on Plaintiff's claims regarding the General Permit for the Discharge of Stormwater Associated with Industrial Activity issued in 2018 by the Connecticut Department of Energy and Environmental Protection ("CT DEEP") and reissued in 2021 without any relevant substantive changes (the "2018/2021 General Permit"). The 2018/2021General

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



Permit governed stormwater discharges at a bulk storage fuel terminal located at 481 East Shore Parkway, in New Haven, Connecticut (the "New Haven Terminal").

3. Specifically, I have been asked to opine about Plaintiff's allegations that, at the time the Amended Complaint was filed, Defendants were in violation of a requirement in the General Permit that permittees implement a Stormwater Pollution Prevention Plan ("SWPPP") that includes specific best management practices "to minimize the discharge of pollutants from the permitted facility," where the term "minimize" means "reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice." In addition, I have been asked to opine whether the Defendants created an imminent and substantial endangerment as that term is defined under RCRA through their operation of the New Haven Terminal. Finally, I was asked to opine whether the parent company of Defendants, Shell USA, operated the New Haven Terminal and was responsible for any violations at the New Haven Terminal and whether Shell USA's assets would be relevant in determining the amount of any penalties imposed against Defendants.

4. Based on the information I reviewed, it is my expert opinion that Defendants complied with the enforceable stormwater pollution prevention requirements of the General Permit by implementing a hurricane action plan and adopting other emergency response measures at the New Haven Terminal. In my opinion, from an enforcement perspective, the "best management practices" and "best industry practices" incorporated into the 2018/2021 General Permit did not require Defendants to take the additional climate resiliency measures specified in the Amended Complaint and in an expert report submitted by Plaintiff. It may have been advisable to implement additional climate resiliency measures at the New Haven Terminal—and

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



permit revisions in 2024, for the first time, require specific climate resiliency measures. In my opinion, however, from an enforcement perspective, it would not have been possible to treat those specific climate resiliency measures as best industry practices for petroleum bulk storage facilities at the time the Amended Complaint was filed in 2021. To my knowledge, there has never been a Clean Water Act enforcement action for general permit violations, predicated on the best industry practice language, other than this case and three other similar cases filed by Plaintiff against terminal owners or operators in Massachusetts, Rhode Island, and Connecticut.

5. It is my expert opinion, based on the materials I have reviewed, that Defendants did not create an imminent and substantial endangerment, as that term is defined under RCRA. RCRA creates a cradle-to-grave regulatory scheme for treating, storing, and disposing of hazardous waste. It is my understanding that Defendants were "small quantity generators" of hazardous waste at the New Haven Terminal, based on leaks and spills that occurred occasionally at the facility. But the fuel stored by Defendants at the New Haven Terminal, which is the focus of Plaintiff's imminent and substantial endangerment claims, would only become a solid waste and therefore regulated under RCRA if it were released into the environment. In my opinion, if the legal theory alleged in the Amended Complaint were actionable under RCRA, hundreds if not thousands of facilities across the United States also would be creating imminent and substantial endangerments in violation of RCRA, which is not the intent of the statute.

6. It is my expert opinion, based on the material I have reviewed, that the corporate parents of Defendants, including Shell USA, did not exercise "active" control over operations at the New Haven Terminal, including over day-to-day operations and decisions relating to compliance with the Clean Water Act. Plaintiff also references "Shell plc" in certain reports, but

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



my understanding is that Shell plc is not a defendant in this case. In my opinion, the United States Environmental Protection Agency ("EPA") would not consider the parent companies to be responsible for any violations of environmental statutes and regulations at the New Haven Terminal. In addition, while EPA penalty policies allow for the consideration of the assets of corporate parents when subsidiaries are not adequately capitalized, to my knowledge there is no issue in this case about whether Defendants possess the ability to pay any penalties, if violations had occurred at the New Haven Terminal.

7. All the opinions in this expert witness report are expressed to a reasonable degree of professional certainty based on (a) my experience, which is described below and in the curriculum vitae that is attached as Exhibit 1 to this report, and (b) my review of the materials listed in Exhibit 2.

## Qualifications and Experience

8. I have spent my entire professional career practicing, researching, teaching, and writing about environmental law, with a particular focus on environmental enforcement. I currently am a partner at Marten Law, where my practice focuses on representing state and local governments in their efforts to address climate change and exposure to PFAS and other emerging contaminants; renewable energy companies, utilities, and trade associations in the clean energy space; and corporate clients seeking strategic counsel regarding values-driven solutions to environmental challenges and enhanced ethics, integrity, and compliance programs. Beginning on July 1, I also will be serving as a Visiting Professor of Law at the George Washington

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



University Law School and as a Nonresident Senior Fellow in the Governance Studies Program at the Brookings Institution in Washington, D.C.

9. Before joining Marten Law in May 2025, I served from July 2023 until December 2024 as the EPA Assistant Administrator for Enforcement and Compliance Assurance. While awaiting Senate confirmation as EPA Assistant Administrator, I served as the Deputy Assistant Administrator and a Senior Advisor to the Administrator from September 2022 to July 2023. In these roles, I led approximately 2,800 EPA employees nationwide responsible for criminal, civil, and administrative enforcement and compliance assurance under the federal environmental laws, including the Clean Water Act and RCRA.

10. As EPA Assistant Administrator, I approved the National Enforcement and Compliance Assurance Initiatives for 2024–2027, which included an initiative to address climate change,[1] and EPA's Climate Enforcement and Compliance Strategy ("Climate Enforcement Strategy").[2] I also issued policies designed to enhance strategic coordination between the civil and criminal enforcement programs at EPA[3] and to accelerate the timelines for EPA enforcement

---

[1] David. M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: FY 2024 – 2027 National Enforcement and Compliance Initiatives (Aug. 17, 2023), https://www.epa.gov/system/files/documents/2023-08/fy2024-27necis.pdf.

[2] David M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: EPA's Climate and Enforcement Strategy (Sept. 28, 2023), [hereinafter Climate Enforcement Strategy] https://www.epa.gov/system/files/documents/2024-02/epasclimateenforcmentandcompliancestrategy_1.pdf.

[3] David M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: Strategic Civil-Criminal Enforcement Policy (Apr. 17,

actions to ensure results for communities within meaningful timelines and in a manner that reflected the seriousness of the public health and environmental threats addressed by EPA.[4] During fiscal year 2024, under my leadership, EPA concluded approximately 1,850 civil and administrative enforcement matters nationwide.

11. Prior to my appointment at EPA, I was the Jeffrey F. Liss Professor from Practice and the Director of the Environmental Law and Policy Program at the University of Michigan Law School from 2007 to 2022. My research and advocacy interests included criminal and civil enforcement of environmental laws, corporate accountability, and climate change and sustainability. I testified before Congress about the use of environmental protections to address shortcomings in worker safety laws and redressing environmental harm in settlements. I also lectured widely about corporate crime and the exercise of prosecutorial discretion in cases involving corporate wrongdoing. My views on accountability for the Gulf oil spill and the Volkswagen diesel scandal, the urgency of climate disruption, and the need to promote a sustainable future have been published in the *New York Times*, *The Atlantic*, the American Constitution Society's *Issue Briefs* series, and numerous top law reviews.

12. As a law professor, I also served as Counselor to the Compliance Monitor and Independent Auditor appointed by the Justice Department and EPA in the wake of the

---

2024), https://www.epa.gov/system/files/documents/2024-04/strategic-civil-criminal-enforcement-policy-april-2024.pdf.

[4] David M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: Increasing Case Urgency to Address 21st Century Environmental Challenges (Dec. 19, 2024), https://www.epa.gov/system/files/documents/2024-12/case-urgency-memo_final.pdf.

Volkswagen diesel scandal. I served in that role for 3 1/2 years, advising the Compliance Monitor on the underlying misconduct at Volkswagen and corporate environmental compliance. I made more than 20 presentations to the Volkswagen and Audi boards regarding environmental law in the United States, corporate accountability, and promoting environmental stewardship and an ethical culture. I also advised investors regarding how to assess environmental liabilities in some of the most high-profile cases ever brought under the environmental laws, including the Gulf oil spill, the Anadarko-Tronox litigation, and the Volkswagen diesel scandal. In addition, I testified as an expert witness on environmental enforcement topics.

13. Before joining the faculty at the University of Michigan Law School, I served for 17 years in the United States Department of Justice, the last seven as chief of the Environmental Crimes Section (2000–2007). In that position, I was the top environmental crimes prosecutor in the country and led an office of approximately 40 prosecutors responsible for the prosecution of environmental crimes nationwide. I chaired indictment reviews for cases litigated by our office, which included a thorough analysis of the sufficiency of the evidence, any legal issues and potential defenses, and the proper exercise of prosecutorial discretion.

14. Prior to my selection as Chief of the Environmental Crimes Section, I served as an attorney at every level within the Section, including as an Assistant Section Chief (1998–2000), as a Senior Trial Attorney (1997–1998), and as a Trial Attorney (1990–1997). As an Assistant Section Chief, I supervised litigation, reviewed indictments and plea agreements, led training programs, and served on Justice Department policy committees.

15. I am a fellow in the American College of Environmental Lawyers and a past member of its Board of Regents. I was named a “Conservation Hero” by the Michigan League of

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



Conservation Voters and selected by the University of Michigan to be a Distinguished Faculty Fellow in Sustainability. I received a J.D. from Yale Law School and a B.A. in history and political science with high honors from Swarthmore College. After law school, I clerked for U.S. District Court Judge Marvin H. Shoob in Atlanta, Georgia.

16. I have not testified at trial or by deposition within the last four years.

## Opinions

**Opinion 1: Climate change is a global threat that requires urgent mitigation and resiliency efforts, but the Clean Water Act and RCRA do not contain statutory climate provisions so any climate enforcement under those statutes must be limited to violations of applicable regulations, specific permit requirements, and/or resiliency measures that companies agree to implement as part of settlement agreements.**

17. Climate change is a global threat that demands significant near-term mitigation efforts and economy-wide resiliency measures. But Congress has not amended the environmental laws enacted during the 1970s and 1980s—including the Clean Water Act and RCRA—to add enforceable statutory language that require companies to mitigate climate change and to implement climate resiliency measures. Congress has been content to study the problem[5] and to address climate change through legislation that establishes grant programs and tax incentives to lower greenhouse gas emissions to accelerate transition to a clean energy economy.[6]

18. EPA has taken steps over the last 16 years to address climate change as part of its regulatory authorities under the Clean Air Act, beginning with the finding in 2009 that

[5] *See, e.g.*, Cong. Rsch. Serv., U.S. Climate Change Policy (Oct. 28, 2021), *available at* https://www.congress.gov/crs-product/R46947.

[6] *See, e.g.*, Inflation Reduction Act of 2022, Pub. L. 117-169, 136 Stat. 1818 (2022).

greenhouse gas emissions were endangering public health and the environment.[7] The endangerment finding allowed EPA to regulate greenhouse gas emissions from mobile sources (*i.e.*, cars and trucks)[8] and stationary sources (*i.e.*, power plants and refineries).[9] EPA also has required climate disclosures under the Clean Air Act and other environmental laws.[10]

19. EPA also has begun addressing climate resiliency and encouraging facilities to plan for climate risks.[11] As with climate mitigation, however, Congress has not provided EPA with statutory tools to require climate resiliency efforts, which leaves the Agency limited in its ability to require climate resiliency as part of regulatory programs. These limitations are especially acute in statutes like the Clean Water Act and RCRA, which speak even less directly to climate change than the Clean Air Act.

20. The Clean Water Act and RCRA do not mention climate change, and I do not recall any regulations promulgated by EPA under the Clean Water Act or RCRA that impose

---

[7] Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009).

[8] *See* EPA, Regulations for Greenhouse Gas Emissions from Passenger Cars and Trucks, https://www.epa.gov/regulations-emissions-vehicles-and-engines/regulations-greenhouse-gas-emissions-passenger-cars-and (last updated Feb. 28, 2025).

[9] *See* EPA, Greenhouse Gas Standards and Guidelines for Fossil Fuel-Fired Power Plants, https://www.epa.gov/stationary-sources-air-pollution/greenhouse-gas-standards-and-guidelines-fossil-fuel-fired-power (last updated June 18, 2025).

[10] *See* EPA, Greenhouse Gas Reporting Program (GHGRP), https://www.epa.gov/ghgreporting (last updated May 22, 2025).

[11] *See, e.g.*, EPA, 2024–2027 Climate Adaptation Plan (June 2024), https://www.epa.gov/system/files/documents/2024-06/epas-2024-2027-climate-adaptation-plan-508-compliant.pdf; *see also* EPA, Climate Adaptation Plans, https://www.epa.gov/climate-adaptation/climate-adaptation-plans#previousCAPs (last updated Feb. 12, 2025) (linking to previous Climate Adaptation plans from 2012, 2013, 2014, and 2021).

express requirements relating to climate change on regulated industries. As a result, in my opinion, EPA would not have a basis to allege violations of the Clean Water Act or RCRA based on the failure to plan for climate change, absent regulations that did not exist when the Amended Complaint was filed in 2021 or applicable permits that include specific climate resiliency requirements.

21. Since Plaintiff filed its Amended Complaint, EPA has taken steps to enhance climate enforcement, including imposition of climate resiliency measures as part of settlement agreements. On September 28, 2023, when I served as the EPA Assistant Administrator for Enforcement and Compliance Assurance, I issued EPA's Climate Enforcement Strategy.[12] In that document, I directed "all EPA enforcement and compliance offices to address climate change, whenever appropriate, in every matter within their jurisdiction." Pursuant to the Climate Enforcement Strategy, EPA's enforcement and compliance programs were required to prioritize enforcement and compliance actions to mitigate climate change; include climate adaptation and resilience in "case conclusions" (*e.g.*, settlement agreements) whenever appropriate; and provide technical assistance to state and local partners to achieve climate-related solutions.

22. Significantly, however, EPA's Climate Enforcement Strategy recognized the relative lack of statutory and regulatory requirements relating to climate resiliency, noting that EPA's enforcement and compliance should work to incorporate climate resiliency measures into "agreed upon case resolutions," such as settlement agreements, with regulated entities. EPA did not direct its enforcement and compliance divisions to identify violations of environmental

[12] Climate Enforcement Strategy, *supra* note 2.

statutes and regulations, including the Clean Water Act and RCRA, that were related to entities' failures to adapt to or plan for climate change-related impacts to their operations.

23. In furtherance of the Climate Enforcement Strategy, EPA issued a June 12, 2024, memorandum titled *Addressing Climate Vulnerabilities in Water Enforcement Remedies* ("EPA Water Enforcement Memo")[13] that directed EPA's water enforcement staff to ensure that entities in violation of the Clean Water Act "consider climate change in taking the steps needed to return to, and maintain, compliance" with the Clean Water Act. The EPA Water Enforcement Memo notes that "[s]ettlements resolving CWA … enforcement actions should incorporate the remedial measures necessary to address vulnerabilities to climate change that will ensure long-term compliance" with the Clean Water Act. The EPA Water Enforcement Memo recommends specific resilience and adaptation measures, including several measures related to stormwater, that entities that are in violation of other aspects of the Clean Water Act can implement to address climate change vulnerabilities moving forward.

24. The EPA Climate Enforcement Strategy and the EPA Water Enforcement Memo demonstrate that, through the end of the Biden Administration, EPA's enforcement program only addressed climate resiliency in the context of the Clean Water Act as a settlement term. Despite the fact that climate enforcement was one of my top priorities, EPA did not pursue enforcement

---

[13] Joseph Theis, Acting Director, Water Enforcement Division, Office of Civil Enforcement, Memorandum Re: Addressing Climate Vulnerabilities in Water Enforcement Remedies (June 12, 2024), https://www.epa.gov/system/files/documents/2024-06/addressingclimatevulnerabilitiesinwaterenfremedies.pdf. The EPA Water Enforcement Memo recognizes that "[t]he design of compliance remedies has traditionally been based on historic climate and hydrologic patterns, but historic weather patterns and data are no longer adequate to accurately characterize current or future conditions in light of a changing climate." *Id.* at 3.

actions during my tenure against facilities that did not perform climate assessments or build climate-adaption measures into their long-term planning. To the best of my knowledge, EPA has never taken enforcement action under the Clean Water Act or RCRA based on the failure to pursue climate resiliency measures at a particular facility, as sought by Plaintiff in this case.

**Opinion 2: Clean Water Act general permits requiring best industry practices will be implemented differently across various sectors and will evolve as technology, science, and industries develop and new practices are adopted, which makes them a poor fit for enforcement except in cases where specific practices are well-established in a sector.**

25. The Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[14] The Act prohibits the discharge of a pollutant from any point source into a "water of the United States" except in compliance with a Clean Water Act permit.[15]

26. Clean Water Act permits can impose a variety of requirements. Generally, a permit allows a facility to discharge a specified amount of a pollutant, or combination of pollutants, into a receiving water under certain conditions. Permits must include "effluent limitations," which are restrictions on the quantities, rates, and concentrations of discharged

---

[14] 33 U.S.C. § 1251(a).

[15] *See* 33 U.S.C. § 1311(a) ("Except in compliance with this section and [other sections detailing permitting requirements] of this title, the discharge of any pollutant by any person shall be unlawful."); *id.* § 1362(12) (defining "discharge of a pollutant" to mean "any addition of any pollutant to [a jurisdictional water] from any point source").

pollutants.[16] In addition to effluent limitations, a permit may also impose other requirements, including best management practices to reduce pollution.[17]

27. There are two types of Clean Water Act permits: individual permits and general permits. An individual permit only covers a single facility and is issued to address site-specific conditions at that facility. An individual permit is issued directly to the discharger based on that entity's application for such a permit. A general permit, on the other hand, is developed by the permitting authority to cover an entire class of hypothetical dischargers, often including multiple industrial sectors, and in some cases with nationwide coverage.[18] General permits are developed when the covered dischargers have similar operations and types of discharges.[19]

28. Under the Clean Water Act, EPA can authorize state, tribal, and territorial governments to operate permit programs within their jurisdictions.[20] That authorization enables State, tribal, or territorial governments to perform many of the permitting, administrative, and enforcement aspects of the Clean Water Act—all with EPA oversight. Currently, however, EPA implements the Clean Water Act in New Mexico, New Hampshire, Massachusetts, the District of Columbia, and all U.S. territories other than the U.S. Virgin Islands.[21]

---

[16] 33 U.S.C. § 1362(11)

[17] *See* 40 C.F.R. § 122.44(k)(3).

[18] *See* 40 C.F.R. § 122.28.

[19] *See id.*; *see also Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1183 (9th Cir. 2002) (discussing issuance of general permits).

[20] *Id.* §§ 1342(b), 1362(3), 1377.

[21] *NPDES Permits Around the Nation*, EPA.GOV, https://www.epa.gov/npdes-permits (last updated Feb. 5, 2025).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



29. General permits typically contain broad requirements because they apply to numerous facilities across various industries. Because it would be impossible for EPA or authorized States to address in each general permit every category and type of facility, a general permit must rely to some extent on broader requirements, such as "best management practices," and/or "best industry practices." Best industry practices are not static. They evolve over time as industry develops new technologies, new control measures become economically feasible, and new practices are more widely adopted within a given sector—and recognized by regulators.

30. EPA and the States can enforce the requirements of Clean Water Act general permits, including language regarding best management practices and best industry practices. But best industry practices only are enforceable in limited circumstances. Unlike enforcement of a permit condition that imposes, for example, a numeric limit on the discharge of a pollutant, enforcement of a permit condition that requires adoption of a best industry practice requires a broader analysis that considers whether a specific practice is economically practicable and achievable and the extent to which the practice has been adopted by comparable facilities within the relevant sector. The need for that analysis poses challenges from an enforcement standpoint, since regulated entities only may face penalties for violating the Clean Water Act—or any other statute—when the relevant legal standard can be determined in advance. As a result, best practices typically only are enforceable when there is evidence that they are technologically and economically practicable, and the practices are widely adopted within the relevant industry

sector. To proceed otherwise would violate Constitutional due process requirements regarding fair notice.[22]

**Opinion 3: Plaintiff's expert has provided recommendations about how to increase climate resiliency at the New Haven Terminal, but those climate resiliency recommendations do not rise to the level of enforceable best industry practices, absent evidence that the measures were technologically and economically feasible and the extent to which comparable facilities implemented the measures at the time of the Amended Complaint.**

31. I have reviewed the Expert Report of Dr. Wendi Goldsmith, dated May 8, 2025 (the "Goldsmith Report"), which identifies several measures that Dr. Goldsmith believes would be appropriate to address and mitigate climate risk and/or enhance climate resilience at bulk fuel storage terminals. These include, among other things, to proactively plan for upward trends in weather-related risks and to consider, based on accurate risk modeling, projected climate change impacts over the life of a facility.[23] Even if such measures were optimal, however, they would only rise to the level of enforceable best industry practices when they are adopted widely enough in the relevant sector so that a failure to take such measures would be out of step with what responsible companies in the relevant sector are doing. Moreover, practices that could be deemed

---

[22] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also id.* (explaining that "clarity in regulation is essential to the protections provided by the Due Process Clause"). To ensure due process, "regulated parties should know what is required of them so they may act accordingly; and precision and guidance are necessary so that those enforcing the law do not act in an arbitrary way." *Id.*

[23] *See, e.g.*, Goldsmith Report at 25-26, 31.

**CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER**



"optimal" might not be "best" industry practices because they are not "technologically and economically practicable and achievable" under the 2018/2021 General Permit.

32. To my knowledge, neither EPA nor any other federal or state agency has brought an enforcement action against any entity for failing to implement a best industry practice involving climate resiliency measures. Indeed, as discussed in Opinion 1, neither the EPA nor States with delegated Clean Water Act enforcement authority, including Connecticut, have brought an enforcement action based on a regulated entity's failure to perform a climate assessment or to incorporate climate resiliency measures into a compliance program. Although not dispositive, the absence of such enforcement actions—under any statute, against any entity, in any sector—strongly suggests that there was no enforceable requirement to perform the climate resiliency measures identified in the Goldsmith Report when Plaintiff filed the Amended Complaint.

33. The Goldsmith Report identifies only a handful of instances where other facilities have proposed or engaged in the type of analysis that Dr. Goldsmith believes should have occurred at the New Haven Terminal. It merits emphasis that those facilities either were responding to specific permit requirements absent from Connecticut's 2018/2021 General

Permit[24] or to extreme weather events that caused major operational disruptions.[25] From an enforcement perspective, identifying a few facilities at which a certain measure has been adopted—particularly when those facilities adopted that measure in response to express permit requirements or extreme weather-related incidents not present here[26]—is not enough to show that those measures are best industry practices for purposes of creating an enforceable requirement under the Clean Water Act.

34. In my opinion, before enforcing a permit condition that involves best industry practices, EPA or authorized States would need to identify a group of comparable facilities. Only after doing so could EPA or the State determine whether a particular practice was technically and economically feasible and adopted widely enough to have ripened into an enforceable requirement. In determining a set of comparable facilities, relevant considerations would include the purpose and function of the facility, its size, and its location (including, in the present case, whether it is in a coastal area).

---

[24] Dr. Goldsmith references the "Chelsea Terminal SWPPP which addresses climate change." Goldsmith Report at 34, n.135. The NPDES Permit that required development of that SWPPP, unlike the General Permit that covers the New Haven Terminal, specifically requires that the SWPPP "take future conditions into consideration." *See* NPDES Permit No. MA0001091, at 18. The Chelsea Terminal SWPPP also postdates the 2018/2021 General Permit.

[25] *See, e.g.*, Goldsmith Report at 34 (discussing an investigation of failure mechanisms at Motiva Port Arthur Refinery and Shell's Deer Park, Texas facility and proposals to implement various improvements).

[26] The Amended Complaint in this case discusses only one incident of past storm-related flooding at the New Haven Terminal, which resulted in exceedances at two outfalls. *See* Am. Compl. at 54-55 (discussing storm surge caused by Hurricane Irene in 2011). The Goldsmith Report does not specifically identify any such events.

35. During Plaintiff's Rule 30(b)(6) deposition, Sean Mahoney from the Conservation Law Foundation was asked whether Plaintiff was aware of other facilities in Connecticut that had implemented specific measures related to climate change resiliency. Mr. Mahoney stated that he was not aware of any such facilities.[27] Although not dispositive, the absence of such comparable facilities would be a relevant consideration in determining whether climate resiliency measures were enforceable best industry practices under the Clean Water Act at the time of the Amended Complaint.

36. The climate resiliency measures described by Dr. Goldsmith and Mr. Mahoney are the kind of steps that EPA sought to require as part of settlements under the Climate Enforcement Strategy in 2023 and the Water Enforcement Memo in 2024.[28] But the fact that EPA in 2023 and 2024 sought to require climate resiliency efforts as part of settlement agreements is categorically different from the conclusion that climate resiliency measures were enforceable requirements of the 2018/2021 General Permit, as the Amended Complaint alleges.

37. Despite my belief that federal and state agencies should promote climate resiliency, it is my opinion that the specific steps recommended by Dr. Goldsmith were not enforceable best industry practices when Plaintiff filed the Amended Complaint. My opinion that

---

[27] *See* Mahoney Dep. Tr. (rough transcript), at 279:6-11 ("I'm not aware of—of any other facility—I'm not aware of how any other facility is attempting to address the impacts of sea level rise in Connecticut.")

[28] EPA also encouraged permittees to consider rising sea levels and increased rainfall in the 2021 Multi-Sector General Permit ("2021 MSGP"). Significantly, however, Connecticut did not utilize the 2021 MSGP and even the 2021 MSGP did not require implementation of the climate resiliency measures described by Dr. Goldsmith and Mr. Mahoney.

the climate resiliency measures recommended by Dr. Goldsmith were not enforceable requirements of the 2018/2021 General Permit is reinforced by the fact that EPA and the States have never brought an enforcement action alleging similar violations. Indeed, there is no evidence that comparable facilities implemented climate resiliency measures except when required to do so by specific permit language or in response to extreme weather events that caused major operational disruptions at an individual facility. Those occurrences did not amend the 2018/2021 General Permit or otherwise establish a new enforceable best industry practice.

**Opinion 4: By implementing a hurricane action plan and adopting other emergency response measures at the New Haven Terminal, Defendants addressed climate risks to the extent that they would have been enforceable best industry practices under the 2018/2021 General Permit; the additional climate resiliency steps specified in the Amended Complaint and in the Goldsmith Report were not enforceable terms of the 2018/2021 General Permit.**

38. Based on the materials that I have reviewed relating to operations at the New Haven Terminal, Defendants took a number of steps to address the possibility of extreme weather events at the New Haven Terminal. Defendants instituted a "business continuity plan" and previously implemented a "hurricane action plan" to ensure that the New Haven Terminal was prepared for extreme weather events, including training to prepare for such events. For example, Defendants' Business Continuity and Storm Action Plan ("Business Continuity Plan")[29] directs the facility manager to "work with the Supply Team to evaluate options for tanks that could be impacted by a storm surge event due to low product levels."[30] The Business

---

[29] Shell Trading & Supply Distributions US East Business Continuity and Storm Action Plan (Apr. 2024).

[30] *Id.* at 9.

Continuity Plan outlines several steps that the facility manager can take to protect storage tanks from storm damage, such as increasing the height of product or adding a water bottom to the tank for ballast. The Business Continuity Plan also directs the terminal manager to confirm that the seals between the concrete foundation and the tanks have been inspected on a monthly basis and that the seals are not "compromised or showing signs of deterioration, holes or otherwise areas that water could penetrate between the tank chime and concrete foundation."[31]

39. It is my understanding that the measures implemented by Defendants to prepare for the potential of extreme weather events were similar to those recommended by the EPA Region 6 Regional Response Team.[32] In addition, based on an expert report submitted by Defendants, operators of bulk petroleum storage facilities located in coastal areas appear to have implemented ballasting procedures and other storm preparedness measures that are similar to those in Defendants' Business Continuity Plan described above.[33] From an enforcement perspective, the ballasting procedures and storm preparedness measures that Defendants and other operators of coastal fuel terminals implemented to prepare for the possibility of extreme weather events may have been enforceable best industry practices at the time of the Amended Complaint. But the additional measures identified by Dr. Goldsmith, which are focused on designing and hardening facilities for long-term impacts of climate change, do not appear to have

---

[31] *Id.*

[32] *See* Region 6 Regional Response Team, Flood Preparedness: Recommended Best Practices (Jan. 2016).

[33] Expert Report of Eric Kovich P.E. (June 23, 2023).

been generally accepted or implemented widely enough to be considered enforceable best industry practices.

40. The State of Connecticut has conducted regular inspections at the New Haven Terminal. The State determined that the New Haven Terminal was in compliance with the 2018/2021 General Permit for nearly a decade.[34] Although also not dispositive, these findings by state regulators militate strongly in favor of the view that specific climate resiliency measures were not required best industry practices prior to the filing of the Amended Complaint.

41. On that basis, it is my opinion that Plaintiff has not demonstrated that Defendants failed to conduct their operations in accordance with the enforceable best industry practices for minimizing stormwater discharges caused by storm events. From an enforcement perspective, I do not believe that EPA and the State of Connecticut could have proven that Defendants violated the requirements of the 2018/2021 General Permit, including the best industry practices provision, by not including the long-term design and hardening measures promoted by Dr. Goldsmith, as those measures were not generally implemented by industry at that time. My opinion is reinforced by the other opinions expressed in this report: (a) the Clean Water Act does not contain statutory language addressing climate change; EPA has never alleged that the failure

---

[34] *See* Expert Report of Russ Parkman (June 23, 2025). *See also* Equilon Enterprises LLC (Shell Oil Products US) FRS ID 110070687145 Detailed Facility Report (showing, as of June 11, 2025, no informal or formal enforcement actions within the past five years), *and* Motiva Enterprises LLC FRS ID 110000491977 Detailed Facility Report (showing, as of June 11, 2025, one Clean Air Act compliance violation in 2023, one presumably related informal enforcement action that same year, and no other informal or formal enforcement actions within the past five years) (both reports retrieved from EPA's Enforcement And Compliance History Online (ECHO) database, https://echo.epa.gov/).

to implement climate resiliency measures is a violation of the Clean Water Act; and climate resiliency only has been required by EPA as part of settlement agreements; (b) best industry practices—the only term in the 2018/2021 General Permit that Plaintiff cites to support its claims—are not well-suited to enforcement absent far more compelling evidence than what has been presented by Plaintiff; and (c) Plaintiff's expert report fails to identify climate resiliency measures widely adopted by other coastal fuel storage terminals.

42. It merits emphasis that, while citizen suits can be brought in situations where EPA and the State fail to act, citizen suits cannot be premised on violations that the government cannot enforce. Stated differently, if EPA and the State of Connecticut cannot bring an enforcement action alleging that the failure to perform climate resiliency measures constitutes a violation of the 2018/2021 General Permit, a citizen suit cannot be brought on that basis either. Citizen suits cannot create new obligations or enforce new requirements that do not appear in the Clean Water Act, regulations under the Clean Water Act, or permits issued by EPA or a State under the Clean Water Act.

**Opinion 5: Defendants have not created "an imminent and substantial endangerment" at the New Haven Terminal, as that term is defined under RCRA, because the storage of petroleum products is not regulated under RCRA, and any quantities of petroleum products released during regular operations at the site are too small to present an imminent and substantial endangerment.**

43. The storage of petroleum products is not regulated under RCRA because the petroleum products are not "discarded" and therefore not "solid waste" or "hazardous wastes"

under RCRA.[35] For a RCRA violation to occur at a fuel storage terminal, there would need to be a disposal of petroleum products or other hazardous wastes at the site. While disposal of hazardous waste could occur if a storage tank ruptured, EPA has never taken the position in an enforcement action that the mere storage of petroleum products requires a RCRA storage permit or that a potential fuel tank rupture is somehow prospectively a disposal of hazardous waste under RCRA.

44. Plaintiff seeks to salvage its RCRA claim by alleging that the petroleum stored at the New Haven Terminal constitutes a solid waste "because [Defendants'] failure to address the known imminent risks associated with severe precipitation, extreme weather, storm surge, and sea level rise … will result in release of these products when these foreseeable events inevitably occur." Amended Complaint at 491. Plaintiff also argues that Defendants' "inaction" demonstrates an "intent to discard" wastes. *Id.* In my opinion, Plaintiff's theories are not enforceable violations of RCRA and are inconsistent with RCRA's regulatory scheme. RCRA requires that material must be "discarded" to qualify as a solid waste, not material that may be discarded in the future.

45. Because other materials present at the New Haven Terminal constitute hazardous waste, the New Haven Terminal is categorized as a "small quantity generator" under RCRA. Small quantity generators generate more than 100 kilograms, but less than 1,000 kilograms of hazardous waste per month. For the reasons explained above, Plaintiff's RCRA claim only exists

---

[35] *See* 42 U.S.C. § 6903(27); *id.* at § 6903(5) (a "hazardous waste" is a solid waste with certain characteristics).

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



to the extent that the New Haven Terminal is a small quantity generator and that past discharges of solid waste have occurred at the New Haven Terminal. Because the New Haven Terminal is a small quantity generator, the amount of waste discarded is unlikely to be of a sufficient amount that would pose a substantial threat to the surrounding community or environment.

46. Enforcement based on imminent and substantial endangerment is reserved for the most serious RCRA violations, where substantial harm is already being caused by the unlawful treatment, storage, and disposal of hazardous waste—or those unlawful activities create a substantial risk of harm that meets the legal definition of imminent (*i.e.*, the exposure is taking place, even if the harm may not be immediate). In this case, Plaintiff cannot establish that Defendants are unlawfully treating, storing, or disposing of hazardous waste. The most they allege is that Defendants *may* unlawfully dispose of hazardous waste in the future *if* one of their fuel storage tanks ruptures—and that the public would therefore be endangered. I cannot recall EPA or any State bringing a RCRA enforcement action for imminent and substantial endangerment where there is no present violation of RCRA—and where the imminent and substantial endangerment is so contingent on future events that may or may not occur.

47. Plaintiff's interpretation of imminent and substantial endangerment would expand RCRA to reach conduct that never has been thought to be covered by the statute. Every fuel storage terminal in the United States arguably would be in violation, as would chemical storage facilities in every city and town in the country. Throughout my career, I have advocated for robust enforcement of the environmental laws, including RCRA. But the imminent and substantial endangerment provisions of RCRA do not reach every petroleum facility and every chemical storage facility in the United States without dramatically expanding the statute.

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



48. Nor is there any basis for arguing that small quantity generators present an imminent and substantial endangerment because they could be impacted by severe weather events. There are thousands of small quantity generators in the United States. To construe imminent and substantial endangerment under RCRA to extend to every small quantity generator in the United States would produce absurd results. RCRA was not intended to have such a broad swathe, and EPA and the States never have interpreted RCRA to apply so broadly.

**Opinion 6: There is no evidence that non-party parent corporations exercised the level of pervasive control over the New Haven Terminal that would impose parent company liability nor that the assets of the parent companies here are relevant to any penalties.**

49. I also have reviewed the Expert Report of Professor Joshua C. Macey, dated May 8, 2025 ("Macey Report"). In his report, Professor Macey concludes that "Shell"[36] "carefully monitored and controlled" operations at the New Haven Terminal and exerted control over environmental protocols that go "beyond oversight and supervisory activities common of parent companies whose subsidiaries operate potential environmental hazards." Macey Report, ¶ 48. Professor Macey appears to be trying to establish Shell's corporate liability under the *United States v. Bestfoods* standard, although he does not explicitly state that conclusion.

50. Shell plc was not named as a defendant in this lawsuit, and it is my understanding from the Court's docket that the claims against Shell Petroleum, Inc. and Shell Oil Company in this lawsuit have been dismissed. Thus, it is not clear why Professor Macey's opinions regarding

---

[36] Professor Macey does not define which company "Shell" is, or whether it is a single entity or a conglomerate of related entities. In forming my opinions, I have assumed that Professor Macey is referring collectively to "Shell plc," identified as a non-party in the Amended Complaint, Shell Petroleum, Inc. and Shell Oil Company.

"Shell" are relevant to this matter. Regardless, it is my opinion that, were these entities included as defendants in this lawsuit, they did not exercise the level of control over Defendants' operations that would cause EPA to initiate an enforcement action against them under the Clean Water Act or RCRA.

51. Professor Macey discusses at length policies and guidelines established by "Shell" that were followed at the New Haven Terminal. *Id.* ¶¶ 40-45. In the context of Clean Water Act and RCRA enforcement, however, the existence of, and adherence to, these manuals and policies would not support a conclusion that "Shell" should be held liable as an entity that exercised control over the facility under the standard articulated in *United States v. Bestfoods*. Operators in every industry follow a variety of corporate manuals and guidance, some of which are established by related corporations; others are established by government entities or independent industry organizations (*e.g.*, ASTM standards).[37] In my opinion, from an enforcement perspective, Shell's promulgation of policies and guidelines does not equate to "control over processes" at the facility itself such that Shell was operating the facility and not Defendants.[38] To conclude otherwise, would violate basic notions of corporate separateness and discourage the kind of proactive environmental and climate policies implemented by Shell.

---

[37] *See, e.g.*, Declaration of James Kent Yeates, dated Sept. 9, 2022 ("Yeats Declaration") at ¶ 17 (Shell's "Asset Integrity" process ensured that operators follow "API tank standards").

[38] In his declaration, Mr. Yeates explained that Shell's corporate policies provided a "general framework" for its subsidiaries follow, but did not "set engineering standards for New Haven Terminal or any other asset." *Id.* ¶ 21. *See also id.* ¶ 24 (Shell's HSSE Control Framework "provides a high level framework to the companies in the Shell group as to the identification of risks and the level to which such risks should be managed … but does not prescribe *how* such risks should be managed." (emphasis in original)).

52. Further, the Macey Report repeatedly states that Equilon, not Shell plc, determined how compliance occurred at the New Haven Terminal after Motiva transferred the terminal to Triton:

- "*Equilon* ... required third-party contractors [to] comply with Shell" protocols and contractor safety manuals;
- "*Equilon* made sure vendors and contractors were selected from a list of vendors" maintained by Shell;
- "*Equilon* maintained spreadsheets documenting how Motiva … complied with DEP design standards";
- "*Equilon* … followed Shell's Distribution Global Asset Management Excellence" design manuals.

(Macey Report, ¶¶ 44-45) (emphasis added). Based on the information I reviewed, it appears that Equilon has been the operator (*i.e.*, the permittee) and Triton has been the owner of the New Haven Terminal from May 2017 to the present.[39]

53. In my opinion, the existence of and adherence to Shell corporate policies and guidelines would only be relevant to EPA in developing the civil penalty assessed to a subsidiary that did not possess the financial resources to pay a penalty and would not affect EPA's decision making as to what entity violated a particular statute. It is my understanding that Equilon and Triton possess the financial resources to pay a penalty, if any penalty were warranted. When

[39] *See, e.g.*, Declaration of James Kent Yeates, ¶¶ 1, 3 (Sept. 9, 2022) (stating that since 2017, the New Haven Terminal has been owned by Triton and operated by Equilon, and that since 2017 Motiva has had no interest or involvement in, or control over, the New Haven Terminal); Transcript of Deposition of Brian Evans at 226:15-17 ((30)(b)(6) representative for Triton and Equilon stating: "Equilon is the operator from a legal entity p[er]spective. Triton is the owner.").

CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER



assessing civil penalties, EPA will include an amount, known as the "gravity component," that reflects the seriousness of the violation. Often, EPA will consider a history or "culture" of noncompliance at a facility when analyzing the gravity component and adjust a penalty upward. If EPA had found Clean Water Act violations at the New Haven Terminal, the fact that the operators followed corporate guidelines established by Shell could preclude such a finding and upward adjustment. The existence of Shell's corporate guidelines, however, would not rise to the level of corporate "active" control of a subsidiary that would lead EPA to enforce the statute against the corporate parent as well as a subsidiary.

54. Similarly, in my opinion, Shell plc's corporate revenues and balance sheets are not relevant to this lawsuit. EPA's penalty policy, to the extent it is applicable here, allows EPA and courts to consider a parent entity's assets and revenues in an enforcement action as part of an "ability to pay" assessment for the permittee. A parent entity's financial position may be relevant when the subsidiary is not sufficiently liquid to pay a potential penalty. In this case, in the absence of evidence that Defendants committed an enforceable violation of the Clean Water Act or RCRA, Shell plc's financial position would not be relevant.

David M. Uhlmann

**<u>Exhibit 1</u>: Curriculum Vitae**

**<u>Exhibit 2</u>: Materials Considered**

# Exhibit 1

**DAVID M. UHLMANN**
Marten Law
1747 Pennsylvania Avenue, N.W.
Suite 1250
Washington, D.C. 20006
duhlmann@martenlaw.com

**EXPERIENCE**

***Partner, Marten Law,* Washington, D.C.** (May 2025 to Present)

- Represent state and local governments in their efforts to address climate change and exposure to PFAS and other emerging contaminants. Appointed as Special Assistant Attorney General for the State of Michigan in *United States of America v. Michigan*.
- Counsel renewable energy companies, utilities, and trade associations in the clean energy space and federal grant recipients regarding restoration of environmental funding.
- Advise corporate clients seeking strategic counsel regarding values-driven solutions to environmental challenges and enhanced ethics, integrity, and compliance programs.

***Visiting Professor of Law, The George Washington University Law School,* Washington, D.C.** (July 2025 to Present)

- Scholarship and teaching focused on corporate accountability, climate disruption, and sustainability. Public-facing advocacy and outreach stress need to reclaim bi-partisan support for environmental protection, climate action, and environmental justice.
- Mentorship efforts emphasize promoting public service and public interest careers, as well as strengthening ethics, integrity, and sustainability programs in the private sector. Classes include Environmental Crimes (Fall 2025) and Criminal Law (Spring 2026).
- Appointed to serve at The Brookings Institution as a Non-Resident Senior Fellow in the Governance Studies Program.

***Assistant Administrator, Office of Enforcement and Compliance Assurance,* United States Environmental Protection Agency, Washington, DC** (July 2023 to December 2024)

- Nominated by President Biden and confirmed by the United States Senate to lead EPA enforcement and compliance assurance activities under federal environmental laws.
- Developed National Enforcement and Compliance Assurance Initiatives for 2024-2027, including mitigating climate change, addressing PFAS contamination, and limiting exposure to coal ash contamination, and incorporated environmental justice principles.
- Established first-ever EPA Climate Enforcement and Compliance Assurance Strategy, Strategic Civil-Criminal Coordination Policy, and PFAS Enforcement Discretion Policy for CERCLA Cases.
- Revitalized EPA enforcement after more than a decade of declining budgets, securing first budget increases since 2010 and creating more than 300 new positions. Increased on-site inspections, criminal investigations, cases concluded, and criminal defendants charged.
- Previously served as Deputy Assistant Administrator (February 2023 to July 2023) and Senior Advisor to the Administrator (September 2022 to February 2023).

***Jeffrey F. Liss Professor from Practice; Director, Environmental Law and Policy Program,*** **University of Michigan Law School, Ann Arbor, Michigan** (July 2007 to September 2022)

- Established and directed environmental law and policy program, including environmental scholarship, research, teaching and curriculum, multiple lecture series, conferences, student mentoring, interdisciplinary programs, alumni relations, and fundraising.
- Chair, Dow Postdoctoral Fellowship Program and Distinguished Faculty Fellows in Sustainability (2014-15); Member, Criminal Law Drafting Committee, National Conference of Bar Examiners (2014-Present), Provost Search Committee (2017), Transition Committee for School for Environment and Sustainability (2016-17), and Committee on Academic Programs in Environment and Sustainability (2016).
- Served as Counselor to the Independent Compliance Monitor and Auditor for Volkswagen and Audi (2017-2020); consultant on environmental compliance and corporate crime for multiple cases (2010-2020); and expert advisor for domestic and international investment firms on corporate criminal liability and complex litigation (2010-2020).
- Named 2012 Conservation Hero by the Michigan League of Conservation Voters. Selected as Fellow of the American College of Environmental Lawyers (2012); Distinguished Faculty Fellow for Sustainability, University of Michigan (2013); Honorable Mention, Environmental Law and Policy Annual Review (2014).

***Section Chief*, United States Department of Justice, Environmental Crimes Section, Washington, D.C.** (June 2000 to June 2007)

- Led national environmental crimes program, developed enforcement strategy and initiatives, briefed senior administration officials, and supervised prosecutions by the Environmental Crimes Section, including approval of all indictments and plea agreements. Established litigation priorities with United States Attorneys, EPA, the FBI, the Coast Guard, and other federal, state, and local law enforcement agencies.
- Coordinated national policy, training, and legislative proposals for federal environmental criminal enforcement program, including testimony before the United States Sentencing Commission. Chaired the Environmental Crimes Policy Committee of the United States Department of Justice. Served as spokesperson on environmental criminal enforcement.

***Assistant Section Chief*, United States Department of Justice, Environmental Crimes Section, Washington, D.C.** (February 1998 to June 2000)

- Supervised casework of litigating group, mentored new attorneys, coordinated activities with United States Attorneys, investigating agencies, and EPA's National Enforcement Investigations Center. Responsible for budget and financial issues, training, and hiring.
- Lead counsel in *United States v. Allan Elias*, involving a worker who suffered permanent brain damage due from cyanide poisoning, which resulted in longest sentence ever imposed for environmental crimes. Case chronicled in *The Cyanide Canary*.
- Co-lead counsel in *United States v. Browning Ferris, Inc. et al.*, which involved case of first impression regarding illegal discharges from medical waste treatment facility and resulted in establishment of precedent-setting environmental compliance program.

***Senior Trial Attorney and Trial Attorney*, United States Department of Justice, Environmental Crimes Section, Washington, D.C.** (December 1990 to February 1998)

- Prosecuted individuals and corporations for violations of federal environmental statutes throughout the United States. Established environmental crimes task forces. Trained federal, state, and local prosecutors and investigators; supervised law student program.
- Lead counsel in first environmental justice criminal trial (*US v. Williams),* first criminal trial involving the Justice Department's voluntary disclosure policy and EPA's environmental audit policy (*US v. Morrell et al.)*, and first major criminal prosecution for illegal disposal of hazardous waste on public lands *(US v. Pacific Enterprises)*.

***Judicial Law Clerk,* The Honorable Marvin H. Shoob, United States District Court for the Northern District of Georgia, Atlanta, Georgia** (September 1988 to September 1990)

***Teaching Assistant,* Professor Drew S. Days, III, Yale Law School, New Haven, Connecticut** (August 1987 to January 1988)

## EDUCATION

**Yale Law School**, New Haven, Connecticut, J.D. 1988
Articles Editor, *Yale Law and Policy Review*; Moot Court Director

**Swarthmore College**, Swarthmore, Pennsylvania, B.A. 1984
High Honors in History and Political Science; Phi Beta Kappa
Editor-in-Chief, *The Phoenix*, the Swarthmore College Student Newspaper

## ARTICLES AND PUBLICATIONS

"21st Century Environmental Challenges and Revitalizing EPA Enforcement," *ABA SEER Trends* (January 2024)

"New Environmental Crimes Project Data Shows That Pollution Prosecutions Plummeted During the First Two Years of the Trump Administration," Environmental Crimes Project (October 2020)

"Back to the Future: Creating a Bipartisan Environmental Movement for the 21st Century," Environmental Law Reporter 50, no. 10 (October 2020).

"The Climate Crisis Is Still a Crisis," *The Atlantic* (August 2020)

"BP Paid a Steep Price for the Gulf Oil Spill, But for the US a Decade Later, It's Business as Usual," *The Conversation* (April 2020)

“Prosecutorial Discretion and Environmental Crime Redux: Charging Trends, Aggravating Factors, and Individual Outcome Data for 2005-14,” 8 *Mich. J. Envtl. “& Admin. L.* 297 (2019)

“Trump Wants to Weaken Clean Water Rules,” *The New York Times* (Op-Ed, December 12, 2018)

“The Trump Administration’s Orwellian SAFE Vehicles Rule,” *ACSblog,* American Constitution Society for Law and Policy (October 30, 2018)

“Prosecutorial Discretion and Environmental Crime: Updated Environmental Crimes Project Data,” *American Bar Association,* (October 2017)

“Undermining the Rule of Law at the EPA,” *The New York Times* (Op-Ed, October 4, 2017)

"Protection of the Environment Through Criminal Law: An American Perspective," AIDP 2016 World Conference Proceedings (November 2016)

“Vengeance,” *The New York Times* (Op-Ed, October 17, 2016)

"Environmental Protection Through Law: The Role of Corporate Criminal Prosecution," JUS, 1 (2016) 023-048 (July 2016)

“The Essential Role of Community Service in Addressing the Harm Caused by Environmental Crimes and Other Regulatory Offenses” (written testimony), U.S. House of Representatives, Subcommittee on Regulatory Reform, Commercial, and Antitrust Law (April 2016)

“Can the Flint Prosecutions Succeed?” *The New York Times* (Op-Ed, April 23, 2016)

“The Pendulum Swings: Reconsidering Corporate Criminal Prosecution,” 49 *U.C. Davis L. Rev.* 1235 (April 2016)

“Justice Falls Short in G.M. Case,” *The New York Times Sunday Review* (Op-Ed, September 20, 2015)

“Reconsidering Corporate Criminal Prosecution,” *The Columbia Law School Blue Sky Blog* (August 19, 2015)

“Prosecutorial Discretion and Environmental Crime,” *45 ELR 10081* (August 2015)

“Prosecutorial Discretion and Environmental Crime,” *ABA SEER Trends* (July/August 2015)

“Environmental Law, Public Health, and the Values Conundrum,” *3 Mich. J. Envtl. “& Admin. L. 231* (2014)

“Prosecutorial Discretion and Environmental Crime,” *38 Harv. Env’t L. Rev 159* (2014)

“Prosecution Deferred, Justice Denied,” *The New York Times* (Op-Ed, December 14, 2013)

"The Erosion of Corporate Criminal Liability," *ACSblog,* American Constitution Society for Law and Policy (December 10, 2013); *The Columbia Law School Blue Sky Blog* (November 6, 2013)

"Deferred Prosecution Agreements and Non-Prosecution Agreements and the Erosion of Corporate Criminal Liability," 72 *Md. L. Rev* 1295 (Symposium Issue) (2013)

"Toward A Sustainable Future: An Environmental Agenda for the Second Term of the Obama Administration," published in *Toward A More Perfect Union: A Progressive Blueprint for the Second Term,* American Constitution Society for Law and Policy (January 2013).

"The Quest for a Sustainable Future and the Dawn of a New Journal at Michigan Law," 1 *Mich. J. Envtl. & Admin. L.* 1-17 (2012).

"Just Say No to Deferred Prosecution in the Gulf Oil Spill Criminal Case" (interview) published in 26 *Corporate Crime Reporter* 12 (March 16, 2012).

"For 29 Dead Miners, No Justice," *The New York Times* (Op-Ed, December 9, 2011).

"After the Spill Is Gone: The Gulf of Mexico, Environmental Crime, and the Criminal Law," 109 *Mich. L. Rev.* 1413-61 (2011).

"The REINS Act: A Future Without Environmental, Health, and Safety Protections," *ACSblog,* American Constitution Society for Law and Policy (February 25, 2011)

"BP, Manslaughter, and the Case Against Deferred Prosecution" (interview) published in 25 *Corporate Crime Reporter* 8 (February 16, 2011)

"Crimes on the Gulf," *Law Quadrangle Notes,* Vol. 53, No. 2 at 31-32 (Fall 2010)

"Fighting Crimes Against the Earth" (interview) published in *The Yale Politic* (September 2010)

"Prosecuting Crimes Against the Earth," *The New York Times* (Op-Ed, June 4, 2010)

"Environmental Crime Comes of Age: The Evolution of Criminal Enforcement in the Environmental Regulatory Scheme," 2009 *Utah L. Rev.* No. 4, 1223-1252 (2009)

"Keeping America's Promise of a Safe Workplace: The Need for Stronger Criminal Penalties to Deter Violations of the Occupational Safety and Health Act" (written testimony), United States House of Representatives, Committee on Education and Labor (April 2009)

"Combating Global Climate Change: Why A Carbon Tax Is a Better Response to Global Warming Than Cap and Trade," 28 *Stan. Envt'l L.J.* No. 1, 3-50 (2009) (with R. Avi-Yonah)

"Strengthening the Criminal Provisions of the Worker Safety Laws to Protect America's Workers," 3 *Advance J. Am. Const. Soc. Issue Groups* 191-201 (2009)

"Deferred Prosecutions, Worker Endangerment, and Environmental Crimes During the Bush Administration" (interview) published in 22 *Corporate Crime Reporter* (June 9, 2008)

"Working Wounded," *The New York Times* (Op-Ed, May 27, 2008)

"Strange Bedfellows: The Expansion of the Environmental Crimes Program During the Bush Administration," Volume 25, *Environmental Law Forum*, Number 3 (May/June 2008)

"The Prosecution of Worker Endangerment Cases and the Need for Stronger Criminal Provisions of the Worker Safety Laws to Protect America's Workers" (written testimony), Senate Committee on Health, Education, Labor, and Pensions (April 29, 2008)

"Environmental Crimes 2005: A Review of Initiatives and Major Prosecutions by the United States Department of Justice's Environmental Crimes Section" submitted for the ABA's 20th Annual National Institute on White Collar Crime in San Francisco, California (March 2006)

"Effective Closing Arguments in Environmental Cases" submitted for the ABA's 34th Annual Conference on Environmental Law in Keystone, Colorado (March 2005)

## SPEECHES AND PRESENTATIONS

"Who Holds Polluters Accountable When EPA 'Pauses' Its Enforcement Program" presented to ELPC Thinks Webinar, Environmental Law and Policy Center (May 2025)

"Michigan's Environmental Crisis" presented to Lunch and Learn Speaker Series, Michigan League of Conservation Voters (May 2025)

Keynote Presentation, "Past Is Not Prologue: Environmental Enforcement Under President Biden and What the Future Holds Under President Trump," 2025 Minnesota Environmental Institute, Minneapolis, Minnesota (April 2025)

Keynote Address, "The Future of Environmental Enforcement," 2025 Villanova Environmental Law Journal Blank Rome LLP Symposium, Villanova, Pennsylvania (February 2025)

"21st Century Environmental Challenges and Revitalizing EPA Enforcement" presented to the National Association of Manufacturers, Washington, D.C. (October 2024)

Keynote Address, American Conference Institute, PFAS Regulation, Compliance, and Litigation, New York, New York (May 2024)

Featured Speaker, Steel Manufacturer's Association, Environment Committee, Washington, D.C. (May 2024)

Keynote Address, The Association of Air Pollution Control Agencies, Spring Meeting, Indianapolis, Indiana (April 2024)

Keynote Panel, "Federal Environmental Enforcement in 2024" presented to American Law Institute, Environmental Law Conference, Washington, D.C. (February 2024)

Featured Speaker, Baker Botts' 37th Annual Environmental, Safety and Incident Response Seminar, Houston, Texas (February 2024)

Keynote Address, American Fuel & Petrochemical Manufacturers, Environmental Conference, San Antonio, Texas (October 2023)

Keynote Address, American Bar Association, Section on Environment, Energy, and Resources, Fall Meeting, Washington, D.C. (October 2023)

Featured Panelist, "Environmental Enforcement: Policies, Priorities, and the Rule of Law," the Federalist Society, Washington, D.C. (June 2023)

Keynote Panel, "Environmental Enforcement – Developments, Directions, and Trends" presented to American Law Institute, Environmental Law Conference, Washington, D.C. (February 2023)

"Can the Biden Administration Reverse the Decline in Pollution Prosecutions During the Trump Years?" presented to the District of Columbia Bar (March 2021)

"Climate Justice and Sustainability" presented to the University of Michigan, Central Student Government Fireside Chat Series (February 2021)

"Back to the Future: Creating a Bi-Partisan Environmental Movement for the 21st Century" presented to the Rotary Club of Ann Arbor (January 2021).

"Who Calls the Shots? Enforcement in the Midst of Federal Deregulation" (panel discussion), presented to the ABA Section on Environment, Energy, and Resources Fall Conference (October 2020)

"Environmental Protection Apocalypse: What's Happening at the EPA" (interview), *Science Friday* (May 2020)

"Drawing a Line: When Should Violations of Environmental Law Trigger Criminal Prosecution?" (panel discussion), presented to ABA National Enforcement Conference, Washington, D.C. (November 2019)

"The Future of the EPA" (panel discussion), presented to the annual conference of the Society of Environmental Journalists, Fort Collins, Colorado (October 2019)

"A Conversation with former Massachusetts Governor Deval Patrick on Climate Change and Sustainability," presented at the University of Michigan Law School (September 2019)

"Welcoming Remarks for Climate in Peril Conference: Averting Climate Catastrophe Through Law and Social Change," presented at the University of Michigan Law School (April 2019)

"Back to the Future: Reclaiming Bi-Partisan Support for Environmental Protection and Climate Action," presented at the University of Michigan Law School (March 2019)

"How to Improve Environmental Law," presented at the annual conference of the American College of Environmental Lawyers, Jackson, Wyoming (October 2018)

"Corporate Prosecution of Environmental Crime," presented to the Pritzker Northwestern School of Law Environmental Law Colloquium, Chicago, Illinois (March 2018)

"Environmental Enforcement During the Trump Administration," presented to Dorsey Whitney Federal Enforcement Conference, Washington, D.C. (December 2017)

"Parallel Proceedings: Trends in Civil and Criminal Environmental Enforcement" (panelist) presented to the 25th Anniversary of the ABA Section of Environment, Energy, and Resources Fall Conference, Baltimore, Maryland (October 2017)

"The Fate of Environmental Law During the Trump Administration" presented to the University of New Mexico Law School, Continuing Legal Education Institute (September 2017)

"Corporate Prosecution of Environmental Crime" presented to the University of New Mexico Law School, Faculty Colloquium Series (September 2017)

"A Panel Discussion with the Clinton, Bush, and Obama EPA General Counsels" (moderator) presented to the University of Michigan Law School (September 2017)

"The Fate of Environmental Law During the Trump Administration" presented to the National Press Foundation, Washington, D.C. (June 2017)

"A Panel Discussion with the Chiefs of the Environmental Crimes Section from 1987-2017" (moderator and panelist), presented to the University of Michigan Law School (March 2017)

"Advancing Environmental Sustainability in the Trump Era" (panelist), presented to the SNRE Dean's Speaker Series, University of Michigan (January 2017)

"Climate Change and Environmental Protection in the Trump Administration" presented to the Distinguished Faculty Fellows Program, University of Michigan (January 2017) and the Environmental Law and Policy Program, University of Michigan Law School (November 2016)

"Prosecutorial Discretion and Corporate Environmental Crime" presented to EPA Criminal Law Conference, Denver, Colorado (October 2016)

"Landmark White-Collar Crime Trials in Wake of Major Disasters" (panelist) presented to ABA Section of Environment, Energy, and Resources, Washington, D.C. (September 2016)

"A Panel Discussion with the Clinton, Bush, and Obama AAGs for Environment" (moderator), presented to the University of Michigan Law School (September 2016)

"U.S. Environmental Criminal Enforcement" presented to the Second AIDP World Conference, the Protection of the Environment Through Criminal Law, Bucharest, Romania (May 2016)

"Environmental Law in the U.S.: Principles, Regulations, and Institutions" presented to National University of Political Studies and Public Administration, Bucharest, Romania (May 2016)

"The Pendulum Swings: Reconsidering Corporate Criminal Prosecution" presented to the University of Michigan, Department of Psychology, Decision Consortium (December 2015) and the Wharton Legal Studies Program, University of Pennsylvania (November 2015)

"Hot Topics in Wildlife Protection Laws" (moderator) presented to ABA Section of Environment, Energy, and Resources, 23rd Fall Conference, Chicago, Illinois (October 2015)

"Criminal Prosecution of Environmental and Worker Safety Violations in Chemical Disasters" (panelist) presented to the University of Houston Law Center (October 2015)

"The Volkswagen Scandal: Degrading the Environment and Bilking Consumers" presented at Yale Law School (October 2015) and UCLA School of Law (November 2015)

"Experiences in Engagement" presented to the Michigan Meeting: Academic Engagement in Public and Political Discourse, University of Michigan, Ann Arbor, Michigan (May 2015)

"Competing Visions of a Sustainable Future" (conference organizer), University of Michigan Law School, Ann Arbor, Michigan (April 2015)

"Climate Change and the Law" presented to the School of Natural Resources and the Environment, University of Michigan, Ann Arbor, Michigan (March 2015)

"Gulf Oil Spill Litigation Update" presented to the Environmental Defense Fund and the University of Michigan Law School Informal Faculty Lunch Series (September 2014)

"Environmental Regulation: A Tax Approach" presented to Tax Research Center (OFC Osservatorio Fiscale e Contabile) of Bocconi Business School together with the Master in Green Management, Energy and Corporate Social Responsibility, Milan, Italy (June 2014)

"The Expressive Function of Corporate Criminal Liability" presented at the Universita Cattolica del Sacro Cuore conference on Environmental Protection Through Law, Milan, Italy (June 2014)

"Prosecutorial Discretion and Environmental Crime" presented to the Universita Cattolica del Sacro Cuore, Milan, Italy (June 2014)

"The Promise and the Peril of the Natural Gas Boom for U.S. Sustainability Efforts" presented to University of Michigan Law School alumni event in Rome, Italy (June 2014)

"Prosecutorial Discretion and Environmental Crime" presented to the American Law Institute, Criminal Enforcement of Environmental Laws Course of Study, Washington, D.C. (June 2014)

"Combating Global Climate Change Reprised: the Continuing Case for a Carbon Tax" presented to the University of Michigan, School of Natural Resources and Environment (March 2014)

"Deferred Prosecution Agreements and the Erosion of Corporate Criminal Liability" presented to the American Constitution Society, University of Michigan Law School (March 2014)

"Prosecutorial Discretion and Environmental Crime" presented to the Postdoctoral Fellows and Distinguished Faculty Fellows in Sustainability at the Graham Environmental Sustainability Institute, University of Michigan (October 2013).

"Prosecutorial Discretion and Environmental Crime" presented at Harvard Law School, Cambridge, Massachusetts (October 2013).

"Environmental Protection and Public Health Values" (moderator), Environmental Law and Public Health Conference, University of Michigan Law School (September 2013).

"A Discussion with EPA Administrator Gina McCarthy" (moderator), Environmental Law and Public Health Conference, University of Michigan Law School (September 2013).

"The Environmental Crimes Project: An Empirical Study of Criminal Cases Investigated by the EPA" presented to the Environmental Law Institute, Washington, D.C. (July 2013).

"Environmental Law at the Crossroads: The Quest for a Sustainable Future" Osher Lifelong Learning Institute, Distinguished Lecture Series, University of Michigan (May 2013)

"Deferred and Non-Prosecution Agreements" (panelist) presented at the Corporate Crime Reporter Conference "Neither Admit Nor Deny: Corporate Crime in the Era of Deferred Prosecutions, Consent Decrees, Whistleblowers & Monitors," Washington, D.C. (May 2013)

"Pathbreaking Sustainability Research: the Michigan Environmental Crimes Project" presented to the President's Advisory Group, University of Michigan (April 2013)

"Toward a Sustainable Future: An Environmental Agenda for the Second Term of the Obama Administration" presented to the American Constitution Society and the Environmental Law Society, University of Michigan Law School (March 2013)

"The Gulf Oil Spill After Three Years" presented to the Environmental Law Society, University of Michigan Law School (February 2013)

"The Michigan Environmental Crimes Project: An Empirical Study of Criminal Cases Investigated by the EPA" presented to the Fawley Lunch Series, University of Michigan (February 2013), and the Faculty Colloquium Series, University of Colorado (October 2012)

"The Gulf Oil Spill Litigation" (Keynote Address) presented to the American Law Institute and Environmental Law Institute Clean Water Act conference, Washington, D.C. (September 2012)

"Enforcing Health, Safety, and Environmental Requirements" (panelist) presented at the University of Maryland's Ward Kershaw Symposium, "Too Big to Jail: The Roadblocks to Regulatory Enforcement," (September 2012)

"25 Years of Environmental Law" (moderator) presented to the 25th Annual Conference of the National Association of Environmental Law Societies, University of Michigan (March 2012)

"The BP Blowout and the Pending Prosecution: Was It a Crime" presented to the 17th Annual Tulane Environmental Summit, Tulane Law School, New Orleans, Louisiana (March 2012)

"After the Spill Is Gone: The Gulf Oil Spill, Environmental Crime, and the Criminal Law" presented to the Osher Life Learning Institute, University of Michigan (December 2011)

"Settling a Clean Air Act Case" and "Ethical and Professional Responsibility Issues in Clean Air Act Cases" presented to ALI-ABA "Clean Air: Law, Policy, and Practice Course of Study" (cosponsored by the Environmental Law Institute), Washington, D.C. (December 2011)

"A Gulf Oil Spill Enforcement Primer for Journalists" presented to the Knight-Wallace Scholars, University of Michigan (October 2011)

"The New Environmental Landscape: Legislation, Regulation, and Enforcement" presented to ABA Section of Environment, Energy, and Resources, Indianapolis, Indiana (October 2011)

"Government Policies and Their Impact on Energy Deals" presented to Mayer Brown's Energy and Infrastructure Seminar, Chicago, Illinois (May 2011)

"Gulf Oil Unplugged" presented to University of Michigan Risk Science Center (April 2011)

"Industries for a Sustainable Future: Green Technology and Big Business in Michigan" (moderator) presented to Michigan Telecommunications and Technology Law Review Symposium, "Green Technology and Economic Revitalization in Michigan" (March 2011)

"Global Climate Change and Public Nuisance Litigation" presented to American Constitution Society and Federalist Society Supreme Court Preview, Ann Arbor, Michigan (March 2011)

"The Gulf Oil Spill: Criminal Fines, Civil Penalties, and Natural Resource Damages for the Worst Environmental Disaster in U.S. History" presented to the Graham Environmental Sustainability Institute, External Advisory Board, Ann Arbor, Michigan (October 2010)

"Criminal and Civil Penalties for the Gulf Oil Spill" presented to the University of Michigan Law School, Dean's Advisory Council, Ann Arbor, Michigan (October 2010)

"Keeping America's Promise of a Safe Workplace: OSHA Reforms for the 21st Century" (Keynote Address) presented to American Industrial Hygiene Association, Professional Conference on Industrial Hygiene, Fort Worth, Texas (October 2010)

"Environmental Crimes: Real Crimes, Real Victims" (Keynote Address) presented to National Center for Victims of Crime Annual Conference, New Orleans, Louisiana (September 2010)

"Environmental Crime: Polluters, Justice and Sustainability" presented to the Goodwin-Niering Center for Conservation Biology and Environmental Studies, Connecticut College (April 2010)

"Climate and Energy" (panelist) presented to University of Michigan, Sustainability Teach-In (March 2010)

"Resource Exploitation and Renewable Energy" (moderator) presented to University of Michigan Asia Law Society Symposium, "Doing Business in Asia Without Selling Your Soul: Corporate Social Responsibility and its Influence on the Rule of Law" (March 2010)

"Go With the Flow: Reflections on Water and People" (panelist) presented to Marquette University Law School Conference, Milwaukee, Wisconsin (February 2010)

"Environmental Crime Comes of Age: The Evolution of Criminal Enforcement in the Environmental Regulatory Scheme" presented to the Erb Colloquium, University of Michigan Ross School of Business and School of Natural Resources and the Environment (January 2010)

"Global Challenges and Opportunities for the 21st Century: Climate Change" presented to Swarthmore College Alumni Weekend (June 2009)

"Carbon Tax It or Trade It?" presented to the Tulane Environmental Law Summit, Tulane University Law School (April 2009)

"Environmental Crime Comes of Age: The Evolution of Criminal Enforcement in the Environmental Regulatory Scheme" presented to the University of Utah S.J. Quinney College of Law, Law Review Symposium (January 2009)

"Unsafe at Work: The Need for Stronger Criminal Penalties to Promote Compliance with Worker Safety Laws and Protect America's Workers" presented to The University of Michigan's Center for Occupational Health and Safety Engineering (January 2009)

"Protecting America's Workers: The Need for Stronger Criminal Penalties for Violations of the Occupational Safety and Health Act" presented to American Industrial Hygiene Association, Academy of Industrial Hygiene, Tampa, Florida (November 2008)

"After the Cyanide Canary" presented to the Michigan Difference Seminars in Chicago, Art Institute of Chicago (May 2008)

"Panel Discussion on Alternative Energy" (moderator) presented at the Gerald R. Ford School of Public Policy, University of Michigan (co-sponsored by School of Natural Resources and Environment and the University of Michigan Law School) (March 2008)

"Environmental Crimes in the New Millenium" (moderator) presented to the Public Interest Environmental Law Conference at the University of Oregon (March 2008)

"Focus the Nation: Confronting Global Climate Change" (moderator) at the University of Michigan (January 2008)

"Freedom from Oil" (panelist) presented to the Dean's Lecture Series, School of Natural Resources and Environment, University of Michigan (October 2007)

"Interview with Former DoJ Environmental Crimes Chief" presented to the ALI-ABA Criminal Enforcement of Environmental Laws Course of Study in Washington, D.C. (October 2007)

"Environmental Crimes Take Center Stage" (moderator) presented to the ABA's 36th Annual Conference on Environmental Law in Keystone, Colorado (March 2007)

"Introduction to Environmental Crimes" presented to the ABA Section on Energy, Environment and Resources Teleconference Program on Environmental Enforcement Issues (October 2006)

"Environmental Crimes: The Government's View" presented to the ALI-ABA Criminal Enforcement of Environmental Laws Course of Study in Washington, D.C. (May 2006)

"Successes and Challenges for Environmental Prosecutions" presented to the Office of Legal Education's Advanced Environmental Crimes Seminar in Columbia, South Carolina (May 2006)

"Environmental Crimes in the New Millennium" (moderator) presented to the ABA's 20th Annual National Institute on White Collar Crime in San Francisco, California (March 2006)

"A Discussion with the Government's Top Environmental Crimes Prosecutor" presented to the DC Bar Association's Brown Bag Luncheon Program in Washington, D.C. (December 2005)

"Hot Topics: The Justice Department's Worker Endangerment Initiative" presented to the ABA Section on Energy, Environment and Resources 13th Fall Section Meeting in Nashville, Tennessee (September 2005)

"Overview of Criminal Enforcement" presented to the 2005 Midwest Region Environmental Conference in Kansas City, Missouri (April 2005)

"Criminal Enforcement for Prosecutors and Investigators" and "Vessel Pollution" workshops presented at the 7th International Conference on Environmental Enforcement and Compliance in Marrakesh, Morocco (April 2005)

"Attorney Client Privilege Waivers in Environmental Crimes Prosecutions" presented to the ABA Section on Energy, Environment and Resources Teleconference Program (March 2005)

"Closing Arguments in Environmental Cases" presented to the ABA's 34th Annual Conference on Environmental Law in Keystone, Colorado (March 2005)

"Environmental Crimes, Worker Safety, and Beyond" presented to the ALI/ABA Criminal Enforcement of Environmental Laws Course of Study in Washington, D.C. (October 2004)

"Policies Governing Plea Agreements for Environmental Crimes" presented to the ABA's 18th Annual National Institute on White Collar Crime in Miami Beach, Florida (March 2004)

"Trends in Environmental Crimes" (Keynote Address) presented to the ABA Environmental Prosecution and Defense Conference in New Orleans, Louisiana (January 2004)

"What Law Enforcement Regards as an Effective Compliance Program" presented to the Practicing Law Institute (PLI) Corporate Compliance Seminar in New York, NY (June 2003, June 2002), Chicago, Illinois (May 2003), and San Francisco, CA (July 2002)

"How Environmental Crimes Policies Are Implemented After 9/11" presented to the ALI/ABA Criminal Enforcement of Environmental Laws Course of Study in Washington, D.C. (May 2003)

"Proving Mental State in Environmental Prosecutions" presented to the Office of Legal Education's Basic Environmental Crimes Seminar in Columbia, South Carolina (May 2003)

"Trends and Priorities in Prosecution of Environmental Crimes" presented to the State Bar of Michigan Environmental Law Section in Detroit, Michigan (November 2002)

"Federal Criminal Enforcement: How Times Have Changed" presented to the Environmental Law Institute and Allegheny County Bar Association Criminal Enforcement of Environmental Laws Seminar in Pittsburgh, Pennsylvania (September 2002)

"Trends in Defense Strategies" presented to the Office of Legal Education's Advanced Environmental Crimes Seminar in Columbia, South Carolina (May 2002)

"Case Study: United States v. Allan Elias" presented to the National Association of Attorneys General (NAAG) National Training Conference in Denver, Colorado (February 2002)

"Luncheon Address: Environmental Crimes After September 11th" presented to the ABA Environmental Prosecution and Defense Conference in Houston, Texas (January 2002)

"Charging Decisions in Environmental Criminal Cases" presented to the ALI/ABA Criminal Enforcement of Environmental Laws Course of Study in Washington, D.C. (November 2001)

"Environmental Criminal Enforcement Panel Discussion" presented to the ABA's 15th Annual National Institute on White Collar Crime in San Francisco, California (March 2001)

"Priorities for the American Environmental Crimes Program" presented to Interpol's Fourth Annual International Environmental Crimes Conference in Lyon, France (November 2000)

"Luncheon Speaker: Role of the United States Department of Justice in State and Local Prosecution Efforts" presented to the Midwest Environmental Enforcement Association, 52nd Membership Training Conference in Barrie, Ontario (October 2000)

# Exhibit 2

# Materials Considered

Documents Related to Litigation in *Conservation Law Foundation, Inc. v. Shell Oil Co. et al.*, No. 3:21-cv-933 (D. Conn)

- Supplemental Notice of Intent to Sue (Feb. 17, 2021)
- Amended Complaint (Feb. 11, 2022), Dkt. 47
- Order Denying Defendants' Motion to Dismiss (Sept. 16, 2022), Dkt. 111
- Transcript of Hearing on Defendants' Motion for Partial Summary Judgment (Oct, 19, 2023)
- Expert Report of Wendi Goldsmith (May 8, 2025)
- Expert Report of Professor Joshua C. Macey (May 8, 2025)
- Transcript of (30)(b)(6) Deposition of Conservation Law Foundation (Sean M. Mahoney) (June 4, 2025)
- Expert Report of Russ Parkman (June 23, 2025)
- Expert Report of Eric Kovitch P.E. (June 23, 2025)
- Declaration of James Kent Yeates
- Transcript of Deposition of Brian Evans

Additional Documents

- CT DEEP General Permit for the Discharge of Stormwater Associated with Industrial Activity (effective date Oct. 1, 2021)
- David. M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: FY 2024 – 2027 National Enforcement and Compliance Initiatives (Aug. 17, 2023),
- David M. Uhlmann, Assistant Administrator for Enforcement and Compliance Assurance, EPA, Memorandum Re: EPA's Climate Enforcement and Compliance Strategy (Sept. 28, 2023)
- Joseph Theis, Acting Director, Water Enforcement Division, Office of Civil Enforcement, Memorandum Re: Addressing Climate Vulnerabilities in Water Enforcement Remedies (June 12, 2024),
- Shell Trading & Supply Distributions US East Business Continuity and Storm Action Plan (April 2024)
- Shell Trading & Supply Distribution Operations US East Hurricane Action Plan (March 2020)
- Region 6 Regional Response Team, Flood Preparedness: Recommended Best Practices (Jan. 2016)
- Echo Detailed Facility Report - Motiva
- Echo Detailed Facility Report - Equilon
- Chelsea Terminal SWPPP (cited in Goldsmith Report at page 34 n.134 as SOPUS_NHVN02367286.

- 2024 CT DEEP Draft General Permit for the Discharge of Stormwater Associated with Industrial Activities (General Permit No. CTR050000)
- National Pollutant Discharge Elimination System General Permit for the Discharge of Stormwater Associated with Industrial Activity Draft Fact Sheet (Nov. 2024)
- Shell Oil Products US - New Haven, CT - Stormwater Pollution Prevention Plan (SWPPP) DRAFT (Dec. 20, 2024)
- US EPA NPDES Mult-Sector General Permit (MSGP) for Stormwater Discharges Associated with Industrial Activity (effective date Sept. 29, 2021)