UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., *Plaintiff,* -against- EQUILON ENTERPRISES LLC *doing business as* SHELL OIL PRODUCTS US, TRITON TERMINALING LLC, and MOTIVA ENTERPRISES LLC, *Defendants.* | **OMNIBUS MEMORANDUM & ORDER** 3:21-CV-933 (VDO) |

**VERNON D. OLIVER**, United States District Judge:

The plaintiff, Conservation Law Foundation, Inc. ("CLF"), a nonprofit corporation dedicated to the conservation and protection of New England's public health, environment, and natural resources, brought this citizen enforcement action under the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA") for alleged unlawful conduct at a bulk storage and fuel terminal located in New Haven, Connecticut (the "Terminal"). Pending in this action are one RCRA claim and eleven CWA claims against three companies, Equilon Enterprises LLC d/b/a Shell Oil Products US ("Equilon"), Triton Terminaling LLC ("Triton"), and Motiva Enterprises LLC ("Motiva") (collectively, "Defendants").[1] Plaintiff seeks declaratory and injunctive relief, as well as the imposition of civil penalties to "remedy" Defendants' alleged violations of federal law, including the following:

> (1) [Defendants'] past and ongoing failures to comply with Connecticut Industrial Stormwater Permit (currently registered as No. GSI002800) (the

[1] *See* Am. Compl., ECF No. 47; Stipulation of Dismissal, ECF No. 527; Order, ECF No. 529.

> "Permit"), and the Clean Water Act; (2) the … facility's location in a floodplain and improperly managed susceptibility to washout of solid waste, which poses a hazard to human life, wildlife, and land and water resources; (3) [Defendants'] past and present contribution to handling, storage, treatment, transportation, or disposal of solid and hazardous wastes, which may present an imminent and substantial endangerment to health or the environment in violation of RCRA; and (4) [Defendants'] failure to operate and maintain its facility to minimize the possibility of a fire, explosion, or any unplanned release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment.[2]

Plaintiff raises its claims under the CWA pursuant to two versions of the Permit: The 2011 General Permit and the 2021 General Permit. The 2021 General Permit presently governs (the "Current Permit"). Plaintiff's claims rest on Section 5(b) of the Current Permit. That Section lays out thirteen "Best Management Practices,"[3] which the Permit requires that "the permittee [] implement to minimize the discharge of pollutants from the permitted facility."[4] None of those thirteen practices explicitly discusses climate change.[5]

The Plaintiff argues, however, that the requirement to consider climate change is incorporated through the Best Management Practices reference of the term "minimize," which it defines in the next sentence: "The term 'minimize' means reduce and/or eliminate to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice."[6] More specifically, Plaintiff argues that consideration of climate change is and has been an industry best practice, so failure

---

[2] ECF No. 47 ¶ 1.

[3] Ex. G to Mot. to Stay, ECF No. 585-7 at 19–23.

[4] *Id.* at 19.

[5] *Id.* at 19–23.

[6] *Id.* at 19.

to consider climate change in responding to each of the thirteen best management practices would violate the Current Permit's requirement to "minimize . . . in light of best industry practice" the discharge of pollutants.[7] The Current Permit requires that entities engaged in industrial activity and subject to the permit create Stormwater Pollution Prevention Plans for each site which "include records and documentation of compliance with [best management practices] and shall be kept on-site at all times along with a copy of this general permit. The permittee shall maintain compliance with the Plan thereafter."[8]

The parties have filed a flurry of motions to preclude testimony by each side's witnesses. For the reasons set forth below, the Court rules as follows:

- Plaintiff's motion to exclude the testimony of Susan Bodine is **granted in part** and **denied in part**;
- Plaintiff's motion to exclude the testimony of Deborah French-McCay is **denied**;
- Plaintiff's motion to exclude the testimony of Craig Jones is **granted in part** and **denied in part**;
- Plaintiff's motion to exclude the testimony of David Uhlmann is **granted in part** and **denied in part**;
- Plaintiff's motion to exclude the testimony of Renee Bourdeau is **denied**;
- Defendants' motion to exclude the testimony of Edwin Levine is **granted**;
- Defendants' motion to exclude the testimony of Jacqueline Michel is **denied**;
- Defendants' motion to exclude the testimony of James O'Donnell is **granted in part** and **denied in part**;
- Defendants' motion to exclude the testimony of Bruno Pigott is **granted**;

[7] *See* ECF No. 47 ¶¶ 422–426.

[8] ECF No. 585-7 at 24.

- Defendants' motion to exclude the testimony of Joshua Macey is **granted in part** and **denied in part**;
- Defendants' motion to exclude the testimony of Matthew Barlow is **denied**;
- Defendants' motion to exclude the testimony of Richard Horner is **denied**;
- Defendants' motion to exclude the testimony of Phillip Pasteris is **granted**;
- Defendants' motion to exclude the testimony of Wendi Goldsmith is **granted in part** and **denied in part**;
- Defendants' motion to exclude the testimony of Robert Nairn is **denied.**

## I. PROCEDURAL HISTORY

This action was commenced on July 7, 2021.[9] The operative complaint is the Amended Complaint filed on February 1, 2022.[10] On September 16, 2022, Judge Merriam granted in part and denied in part a motion to dismiss.[11] Specifically, Judge Merriam dismissed counts 12 and 14 against all defendants, and dismissed all claims asserted against Motiva, other than Claim 13.[12] Defendants filed an answer on October 7, 2022.[13] On February 11, 2025, the parties stipulated to dismiss Shell Oil and Shell Petroleum.[14] Therefore, the claims between Plaintiff CLF and Defendants Equilon, Triton, and Motiva remain pending.[15]

[9] *See* Compl., ECF No. 1.

[10] *See* ECF No. 47.

[11] *See* Order, ECF No. 111 (*Conservation L. Found., Inc. v. Shell Oil Co.*, 628 F. Supp. 3d 416 (D. Conn. 2022)).

[12] *See generally id.*

[13] Answer, ECF No. 120.

[14] *See* ECF Nos. 527, 529.

[15] Joint Notice, ECF No. 1009 at 2 ("The claims remaining in this matter against Equilon Enterprises LLC d/b/a Shell Oil Products US, and Triton Terminaling LLC are Counts I – XI and XIII. The claim remaining in this matter against Motiva Enterprises LLC is Count XIII.").

In 2023, Defendants filed a Motion for Partial Summary Judgment.[16] That motion argued that, as a matter of law, the Current Permit did not require consideration of climate change because the Current Permit did not explicitly discuss consideration of climate change, that the "industry best practice" term did not add affirmative requirements, and pointed to other evidence to argue that the Permit did not require consideration of climate change.[17] Judge Meyer, then presiding over the action, denied the motion.[18] Judge Meyer held that the term "industry best practice" as used in the definition of "minimize" in fact adduced additional requirements, and further held that whether consideration of climate change was an "industry best practice" remained an issue of material fact that could not be resolved as a matter of law.[19]

The deadline for the parties to "designate any trial experts and provide opposing counsel with reports from retained experts pursuant to Fed. R. Civ. P. 26(a)(2) on any issues as to which they bear the burden of proof" was May 8, 2025.[20] Plaintiff disclosed seven expert reports on May 8, 2025, and Defendants did not disclose any reports at that time.[21]

The deadline for the parties to disclose "all rebuttal expert reports, with a limited exception for two of Plaintiff's rebuttal experts," Dr. Horner and Dr. Goldsmith, was July 22, 2025.[22] On June 23, 2025, Defendants disclosed thirteen expert reports on non-burden of proof

---

[16] *See* Mot. for Partial Sum. J., ECF No. 248.

[17] *See id.*

[18] Order Denying Mot. for Partial Sum. J., ECF No. 302; Tr. of Oral Arg. on Mot. for Partial Sum. J., ECF No. 305.

[19] ECF No. 302.

[20] Order, ECF No. 582.

[21] Status Rep., ECF No. 698 at 2.

[22] Order, ECF No. 662.

issues, and CLF did not disclose any reports at that time.[23] On July 22, 2025, CLF disclosed seven rebuttal reports, including four from newly designated rebuttal experts.[24] Plaintiff then disclosed the rebuttal reports of Dr. Horner and Dr. Goldsmith on July 25, 2025 and August 1, 2025, respectively.[25]

## II. LEGAL STANDARD

### A. Daubert

Federal Rule of Evidence 702 provides that a qualified expert "may testify in the form of an opinion" if the proponent of the expert demonstrates to the Court that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "This standard requires district courts to look carefully at the qualifications and methodology of each expert." *Rutledge v. Walgreen Co.*, 182 F.4th 168, 184 (2d Cir. 2026)

District courts perform a "gatekeeping" function in deciding whether an expert's testimony is admissible under Rule 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), one that operates within the "liberal standard of admissibility" embodied by Rule 702. *See Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005). In defining the gatekeeping role of the Court, the Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the

---

[23] ECF No. 698 at 2.

[24] *Id.* at 2–3.

[25] *Id.* at 3.

trier of fact. *Id.* at 396–97. Put another way, "Rule 702 governs the admissibility of expert testimony: the expert must be qualified, his testimony must be helpful, and his conclusions must derive from reliable principles and methods." *Structured Asset Sales, LLC v. Sheeran*, 120 F.4th 1066, 1077 (2d Cir. 2024).

Whether the witness is "qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert" is a "threshold matter" that courts consider before analyzing the relevance and reliability of the testimony itself. *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (citing *Nimely*, 414 F.3d at 396 n.11). A witness is qualified where he or she has "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). However, the Second Circuit has indicated that an expert's knowledge need not be perfectly tailored to the facts of the case. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81–82 (2d Cir. 1997). "If an expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Tardif v. City of New York*, 344 F. Supp. 3d 579, 598 (S.D.N.Y. 2018).

If an expert meets the threshold requirement of qualification, the Court then must determine whether the expert's testimony itself is reliable. In *Daubert*, the Supreme Court identified several factors that may be considered in assessing reliability:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation'" and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593–94) (cleaned up). These factors, however, do not constitute a "definitive checklist or test." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Instead, the inquiry is a flexible one and must be "tied to the facts of a particular case" with attention to "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.*; *see also Nicholas v. Bratton*, 376 F. Supp. 3d 232, 290 (S.D.N.Y. 2019) (stating that "[w]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis . . . courts recognize that [e]xperts of all kinds tie observations to conclusions through . . . general truths derived from . . . specialized experience") (cleaned up).

Next, in addition to ensuring that expert testimony is reliable, the Court must decide whether the expert's testimony is relevant, *i.e.*, whether it will "help the trier of fact." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 413 (S.D.N.Y. 2016). Like other forms of evidence, expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Once the thresholds of reliability and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of its admissibility." *Royal Ins. Co. of Am. v. Joseph Daniel Const. Inc.*, 208 F. Supp. 2d 423, 426 (S.D.N.Y. 2002) (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 133-35 (D.C. Cir. 1996)).

**1. Qualifications**

The first factor in the Court's inquiry involves the proposed expert witness's qualifications. A witness may be classified as an expert based upon personal experience alone.

*Frederick v. Deco Salon Furniture, Inc.*, No. 16-CV-60, 2018 WL 2750319, at *3 (D. Conn. Mar. 27, 2018). "When considering an expert's 'practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" *SLSJ, LLC v. Kleban*, No. 14-CV-390 (CSH), 2017 WL 4329732, at *4 (D. Conn. Sept. 29, 2017) (quoting *Valentin v. New York City*, No. 94-CV-3911, 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)).

**2. Reliability**

The second factor in the Court's inquiry involves reliability. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. At a minimum, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008). Finally, this Court has "considerable leeway in deciding" how it will go about determining the reliability of proffered expert testimony. *Kumho Tire Co.*, 526 U.S. at 152.

**3. Relevance**

Finally, "in fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos*,

303 F.3d at 265 (cleaned up). "Evidence need not be sufficient by itself to prove a fact in issue" in order to meet the "very low standard" of relevancy. *United States v. Litvak*, 889 F.3d 56, 68 (2d Cir. 2018) (quoting *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010)).

**B. Preclusion for Late or Omitted Expert Disclosures**

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). Where a party seeks to introduce evidence through an expert witness under Federal Rule of Evidence 702, the "disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2)(B). Additionally,

> [t]he report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id.* Federal Rule of Civil Procedure 26(a)(2)(D)(ii) permits the disclosure of a rebuttal report "to contradict or rebut evidence on the same subject matter identified by another party."

The parties must disclose their experts and reports "at the times and in the sequence that the court orders," Fed. R. Civ. P. 26(a)(2)(D), and thus, "if a party has failed to timely disclose information required by Rule 26, the opposing party may seek sanctions, including preclusion of the untimely information." *Geomatrix Sys., LLC v. Eljen Corp.*, No. 20-CV-1900 (SVN), 2023 WL 7385569, at *2 (D. Conn. Nov. 8, 2023); *see also* Fed. R. Civ. P. 37(c)(1)

("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."); *New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 591 (2d Cir. 2019) (explaining that Rule 37(c)(1) provides that untimely expert disclosures could result in preclusion unless the failure was substantially justified or harmless).

## III. DISCUSSION

### A. Plaintiff's Motions

Plaintiff has moved to preclude the testimony of the following expert witnesses: (1) Susan Bodine, (2) Debroah French-McCay, (3) Craig Jones, (4) David Uhlmann, and (5) Renee Bourdeau.

#### 1. Plaintiff's Motion to Preclude the Testimony of Attorney Susan Bodine

The Court grants in part and denies in part Plaintiff's motion to preclude the testimony of Attorney Susan Bodine under Federal Rule of Evidence 702 because portions of Bodine's testimony constitute impermissible legal conclusions.

Ms. Bodine is an environmental lawyer and former Assistant Administrator of the United States Environmental Protection Agency. Bodine was retained by Defendants to testify on whether the facts alleged by Plaintiff were within the scope of regulatory authority created by the Clean Water Act ("CWA") and Resource Conservation and Recovery Act ("RCRA").[26] Bodine offers three principal opinions:

> **Opinion 1** – The duties that Conservation Law Foundation (CLF) seeks to find in the CWA and the Connecticut Department of Energy & Environmental Protection's

[26] Bodine Rep., ECF No. 709 at 2.

> (DEEP's) 2018 and 2021 General Permit for the Discharge of Stormwater Associated with Industrial Activity are not related to meeting CWA obligations. Specifically, a "climate assessment" and proposed measures to adapt to increased flood risks that may result from climate change do not meet the CWA definition of effluent limits or standards and are not limitations on a discharge, which are central to establishing the practical scope of CWA authority.
>
> **Opinion 2 –** Even if climate assessment and adaptation measures fell within the scope of CWA authority, they do not represent best industry practices, so the applicable DEEP permit includes no requirement to implement them.
>
> **Opinion 3 –** The petroleum product stored in aboveground storage tanks at the Terminal is not a solid or hazardous waste regulated under RCRA. Specifically, the petroleum product inside of the tanks at Defendants' New Haven Terminal, located at 481 East Shore Parkway, New Haven, Connecticut ("the Terminal") has not been discarded. Therefore, there is no authority under RCRA to regulate the storage of petroleum product at the Terminal.[27]

Plaintiff argues that Bodine's testimony is neither relevant nor proper under *Daubert* and Federal Rule of Evidence 702.[28] Plaintiff argues that Ms. Bodine's testimony regarding EPA's view that certain practices did not violate the CWA is irrelevant to determining whether considering and taking measures to prepare for climate change flooding was a "best industry practice" required by Defendants' permit.[29] Plaintiff also argues that Ms. Bodine's testimony should be excluded because it constitutes improper legal conclusion.[30]

---

[27] *Id.* at 2–3. By setting forth her opinions in two separate paragraphs, Attorney Bodine seemingly structured her expert report so as to offer only two opinions. *See id.* at 3, ¶¶ 4, 5. The Court, however, interprets Bodine's report as setting forth three opinions because paragraph 4 in fact communicates two. In substance, the paragraph offers one opinion-in-chief with a subsequent, alternative opinion.

[28] Pl.'s Mot. Preclude, ECF No. 708.

[29] *See id.* at 5, 8; *see also* Pl.'s Reply, ECF No. 901 at 5.

[30] Specifically, Plaintiff cites paragraphs 18, 19, 27, 34–37, 42, and 51 of Bodine's expert report. ECF No. 708 at 8–9. Defendants, of course, disagree that Bodine's opinions constitute legal conclusion. *See generally* Defs.' Mem. Opp'n, ECF No. 851. In their *Daubert* motion challenging Plaintiff's expert Bruno Pigott, however, Defendants characterize Pigott's opinion that the 2018/2021 Permit properly imposes performance-based limitations on permittees as "legal argument disguised as expert opinion." *See* Defs.' Mot. Preclude, ECF No. 782 at 9–10.

Plaintiff does not challenge Attorney Bodine's qualifications or the reliability of her methodology. Consequently, the only issue to be resolved is whether Plaintiff has shown Bodine's testimony to be irrelevant.

Plaintiff's argument that Bodine's testimony is irrelevant to defining the scope of Defendants' permit is unavailing. It is true that a permitting authority's decision not to enforce portions of a statute cannot eliminate the public's right to bring suit under a citizen-suit provision. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326 (2014). But when determining whether a given practice is proscribed by a particular statute, tacit approval by the agency charged with enforcing the statute is still entitled to *some* weight. *Brown v. First National City Bank*, 503 F.2d 114, 119–20 (2d Cir. 1974) (citing cases). In this case, Plaintiff brings a citizen suit under the CWA and RCRA. EPA is charged with enforcing both acts. *See* 33 U.S.C. § 1251(d); 42 U.S.C. § 6903(1). Thus, while Bodine's testimony regarding EPA's views on the scope of its enforcement authority and its enforcement practices cannot alone decide whether Defendants' conduct violated those acts, it is certainly relevant.

The Court next addresses whether Bodine's testimony contains improper legal conclusions. It is worth noting here that the question of whether to strike Bodine's opinion is not "all or nothing": the Court is free to strike portions of expert testimony that state legal opinions and conclusions, while permitting other, permissible, expressions of expert opinion. *See In re Pfizer Sec. Litig.*, 819 F.3d 642, 665–66 (2d Cir. 2016) ("When faced with expert testimony that contains both reliable and unreliable opinions, district courts often exclude only the unreliable testimony. This process of parsing expert testimony is consistent with Rule 702's 'liberal admissibility standards,' which favor allowing the jury to hear testimony that 'both rests on a reliable foundation and is relevant to the task at hand.' Of course, district courts are

'not obligated to prune away all of the problematic' elements of an expert's proposed testimony 'to save the remaining portions, however small.' But when the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad.") (cleaned up); *cf. United States v. Alessi*, 599 F.2d 513, 514–15 (2d Cir. 1979) (per curiam) ("Although it is true that there are certain statements in [the challenged] paragraphs that do not appear to be made on personal knowledge and hence are inadmissible, the entire affidavit need not be stricken. The district court judge was free to disregard the inadmissible paragraphs and consider the rest of the affidavit."); *see also Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017) (holding that trial court abused discretion by excluding entirety of expert witness's testimony when only a portion constituted impermissible legal conclusions); *McCord v. Government Employees Insurance Co.*, No. 23-CV-5262, 2026 WL 571658, at *30 n.32 (E.D.N.Y. March 2, 2026) (citing *In re Pfizer Inc. Sec. Litig.*, 819 F.3d at 655); *Stapleton v. Prince Carpentry, Inc.*, No. 22-CV-04044, 2025 WL 2591519, at *4–5 (E.D.N.Y. Sept. 8, 2025); *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 103–04 (S.D.N.Y. 2023); *State v. Almy Bros.*, No. 90-CV-818, 1998 WL 57666, at *11 (N.D.N.Y. Feb. 4, 1998); *Busler Enters., Inc. v. MG Refin. & Mktg., Inc.*, No. 96-CV-3590, 1997 WL 672018, at *7 (S.D.N.Y. Oct. 29, 1997).

Federal Rule of Evidence 704 provides the governing standard in Plaintiff's challenge. Subsection (a) provides that an expert witness's opinion testimony "is not objectionable just because it embraces an ultimate issue." Rule 704 does not, however, admit all expert opinions. It is well-settled in the Second Circuit that expert testimony expressing a legal conclusion will be excluded. *E.g.*, *United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); *United States v. Bilzerian*, 926 F.2d 1285, 1294–95

(2d Cir. 1991) ("Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice . . . testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice."); *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge."); *Burlington Sch. Dist. v. Monsanto Co.*, No. 22-CV-215, 2026 WL 632187, at *4 (D. Vt. Mar. 6, 2026) ("[E]xpert testimony about ordinary practices in an industry is permissible 'as long the expert's testimony does not cross the line into an ultimate legal conclusion based upon the facts of the case.'").

But whether an expert's testimony comprises permissible fact-based conclusions or, on the other hand, impermissible legal conclusions is rarely clear. Certainly, a witness offers legal conclusions when they instruct a jury on what law applies to a case or testify about the meaning of legal terms. *See, e.g.*, *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983) ("[Q]uestions soliciting the former FAA employee's understanding of the meaning and applicability of Part 91 and Part 121 FARs would invade the province of the court to determine the applicable law and to instruct the jury as to that law."); *Levinson v. Westport Nat'l Bank*, No. 9-CV-269 (VLB), 2013 WL 3280013, at *4 (D. Conn. June 27, 2013) ("[A]n expert may not interpret a contract for the jury, nor may an expert testify about the meaning of legal terms." (cleaned up)). But other times, a witness may properly discuss the law to provide an overview of background information helpful to understanding a party's conduct. *E.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 184 (S.D.N.Y. 2018). The line between permissible and impermissible is thus a fine one.

What's more, whatever value may be gleaned from that blurry distinction is diminished in cases where, as here, complex statutes and attendant regulatory schemes simply must be confronted. Particularly in these sorts of cases, a well-qualified expert such as Attorney Bodine can significantly aid a factfinder's evaluation of the circumstances before it. *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 467; *Am. Home Assurance Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 451 (S.D.N.Y. 2006) (admitting expert's testimony on the interpretation of FDA regulations where the court was "persuaded that [the expert's] testimony on these complex regulatory provisions will assist the trier of fact"). *But see, e.g.*, *Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1378 n.6 (Fed. Cir. 2008) ("Because the proper interpretation of these regulations is an issue of law, expert testimony relating to this question . . . 'should not be received, much less considered.'").

Accordingly, courts must be exceedingly mindful of the particular circumstances of the case before them when presented with challenges to an expert's testimony based on a claim that it constitutes improper legal conclusion: what is legal conclusion in one case may be permissible background information in another.

A review of the relevant case law reveals that an expert's testimony is more likely to constitute improper legal conclusion when it discusses or communicates standards applied by the particular law governing the case. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191 n.16 (S.D.N.Y. 2009) ("This principle is invoked to exclude expert testimony about the applicable law that governs the case."). Conversely, expert testimony is less likely to be improper legal conclusion when it discusses standards applied by laws other than the one(s) giving rise to the cause of action or any defense.

Take, for example, *In re Fosamax*, a case cited by Defendants for the proposition that courts in the Second Circuit routinely permit former agency officials to testify about the meaning of statutes and regulations.[31] The court in *Fosamax* did indeed permit an expert witness, qualified by years of experience at FDA, to testify about general FDA regulatory requirements and offer an opinion as to a party's compliance therewith. *Fosamax*, 645 F. Supp. 2d at 191. The court noted, however, that it did so because the defendant was charged with liability under state-law negligence and strict liability theories rather than with violations of FDA regulations. *Id.* at n.16. The ultimate issue was not whether the defendant violated the regulations, but whether the defendant's conduct was reasonable. *Id*. Here, unlike in *Fosamax*, Plaintiff charges Defendants with violations of federal statutes by virtue of their violation of the CT DEEP Permit's regulatory requirements. Thus, the expert's opinion in *Fosamax* about the meaning of a regulation and a party's compliance therewith did not play the same role as Ms. Bodine's testimony here would. *Fosamax* is therefore inapposite.

Likewise in *In re Mirena IUD Products Liability Litigation*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016), a case also cited by Defendants.[32] The court there admitted expert testimony on the defendant's compliance with FDA regulations after finding that it would be helpful to the jury in understanding the complex regulatory process. *Id*. at 467. However, the court also specifically noted that the case was not governed by the federal regulations on which the expert would testify, but rather by state-law theories of negligence and strict liability. *Id.* ("Expert testimony regarding Bayer's compliance with FDA regulations therefore will not usurp the

---

[31] ECF No. 851 at 17.

[32] *See id.* at 24, 30.

Court's role in explaining the law to the jury."). Two other cases cited by Defendants suffer from the same defect. *See In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 184 (admitting, in a suit brought under the Sherman Act, expert opinion on defendant's compliance with regulations under Hatch-Waxman Act to inform ultimate opinion on whether there were regulatory impediments to generics seeking final approval of their drug); *Forman v. Novartis Pharms. Corp.*, 794 F. Supp. 2d 382, 384 (E.D.N.Y. 2011) (admitting, in a products liability case, expert testimony regarding the defendant's compliance with FDA regulations).

Defendants' position is not without support, however. For instance, Defendants cite *Murray Energy Corp. v. McCarthy*, No. 5:14-CV-39, 2016 WL 3390517 (N.D. W. Va. June 17, 2016), a case in which the EPA was charged with violating a provision of the Clean Air Act that required it to perform analyses of the law's effect on certain industries. There, the court permitted former EPA assistant administrator Jeffrey Holmstead to testify that the agency had refused to conduct the required analysis "notwithstanding the requirements of Section 321." *See Murray*, 2016 WL 3390517, at *4; Mem. in Supp. of United States' Expedited Mot. to Disqualify or Exclude Jeffery Holmstead, No. 5:14-CV-39, ECF No. 207 at 16. Whether the analysis was required by that statute, and whether the EPA had performed the analysis, were central to the cause of action. Further, in *Saline River Props., LLC v. Johnson Controls Inc.*, No. 10-CV-10507, 2011 WL 6031943 (E.D. Mich. Dec. 5, 2011), the district court permitted the former Chief of RCRA Enforcement at EPA to testify as to whether the defendant complied with EPA regulations and customs. Whether the defendant complied with those regulations was an ultimate issue; the plaintiff had brought suit claiming that defendant violated a consent order which integrated those regulations. *See id.* at *3. Finally, in *Halfmoon v. Gen. Elec. Co.*, No. 09-CV-228, 2016 WL 866343 (N.D.N.Y. Mar. 3, 2016), the court

permitted a former EPA Enforcement Chief to testify that the plaintiff's claimed response costs were not "necessary" under CERCLA. That issue too was central to the plaintiff's claim. *See id.* at *16 ("I already concluded that [whether plaintiffs complied with CERCLA and/or the NCP] must be determined by a jury.").

The Court recognizes the apparent tension between the decisions of the trial courts cited herein. However, the Court is persuaded by the decisions of two circuit courts: the Second Circuit's decision in *FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983), and the Ninth Circuit's decision in *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993). In *Landy*, an action seeking penalties for violations of airline regulations, the Second Circuit affirmed the exclusion of an expert's testimony about the meaning and applicability of those regulations. 705 F.2d at 632. And in *Weitzenhoff*, a prosecution under the CWA in which the "central issue" was the meaning of an EPA permit, the Ninth Circuit held that the district court erred in admitting the testimony of expert witnesses familiar with wastewater management on the meaning of terms contained in, and obligations imposed by, the Act. 35 F.3d at 1286–87. *See also United States v. Tonawanda Coke Corp.*, No. 10–CR–219S, 2013 WL 672280, at *9 (W.D.N.Y. Feb. 22, 2013) (permitting, in a criminal prosecution under the Clean Air Act, "testimony concerning the regulatory process, how permitting works, the tangential environmental laws and regulations, and other related concepts" but prohibiting any witness from testifying under the guise of expert opinion "about what the law is or what disputed provisions of laws or regulations mean, since that is the province of the court"); *United States v. Ohio*, No. 2:99–CV–1181, 2003 WL 723269, at *1 (S.D. Ohio Feb. 25, 2003) ("Witness[] testimony as to the EPA's interpretation, even by one who worked contemporaneously with

the EPA at the time the CAA regulations were promulgated, improperly invades the province of the Court to determine the applicable law.").

In the instant matter, the Court finds that the cases in which the expert testimony was excluded better account for the danger of unfair prejudice presented by expert testimony on legal issues. And, as previously stated, the Court need not exclude Bodine as a witness altogether: it is within the Court's discretion to strike impermissible portions of expert testimony while still allowing permissible portions to remain. *See In re Pfizer Sec. Litig.*, 819 at 665–66 ("When faced with expert testimony that contains both reliable and unreliable opinions, district courts often exclude only the unreliable testimony. This process of parsing expert testimony is consistent with Rule 702's 'liberal admissibility standards,' which favor allowing the jury to hear testimony that 'both rests on a reliable foundation and is relevant to the task at hand.' Of course, district courts are 'not obligated to prune away all of the problematic' elements of an expert's proposed testimony 'to save the remaining portions, however small.' But when the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad.") (cleaned up); *cf. Alessi*, 599 F.2d at 514–15 (per curiam) ("Although it is true that there are certain statements in [the challenged] paragraphs that do not appear to be made on personal knowledge and hence are inadmissible, the entire affidavit need not be stricken. The district court judge was free to disregard the inadmissible paragraphs and consider the rest of the affidavit."); *see also Reed*, 863 F.3d at 1209 (holding that trial court abused discretion by excluding entirety of expert witness's testimony when only a portion constituted impermissible legal conclusions).

Accordingly, the Court grants in part and denies in part Plaintiff's motion to exclude Bodine's expert testimony, as follows:

With regard to Susan Parker Bodine's first opinion, Attorney Bodine is precluded from offering expert testimony on whether the Clean Water Act and the Multi-Sector General Permit for Industrial Activity require Defendants to modify the Terminal to address potential flooding resulting from climate change, phrased by the witness as "the practical scope of CWA authority." First, questions soliciting the witness' understanding of the applicability of the CWA and the Multi-Sector General Permit for Industrial Activity specifically as relates to legal obligations of Defendants would invade the province of the court to determine the applicable law and to instruct the jury as to that law. Second, opinion testimony as to Defendants' compliance with the aforementioned regulations is properly before the jury, and to allow expert opinion on that question would improperly usurp the jury's fact-finding function on an ultimate issue.

With regard to Attorney Bodine's first and second opinions, she is precluded from offering testimony as to whether the Connecticut Department of Energy & Environmental Protection's (DEEP's) 2018 and 2021 permit includes a requirement to include and implement climate assessment and adaptation measures. Allowing the witness to so opine would risk the jury substituting the expert's opinion for its own judgment. The Court also notes that, while Ms. Bodine's report allows for the potentiality that the jury might reject her primary opinion by inserting an alternative, "even if" opinion, these opinions both still improperly instruct the jury on the law, which is the province of the court, and infringe on the jury's fact-finding function.

Ms. Bodine is, however, permitted to testify and offer an expert opinion on her understanding of the definitions of “Control Measures,” “Best Management Practices,” “Industry Practices,” “Best Practices,” and “Best Industry Practices,” in the context of the subject matter of this matter, to the extent they exist.

Finally, with regard to Attorney Bodine’s third opinion, she is precluded from interpreting and applying RCRA to the facts of the case and opining to the jury as to whether the petroleum product stored in the aboveground storage tanks at the Terminal is a solid or hazardous waste, whether it has been discarded, and whether there is authority under RCRA to regulate the storage of petroleum product at the terminal. To allow the witness to opine on the regulatory breadth of RCRA, to further define both a “waste” or “discarded” waste/materials for the jury when that term is already defined by law, or the regulatory authority of the EPA as specifically applies to the facts of this case would be an improper expansion of the purpose of expert testimony. Allowing this opinion, combined with this witness’s proposed testimony of her understanding of the manner in which materials are stored at the Terminal also risks invading the fact-finding function of the jury as to whether the materials in question were in fact waste and/or discarded.

### 2. Plaintiff’s Motion to Preclude the Testimony of Deborah French-McCay, Ph.D.

The Court denies Plaintiff’s motion to preclude the testimony of Deborah French-McCay, Ph.D., under Federal Rule of Evidence 702 because Plaintiff has failed to show that Dr. French-McCay is not qualified or that her opinions are unreliable. The Court also denies the motion to preclude under Federal Rule of Civil Procedure 37 because Plaintiff fails to show that Defendants withheld evidence related to Dr. French-McCay.

Dr. French-McCay is a Senior Principal Scientist at the RPS Ocean Science office within Tetra Tech,[33] which has clients within the oil industry and government.[34] Defendants retained her to describe the potential trajectory, fate and adverse environmental impacts of a large oil spill at the New Haven Terminal on aquatic resources, assuming one were to occur.[35] Dr. French-McCay evaluated what would occur if oil were to spill at the Terminal by performing oil spill modeling for environmental conditions that would potentially occur during extreme storms.[36] To do so, Dr. French-McCay assumed a maximum credible discharge (MCD, 179-342 thousand gallons of oil) of oil would potentially occur at the Terminal during an extreme storm surge and used an oil spill model that she developed over the past four decades, the Spill Impact Model Application Package ("SIMAP").[37] The inputs into SIMAP included a separate hydrodynamic model run by Dr. Craig Jones and others at Integral Consulting, called the "Delft3D-FM Model."[38]

Dr. French-McCay concluded that "the volumes of the oils handled at the New Haven Terminal do not represent an imminent and substantial endangerment to the environment."[39] She opined that "the likelihood of spilled oil reaching New Haven Harbor is extremely low," that "a spill would need to be catastrophic and instantaneous at the time the [storm] surge reaches the tanks in the Terminal for there to be any possibility of oil entering the harbor," and

[33] French-McCay Rep., ECF No. 844 at 387.

[34] French-McCay Tr., ECF No. 717 at 73:18–24.

[35] ECF No. 844 at 7.

[36] *Id.* at 15.

[37] *Id.* at 7, 16.

[38] *Id.* at 102.

[39] *Id.* at 9.

that "[i]t is extremely unlikely that a large oil spill from the New Haven Terminal would cause extensive adverse impacts to coastal resources."[40]

Plaintiff argues that Dr. French-McCay's lacks the qualifications to offer opinions on Integral's Delft3D FM model, and that all of her opinions are unreliable. Separately, Plaintiff argues that Dr. French-McCay should be precluded from offering any evidence related to the Delft3d FM model because she improperly withheld the identity of the consultant who ran the model upon which she relied.

**a. Qualifications**

The Court finds that Dr. French-McCay is qualified to offer opinions based on the oil spill modeling that she did for this case, including how she used a hydrodynamic model (Integral's Delft3D FM model) as an input for the SIMAP model she developed. She holds a Ph.D. in biological oceanography from the University of Rhode Island,[41] and currently directs research and model development at RPS Ocean Science (Tetra Tech) in South Kingstown, Rhode Island, where she manages projects using models that she has developed to evaluate oil/chemical trajectory and fate, impacts and ecological risks.[42] She has been principal investigator and primary author of more than one hundred technical reports and papers involving this subject matter.[43] While Dr. French-McCay testified that she normally refers to a flood expert for flood modeling instead of doing that modeling herself,[44] those admissions

[40] *Id.* at 8–9.

[41] *Id.* at 12.

[42] *Id.* at 11.

[43] *Id.*

[44] ECF No. 717 at 89:4–11.

do not disqualify her from offering an opinion on how she used flood models, such as the Delft3D-FM model. Particularly relevant here, she routinely uses hydrodynamic models similar to the Delft3D FM model for input into her own modeling.[45] Considering her more than four decades of experience with oil spill modeling, the Court finds that Dr. French-McCay has the specialized knowledge, skill, experience and education to be qualified as an expert in this case.

**b. Reliability**

Next, the Court rejects Plaintiff's argument that Dr. French-McCay's model, SIMAP, does not rest on a reliable foundation. Specifically, Plaintiff argues that SIMAP is not known to be peer reviewed and validated under storm surge conditions, that its error rate is not known and cannot be measured against real-world results due to the confidential nature of the study where it was previously employed, and that Dr. French-McCay has testified that no one outside of Tetra Tech can run SIMAP.

But the record shows that Dr. French-McCay's SIMAP model has been validated on numerous occasions and under diverse circumstances. Dr. French-McCay described the SIMAP model as having been "validated with data from >20 large oil spills, including the Exxon Valdez, North Cape and Deepwater Horizon (DWH) oil spills … as well as test spills designed to verify the model"[46] To do so, Dr. French-McCay collected data from public documents, ran the model, and then made a comparison with that data.[47] At her deposition, Dr.

[45] *Id.* at 92:20–93:5.

[46] ECF No. 844 at 16–17.

[47] ECF No. 717 at 41:2–10 (describing an article about the validation of SIMAP); *id.* at 42:4–16 (describing Dr. French-McCay's collection of publicly available data, running the model, and making a comparison with the data).

French-McCay gave an example of the accuracy of SIMAP by describing its modeling of an oil spill in North Cape.[48] Indeed, Plaintiff's expert, Dr. Michel, opines that Dr. French-McCay has validated her models for limited conditions and that much, if not all of the model has been published in literature in various algorithms and pieces, though the actual model itself is not peer review or published.[49] The concession that Dr. French-McCay has validated SIMAP for certain purposes distinguishes this case from *Valente v. Textron, Inc.*, 931 F. Supp. 2d 409, 425 (E.D.N.Y. 2013), where an expert was precluded from testifying about a computer simulation model because there was no evidence that the model had been validated or tested in any meaningful way.

Against this backdrop, the Court finds that Plaintiff's arguments go to the weight, and not to the admissibility, of Dr. French-McCay's use of the SIMAP. Plaintiff fails to offer any scientific methods or theories to support the notion that SIMAP is based on "junk science." *See Rutledge*, 182 F.4th at 193 ("The gatekeeping role of the district court is to shield the jury from testimony by even qualified experts that is outside the boundaries of ordinary scientific discourse and thus constitutes 'junk science.'"). While Plaintiff provides, through Dr. Michel's testimony, support for the notion that this is the first time that SIMAP has been used for modeling oil fate and behavior under extreme storm surge flooding and hurricane-force

[48] *Id.* at 44:1–45:5.

[49] Michel Rep., ECF No. 719 at 12 ("Dr. French-McCay['s] models are useful, and she has validated the biological effects model for multiple spills. Much, if not all, of the model has been published in literature in various algorithms and pieces, but the actual model itself is not peer reviewed or published. Furthermore, this is the first time that I have seen SIMAP used for modeling oil fate and behavior under extreme storm surge flooding and hurricane-force winds, and it has not been validated or peer reviewed for this application.").

winds,[50] that novelty is not fatal to the reliability of SIMAP where, as here, Plaintiff can challenge the precision of SIMAP through cross-examination. "To the extent the [parties] have any questions about the weight or the sufficiency of the evidence upon which [an expert] relied, or the conclusions generated therefrom, those questions can be asked on cross-examination." *Park W. Radiology v. CareCore Nat. LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009). And upon review of Dr. French-McCay's report, the Court concludes that her methodology is reliable and the opinions based on SIMAP are based on sufficient facts and data.

**c. Omitted Disclosures**

Lastly, the Court concludes that Defendants satisfied its disclosure obligations related to Dr. French-McCay's expert report.

Plaintiff asserts that Dr. French-McCay's opinions should be excluded in full because the expert consultant for Integral's Delft3D FM Model was "functionally" undisclosed. Specifically, Plaintiff takes issue with Dr. French McCay's report not disclosing the identity of the consultant who ran the Delft3D FM Model upon which she relied.

Where a party fails to disclose required information, a district court may preclude a party from using that information "to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Witnesses who are specially employed to provide expert testimony in a case have an affirmative duty to provide a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them;" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). The obligation to disclose "facts or data" considered

[50] *Id.*

by an expert under Rule 26 is "interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients." Fed. R. Civ. P. 26 advisory committee's note, 2010 amend.

Upon due consideration of the briefing, the Court disagrees with Plaintiff. Dr. French-McCay adequately disclosed "the facts or data" that she considered in forming her opinions that rely on the Delft3D-FM Model. Fed. R. Civ. P. 26(a)(2)(B)(ii). Dr. French-McCay did not run the Delft3D-FM Model herself, but explained in her report that "model data (i.e., currents and water levels) for larger (hypothetical) storms were provided to [her] by KSLaw, which were prepared by **Integral** (Appendix B)," that "**Integral** used the Delft3D Flexible Mesh Suite (Delft3D FM) software product from Deltares (2025)," and that "data from the **Integral** hydrodynamic models of storm surges were used as input to SIMAP for the time periods they simulated."[51] "The Federal Rules of Evidence specifically provide that an expert may rely on facts or data "perceived by *or* made known to the expert at or before the hearing,'" *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000) (quoting Fed. R. Evid. 703), and here, Dr. French-McCay undoubtedly notified Plaintiff that a consultant at Integral provided the facts or data underlying her reliance on the Delft3D-FM Model. While Dr. French-McCay received the model from Integral, she extensively discussed its use in her report, described the model's methodology, and produced the model's output files.[52] Notably, as part of their production of document underlying Dr. French-McCay's report, Defendants produced the

---

[51] ECF No. 844 at 19 (emphasis added).

[52] *See id.* at App'xs. B, C.

Delft3D-FM Model's output files with the name "Jones" in the filename.[53] Thus, Defendants have satisfied their disclosure obligations here, because Plaintiff (and its expert) was on notice that "Jones" from Integral was involved with the Delft3D-FM Model.

To the extent that Defendants omitted any "facts or data" that Dr. French-McCay considered in forming her opinions that rely on the Delft3D-FM Model, Fed. R. Civ. P. 26(a)(2)(B)(ii), those omitted disclosures would ultimately be found harmless. Considering Dr. French-McCay's report and production of documents, Plaintiff had ample opportunity to question Dr. Jones about the Delft3D-FM Model during his deposition, including when he explicitly disclosed his involvement. This is not a case where Plaintiff suffered any prejudice because Plaintiff had the opportunity to depose Jones about the analyses in the files bearing his name and the Delft3D-FM Model. Additionally, Dr. French-McCay testified at her deposition that she provided to Dr. Jones the inputs to be used by the Delft3D-FM Model.

Consequently, Plaintiff's motion to preclude expert testimony of Dr. French-McCay is denied.

### 3. Plaintiff's Motion to Preclude the Testimony of Craig Jones, Ph.D.

The Court grants in part and denies in part Plaintiff's motion to preclude the testimony of Craig Jones, Ph.D., under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 37(c)(1). Specifically, portions of Opinions 1, 2, 3, 6, 13, 14, and 15 are excluded for exceeding the permissible scope of expert testimony, and Dr. Jones is precluded from offering any opinions related to the Delft3D model.

---

[53] Nairn Rep., ECF No. 720 at 23 (Plaintiff's expert, Dr. Nairn, writing that he received the numerical model output files and that the files were shared with him included the name "Jones" in the filename).

Dr. Jones is currently the managing principal of Integral Consulting's Marine, Coastal, Climate, and Technology Services group, where he leads engineering and science-based projects focused on coastal and estuarine hazards, sediment dynamics, and climate resilience for both government agencies and private sector clients.[54]

Plaintiff argues that Dr. Jones should be precluded from offering any expert testimony related to the Delft3d FM model because he improperly withheld those opinions from his expert report.[55] Separately, Plaintiff argues that certain of Dr. Jones's opinions include inadmissible legal opinions and conclusions.[56]

**a. Undisclosed Opinions**

After reviewing the record, including Dr. Jones's expert report, to accept Defendants' position that Dr. Jones properly disclosed any opinions on the Delft3d FM model under Rule 26 would be to blink reality. Defendants' arguments that Dr. Jones timely disclosed his opinions on the Delft3D Model—through deposition testimony and producing the Delft3D model run files, which included "Jones" in the filename[57]—is nonresponsive to Rule 26's unambiguous requirement that a testifying expert must provide a report with "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Because Dr. Jones's report does not include any opinions on the Delft3d FM model, the Court considers the *Softel* factors in determining whether to exclude those undisclosed expert opinions: "(1) the party's explanation for the failure to comply with the

---

[54] Jones Rep., ECF No. 838 at 122.

[55] Pl.'s Mot. Preclude, ECF No. 722-1 at 13–17.

[56] *Id.* at 11–13.

[57] *Id.* at 15.

discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns., Inc.*, 118 F.3d 955, 961 (2d Cir. 1997); *see also Patterson v. Balsamico*, 440 F.3d 104, 117–18 (2d Cir. 2006) (applying the *Softel* factors). The first *Softel* factor weighs in favor of exclusion because there is no excuse for Dr. Jones's omitted disclosure here, where Defendants' other expert witness, Dr. French-McCay, disclosed her use of the Delft3D model in her report and included a description of the model as an Appendix in her report.[58] Second, considering that Dr. French-McCay will be able to testify on her use of the Delft3D model, the Court finds that the second *Softel* factor weighs in favor of exclusion because Dr. Jones's opinions on the same subject matter are not essential to the case. The final two *Softel* factors also weigh in favor of exclusion because the failure to properly disclose opinions deprived Plaintiff of the opportunity to examine Dr. Jones during his deposition and a continuance is disfavored due to the protracted nature of this action.

Consequently, because all factors weigh in favor of preclusion, Dr. Jones's omitted opinions related to the Delft3D Model were neither substantially justified nor harmless, and those opinions are appropriately excluded.

**b. Legal Conclusions**

As previously discussed, it is well-established in this Circuit that expert testimony on issues of law is inadmissible, *e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), and a court has discretion to exclude impermissible portions of opinions.

---

[58] *See* French-McCay Rep., ECF No. 844 at 101–07.

As an initial matter, contrary to Plaintiff's arguments, the Court finds that Opinions 7, 8, 9, 10, 11, 12, 16, 17, 18, 19, 25, and 29 do not include legal opinions or legal conclusions. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). These opinions provide appropriate technical context to help the factfinder understand the complex statutory and regulatory regime at issue. Opinions of this sort are permissible. *E.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 467; *Am. Home Assurance Co. v. Merck & Co.*, 462 F. Supp. 2d at 451. As explained below, regarding the remainder of Plaintiff's challenges, the Court finds that portions of Opinions 1, 2, 3, 6, 13, 14, and 15 are impermissible legal conclusions.

First, in Opinion 1, Dr. Jones purports to offer an assessment based on his expertise as an engineer and his review of the 2018/2021 Permit. Dr. Jones opines that "the New Haven Terminal was in full compliance with all applicable requirements of the 2018 Connecticut Multi-Sector General Permit (MSGP) for industrial stormwater at the time CLF submitted its notice of intent ("NOI"). The 2018, or 2021, Connecticut [MSGPs] for industrial stormwater did not mandate the consideration of rising sea levels, storm surge, or other adverse weather events."[59] Dr. Jones may not testify as to whether the Terminal "was in full compliance" with the permits because this is, in effect, a legal conclusion and would trespass the province of the jury in applying the law to the facts before it. But Jones is permitted to opine, based on his experience as an ocean and environmental engineer, what actions Defendants took to comply with regulatory obligations and any indicia that the Terminal complied with the permit. Jones may also provide his opinion from an engineering perspective—but not from a legal

---

[59] Jones Rep., ECF No. 838 at 14.

perspective—that the 2018, or 2021, Connecticut MSGPs for industrial stormwater did not mandate the consideration of rising sea levels, storm surge, or other adverse weather events.

Opinion 2 includes Dr. Jones's judgment of the basis for the allegations raised in Plaintiff's notice of intent and whether they establish enforceable compliance obligations. Dr. Jones opines that the allegations "are based on aspirational standards, future climate modeling, and nonbinding guidance documents that were not incorporated into the 2018 or 2021 Connecticut MSGP and do not establish enforceable compliance obligations."[60] The majority of this opinion is permissible to contextualize the allegations from an engineering perspective, but Dr. Jones may not testify as to whether standards were incorporated into the permit at issue or whether there are enforceable obligations, as that testimony implicitly communicates a legal standard to the jury. *Hygh*, 961 F.2d at 364 ("Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury.").

Next, Opinions 3 and 15 include a legal opinion on whether the Terminal complied with the permit at issue. In Opinion 3, Dr. Jones opines on whether the best management practices at the Terminal were compliant with regulatory requirements and explains the foundation for that opinion, including that "the terminal's stormwater pollution prevention plan (SWPPP) was current, complete, and properly executed in accordance with the 2018 Connecticut MSGP—including all monitoring, inspection, and documentation obligations—and does not require the terminal to incorporate climate scenario modeling or long-term

[60] *Id.*

oceanographic projections."[61] The majority of this opinion is permissible, but Dr. Jones may not testify as to whether the Terminal was fully compliant with all regulatory requirements at the time Plaintiff submitted its notice of intent because this is, in effect, a legal conclusion. Similarly, regarding Opinion 15, Dr. Jones may not testify that the Terminal's secondary containment berms are in "full compliance" with the permit.[62] But Jones is permitted to testify, based on his engineering experience, as to whether there were signs that the Terminal complied with the permit.

Next, Opinion 6 includes an inadmissible legal opinion that "EPA's climate resilience guidance provides nonbinding recommendations and does not create enforceable design or permitting obligations."[63] Jones may not proffer this portion of the opinion, but the remaining portion—including that the Terminal remains fully compliant with EPA's (2024a) core goal—provides appropriate context on Dr. Jones's opinions regarding whether and how engineering standards have been met.

Finally, Opinions 13 and 14 include Dr. Jones's conclusions that the Terminal employs best industry practices to enhance the structural resilience of its aboveground storage and that it "meets or exceeds the enforceable BMP requirements of the MSGP and the discretionary best practices recognized by the petroleum industry."[64] When offering these opinions, Jones may not describe any regulations or practices as "not required" or "enforceable" or

[61] *Id.*

[62] *Id.* at 15.

[63] *Id.* at 14.

[64] *Id.* at 15.

"discretionary" as to do so would implicitly communicate a legal standard to the jury. *See Hygh*, 961 F.2d at 364.

Consequently, portions of Opinions 1, 2, 3, 6, 13, 14, and 15 are excluded as impermissible legal conclusions.

#### 4. Plaintiff's Motion to Preclude the Testimony of Attorney David Uhlmann

The Court grants in part and denies in part Plaintiff's motion to preclude the testimony of Attorney David Uhlmann under Federal Rule of Evidence 702.

David M. Uhlmann is currently a partner at Marten Law, a Visiting Professor of Law at the George Washington University Law School, and a Nonresident Senior Fellow in the Governance Studies Program at the Brookings Institution.[65] Previously, Attorney Uhlmann worked in the Environmental Protection Agency ("EPA"), where he was the EPA Assistant Administrator for Enforcement and Compliance Assurance from July 2023 until December 2024 and Deputy Assistant Administrator and Senior Advisor to the Administrator from September 2022 until July 2023.[66]

Plaintiff argues that Mr. Uhlmann's testimony should be excluded on two grounds. First, Plaintiff claims that Opinions 1, 2, 5, and 6 (concerning the Clean Water Act and RCRA's statutory provisions, enforcement of best practices requirements, substantial and imminent danger, and parent company control) are legal conclusions and therefore inadmissible.[67]

---

[65] Uhlmann Rep., ECF No. 1010-1 ¶ 8.

[66] *Id.* ¶ 9.

[67] Pl.'s Mot. Preclude, ECF No. 733 at 7–11.

Second, regarding Opinions 3 and 4 (concerning best industry practice), Plaintiff claims that Uhlmann lacks the requisite experience to testify and that his opinions are unreliable.[68]

**a. Legal Conclusions**

As previously discussed, it is well-established in this Circuit that expert testimony on issues of law is inadmissible, *e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), and a court has discretion to exclude impermissible portions of opinions. For the following reasons, portions of Opinions 1 and 5, and the entirety of Opinion 6, are excluded for containing legal conclusions.

First, in Opinion 1, Attorney Uhlmann seeks to testify that "[c]limate change is a global threat that requires urgent mitigation and resiliency efforts, but the Clean Water Act and RCRA do not contain statutory climate provisions so any climate enforcement under those statutes must be limited to violations of applicable regulations, specific permit requirements, and/or resiliency measures that companies agree to implement as part of settlement agreements."[69] Uhlmann's assertion that the Clean Water Act and RCRA do not contain statutory climate provisions is inappropriate for expert testimony, as "[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co.,* 550 F.2d at 509–10; *see also DeGregorio v. Metro-N. R.R. Co.*, No. 05-CV-533 (JGM), 2006 WL 3462554, at *3 (D. Conn. Nov. 1, 2006) ("[A]n expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court."). Admitting Uhlmann's view on what a statute does not contain would improperly usurp the role

---

[68] *Id.* at 11–14.

[69] ECF No. 1010-1 ¶¶ 17–22.

of the judge. But Mr. Uhlmann may testify that enforcement under these statutes can include violations of "applicable regulations, specific permit requirements, and/or resiliency measures," because this portion of the opinion would not usurp the role of the judge or jury and is based on Uhlmann's specialized knowledge and leadership experience at EPA.

As to Opinion 2, Mr. Uhlmann's proposed testimony on permits under the CWA, the use of best industry practice standards, and the enforceability of those standards,[70] the Court disagrees with Plaintiff's assertion that it exceeds the permissible scope of expert testimony. *See Halfmoon*, 2016 WL 866343, *16 ("[T]he mere fact that an expert's opinion is based on criteria delineated by the applicable law does not transmogrify it into a legal conclusion.").

Third, in Opinion 5, Uhlmann's proposed testimony on whether Defendants have created an "imminent and substantial endangerment" at the Terminal,[71] the Court finds that Uhlmann may provide his opinion from a technical perspective, but not from a legal one. Whether a substance presents an imminent and substantial endangerment to the health or the environment is an issue of fact involving questions of likelihood and severity. *See Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009) (finding that a report did not create a material issue of fact as to whether there was imminent and substantial endangerment on either of two issues, (1) the likelihood that existing contamination

[70] Opinion 2 provides that "Clean Water Act general permits requiring best industry practices will be implemented differently across various sectors and will evolve as technology, science, and industries develop and new practices are adopted, which makes them a poor fit for enforcement except in cases where specific practices are well-established in a sector." *Id.* at 15.

[71] Opinion 5 provides, "Defendants have not created 'an imminent and substantial endangerment' at the New Haven Terminal, as that term is defined under RCRA, because the storage of petroleum products is not regulated under RCRA, and any quantities of petroleum products released during regular operations at the site are too small to present an imminent and substantial endangerment." *Id.* at 25.

will result in harm, and (2) the severity of any potential harm). But Uhlmann may not testify whether storage of petroleum products is regulated under RCRA because that is an impermissible legal opinion that interprets the statute. *See Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004) ("[T]o make it abundantly clear for the parties, it is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court.").

Next, in Opinion 6, Attorney Uhlmann seeks to testify that "[t]here is no evidence that non-party parent corporations exercised the level of pervasive control over the New Haven Terminal that would impose parent company liability nor that the assets of the parent companies here are relevant to any penalties."[72] In support of his opinion, Uhlmann purports to rely on the standard articulated in *United States v. Bestfoods*, 524 U.S. 51 (1998) to determine whether any of the parent corporations are liable.[73] The Court finds that portions of this opinion include a legal conclusion drawn by applying the law to the facts of the case that would usurp the role of the jury. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."). Uhlmann may not testify on how he applied any legal standard, but he is permitted to rebut any testimony from Professor Macey by testifying on the evidence that he reviewed regarding the relationships between the corporations.

[72] *Id.* at 28.

[73] *See id.* ¶ 51 ("[T]he existence of, and adherence to, these manuals and policies would not support a conclusion that 'Shell' should be held liable as an entity that exercised control over the facility under the standard articulated in *United States v. Bestfoods*.").

**b. Qualifications and Reliability**

The Court concludes that Mr. Uhlmann's specialized professional experience at the EPA renders him qualified to offer his opinions, including his opinions on industry best practices. Mr. Uhlmann is former Assistant Administrator of the EPA who was responsible for interpreting and enforcing environmental permits in the United States. In his role, he led approximately 2,800 EPA employees nationwide responsible for enforcement and compliance assurance under the federal environment laws, including the CWA and RCRA.[74] Mr. Uhlmann issued policies to enhance coordination between civil and criminal enforcement, and to accelerate timelines for EPA enforcement.[75] During fiscal year 2024, under his leadership, EPA concluded approximately 1,850 civil and administrative enforcement matters nationwide.[76] Considering Uhlmann's specialized expertise as an agency employee who enforced the regulatory scheme involved here, the Court rejects Plaintiff's argument that Mr. Uhlmann is unqualified. *See, e.g.*, *Murray Energy Corp.*, 2016 WL 3390517, at *4–5 (holding that former EPA Assistant administrator Jeffrey Holmstead was qualified to testify regarding the Clean Air Act); *Saline River Props., LLC*, 2011 WL 6031943, at *2–4 (holding that former EPA Chief of RCRA Enforcement William E. Muno was qualified to testify on RCRA requirements, EPA standard practices, and past penalties); *see also Fosamax*, 645 F. Supp. 2d at 190 ("[Expert witness] is qualified based on her experience as a Medical Officer at the FDA to offer testimony about regulatory requirements relating to the development, testing, marketing, and surveillance of prescription drugs.").

---

[74] *Id.* ¶ 9.

[75] *Id.* ¶ 10.

[76] *Id.*

Notwithstanding Plaintiff's dubious arguments that Mr. Uhlmann's opinions are unreliable as a matter of law due to being based on personal judgment, the Court finds that Mr. Uhlmann properly relies on his specialized training, knowledge, and experience at EPA to form his opinions. *See Kumho Tire Co.*, 526 U.S. at 156 (finding that "an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); *see also United States v. Litvak*, 808 F.3d 160, 180 n.25 (2d Cir. 2015) (noting that experts may tie observations to conclusion through specialized experience and that the reliability inquiry may focus upon personal knowledge and experience of the expert).

Consequently, Plaintiff has failed to show that either Uhlmann is unqualified or that his opinions are unreliable.

**5. Plaintiff's Motion to Preclude the Testimony of Renee Bourdeau**

The Court denies Plaintiff's motion to preclude the testimony of Renee Bourdeau under Federal Rule of Evidence 702 because Plaintiff does not challenge Bourdeau's qualifications, and Plaintiff has failed to show that Bourdeau's testimony is either unreliable or irrelevant.

Bourdeau is a water resources engineer who was retained by Defendants to testify on whether it was best industry practice in Connecticut for facilities regulated under the Department of Energy and Environmental Protection ("DEEP") to take climate change into consideration when preparing Stormwater Pollution Prevention Plans ("SWPPPs").[77] Bourdeau offers six opinions:

> **Opinion 1** – The DEEP General Permits for the Discharge of Stormwater Associated with Industrial Activity, dated October 1, 2018 and October 1, 2021, do not contain a requirement that permittees are required or even recommended to consider "climate change" when preparing a SWPPP. The proposed new draft General Permit (DEEP,

[77] Bourdeau Rep., ECF No. 740 at 3.

2024) for industrial stormwater by DEEP specifically includes provisions that address "climate resilience" and extreme weather and other conditions.

**Opinion 2** – The DEEP 2011 SWPPP Guidance Document for Preparing a Stormwater Pollution Prevention Plan does not contain a requirement that permittees consider "climate change" when preparing the SWPPP.

**Opinion 3** – None of the SWPPPs reviewed contained considerations for "climate change" or similar terms.

**Opinion 4** – DEEP has not taken or issued an enforcement action for a permittee not including considerations for "climate change" when preparing the SWPPP.

**Opinion 5** – There is no evidence of an "industry practice" or a "best industry practice" in the State of Connecticut for facilities regulated under DEEP to conduct a "climate change vulnerability" risk assessment. If there was an alleged "best industry practice" to assess the effects of a 500-year flood on facilities regulated by DEEP, or a recommended practice for facilities in Connecticut to follow related to industrial stormwater, Bourdeau has found no evidence of it from her research.

**Opinion 6** – The new draft of the DEEP General Permit (2024) includes new provisions that require permittees to consider certain climate-related issues as they move forward with developing a new or updating an existing SWPPP and complying with the industrial stormwater regulations in Connecticut.[78]

Plaintiff argues that Bourdeau's testimony, in which she claims to have found no evidence of an industry practice or best industry practice in Connecticut for facilities regulated under DEEP to take climate change into consideration when preparing SWPPPs, failed to meet the criteria of reliability and relevance under *Daubert*.[79] Specifically, Plaintiff argues that Bourdeau's opinion was not based on her knowledge, skill, experience, training, or education, as required by *Daubert*'s relevance prong, but rather the product of a simple word search that

[78] *Id.* at 6–7.

[79] *See generally* Pl.'s Mot. Preclude, ECF No. 739.

could have been performed by any lay reader.[80] In support of this claim, Plaintiff also highlights the fact that Bourdeau was initially recruited as a fact witness by the defense and argued that she did not perform any additional work after becoming an expert witness.[81] Plaintiff furthermore argues that Bourdeau's opinion is unreliable because it uses insufficient facts and data by failing to examine additional SWPPPs, interview their authors, verify if the SWPPPs were the most recent filings, or consider additional factors such as whether the SWPPP was for a coastal facility.[82] Plaintiff also asserts that Bourdeau fails to explain how her expertise was used to form her opinion.[83] Additionally, Plaintiff asserts that Bourdeau did not explain any technical language or offer a definition of best industry practice in her report or deposition that would be helpful to the trier of fact.[84]

Plaintiff does not challenge Renee Bourdeau's qualifications. Consequently, the remaining issues to be resolved are whether Plaintiff has shown Bourdeau's testimony to be either unreliable or not relevant.

**a. Reliability**

Here, Plaintiff presents no evidence that Bourdeau applied her stated methodology unreliably to the facts used to form her opinion. As Bourdeau states in her report, her

[80] *Id.* at 7–9.

[81] *Id.* at 9.

[82] *Id.* at 10–13.

[83] Reply in Further Supp. Pl.'s Mot. Preclude, ECF No. 900 at 6. While Plaintiff situates this claim with its claims concerning relevance, the link between an expert's expertise and opinion is properly understood as a matter of methodology and reliability and will be addressed accordingly in the discussion of reliability. *See e.g. Gen. Elec. Cap. Corp. v. Nichols*, No. 9-CV-758 (JCH), 2011 WL 1638048, at *5 (D. Conn. Apr. 29, 2011); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 464 (S.D.N.Y. 2010).

[84] *Id.* at 5–7.

methodology was to review and analyze SWPPPs "to determine if permittees took climate change (e.g., sea level rise, storm surge, and extreme precipitation) into consideration when preparing the documents."[85] Bourdeau also analyzed the State of Connecticut's *Guidance Document for Preparing A Stormwater Pollution Prevention Plan* for the same indices of climate change consideration, and interviewed Karen Allen, a Superintendent in the Water Division of the Connecticut Department of Energy & Environmental Protection, about the same matter.[86] Unlike in *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268–69 (2d Cir. 2002), there is no evidence that in conducting these assessments Bourdeau inconsistently applied her methodology to the facts by ignoring any of the key terms she set out in her method; and unlike in *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), there is no substantial dissimilarity between the facts considered in Bourdeau's report and the facts of litigation because both primarily concern SWPPPs. Additionally, Plaintiff presents no evidence of bias in Bourdeau's survey of SWPPPs. She analyzed all 152 publicly available SWPPPs and there is no indication that this subset of SWPPPs on record is biased towards a certain outcome. Likewise, there is no indication that the key terms of Bourdeau's method were designed to validate a particular theory.

Rather, Plaintiff argues that Bourdeau's opinion is unreliable because she did not consider additional facts that were potentially available to her, e.g., other SWPPPs and interviewing their authors. *Du v. Party Perfect Rentals LLC*, 731 F. Supp. 3d 392 (E.D.N.Y. 2024), is illustrative. In *Du*, a biomechanical engineer was allowed to offer expert opinion

[85] ECF No. 740 at 4.

[86] *Id.* at 4–5.

concerning injuries that resulted from a motor vehicle accident based on an analysis of accident records, despite the plaintiff's contention that this analysis was inadequate because the expert failed to examine additional documents available that might have allowed for a more accurate assessment. *Id.* at 402–03. The district court held that the plaintiff's argument went "to the weight of the evidence," not its reliability, and was thus "a subject for cross-examination, not admissibility." *Id.*

In contrast, in *Amorgianos*, which Plaintiff cites in support of their claim,[87] the Second Circuit affirmed the district court's ruling that an expert's testimony was unreliable because the expert, an industrial hygienist, failed to apply his stated methodology to the facts in forming his opinion. *Amorgianos*, 303 F.3d at 268 ("Although data on the additional variables was available to" the expert, "he inexplicably 'did not find it necessary' to include them in his calculation despite his stated opinion that a 'proper exposure assessment' would take them into consideration."); *see also Gen. Elec. Co.*, 522 U.S. at 145 (holding that experts' opinions were unreliable because studies they used were too "dissimilar to the facts in [the] litigation"). Relatedly, the Second Circuit found that the district court did not abuse its discretion when it ruled an expert's testimony inadmissible because it was based on a "biased" and "leading" "survey methodology" that was designed to validate the plaintiffs' theory. *Bustamante v. KIND, LLC*, 100 F.4th 419, 428–29 (2d Cir. 2024). But "issues with representativeness are the kind of errors in survey methodology that usually go to the weight of the evidence and do not warrant wholesale exclusion." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542, 2025 WL 354671, at *26 (S.D.N.Y. Jan. 30, 2025) (cleaned up); *see*

[87] ECF No. 739 at 12–13.

*also Loussier v. Universal Music Grp., Inc.*, No. 02-CV-2447, 2005 WL 5644439, at *4 (S.D.N.Y. Aug. 24, 2005) (declining to exclude a purportedly unrepresentative survey because the challenger opponent had provided no data to suggest that the survey was unrepresentative).

Similarly, Plaintiff suggests that Bourdeau's survey of SWPPPs may have been unrepresentative. But claims of unrepresentativeness likewise go to the weight of the evidence, not its admissibility. Plaintiff has, moreover, not offered any specifics as to why Bourdeau's survey might be unrepresentative. Thus, Plaintiff's argument concerning unrepresentativeness also fails to touch the question of reliability on this ground too.

As to Plaintiff's assertion that Bourdeau has failed to link her experience to her opinion, it is established that "[a]n industry expert…need not… correlate [her] opinions to specific instances of industry practice that he observed or articulate an objective industry benchmark[.]" *In re Davis New York Venture Fund Fee Litig.*, No. 14 CV 4318, 2019 WL 2896415, at *6 (S.D.N.Y. May 30, 2019), *aff'd*, 805 F. App'x 79 (2d Cir. 2020) (summary order). Rather, a "description of [her] experience…provides a sufficient link between [her] experience and [her] opinions to satisfy the reliability requirement of Rule 702." *Pension Comm. of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 464. Here, Bourdeau has described her industry experience. She has therefore sufficiently linked her experience to her opinion to satisfy the reliability requirement.

Consequently, Plaintiff has failed to show that Bourdeau's expert testimony is unreliable.

**b. Relevance**

Plaintiff fails to show that Bourdeau's testimony is not relevant. Ms. Bourdeau's testimony summarizes findings from over 150 technical documents written by and for

engineers. In her analysis of these documents, Bourdeau necessarily had to interpret complex and specialized terminology, and drew inferences that she likely would not have been able to without her experience and education. In doing so, Bourdeau distills the presentation of technical data to the jury, saving the jury the significant time it would take to process these documents, and avoiding the unnecessary confusion that would likely result from that effort. Thus, even if Bourdeau's opinion is one, as Plaintiff contends, that any lay reader could have reached, which is highly unlikely given the technical nature of the documents at issue, her testimony would at the very least substantially assist the average person in understanding the case by virtue of the synthesis it provides. Her testimony would thus help the trier of fact in determining whether it is more or less probable that the consideration of climate change when developing SWPPPs was part of best industry practice.

As to Plaintiff's argument that Bourdeau's testimony is not relevant because she was initially a fact witness and did not conduct additional work after becoming an expert witness, it is well established that "in distinguishing a lay witness from an expert witness, a court's primary focus is on whether their testimony is based on their personal knowledge." *Gottlieb v. Lamont*, No. 20-CV-623 (JCH), 2022 WL 375525, at *5 (D. Conn. Feb. 8, 2022), *aff'd*, No. 22-449, 2023 WL 2879305 (2d Cir. Apr. 11, 2023). Whereas a fact witness "may testify to a matter only if…the witness has personal knowledge of the matter," "'an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation…premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of [their] discipline.'" *Id.* (quoting *Daubert*, 509 U.S. at 592). It is accordingly not the facts or material that differentiates a fact witness from an expert witness, but the nature of the statements the witness is permitted to make based on them. *United*

*States v. Faison*, 393 F. App'x 754, 758 (2d Cir. 2010) ("A witness offering so-called dual testimony, testifying as both an expert and as a fact witness," based on the same set of facts, "is not objectionable in principle." (cleaned up)).

Here, Bourdeau's testimony and opinion offered as an expert concerning best industry practice is not based on her direct personal experience, but rather a conclusion she draws from her analysis of facts and data, the reliability of which rests on her disciplinary knowledge. Thus, even if Bourdeau's conclusion is founded on the same information gathered by her as a fact witness, the nature of the opinion she offers, derived not from firsthand experience but rather disciplinary knowledge, qualifies it as expert testimony.

Consequently, Plaintiff has failed to show that Renee Bourdeau's expert testimony is not relevant.

### B. Defendants' Motions

Defendants have moved to preclude the testimony of the following expert witnesses: (1) Edwin Levine, (2) Jacqueline Michel, (3) James O'Donnell, (4) Bruno Pigott (5) Joshua Macey, (6) Matthew Barlow, (7) Richard Horner, (8) Phillip Pasteris, (9) Wendi Goldsmith, and (10) Robert Nairn.

#### 1. Defendants' Motion to Preclude the Testimony of Edwin Levine

The Court grants Defendants' motion to exclude the testimony of Edwin Levine under Federal Rule of Civil Procedure 37(c)(1), as Mr. Levine's untimely opinions are neither substantially justified nor harmless.[88]

[88] Because the Court holds that Mr. Levine's testimony should be excluded under Federal Rule of Civil Procedure 37, it does not reach the other issues.

Plaintiff seeks to offer the testimony of Mr. Edwin Levine as rebuttal to two reports from Defendants, Drs. Deborah French-McCay and Dagmar Etkin, who both evaluated the likely discharge or impact of hypothetical oil spills at the Terminal using modeling based on potential environmental conditions about the Terminal and its operations.[89] Dr. French-McCay "performed oil spill modeling assuming a maximum credible discharge (MCD, 179-342 thousand gallons of oil) of oil would potentially occur at the New Haven Terminal during an extreme storm surge,"[90] and used a number of other assumptions as part of an "overland spill modeling study."[91] Dr. French-McCay noted that oil spills at the Terminal during extreme storm surges would be "extremely improbable" for the following reasons:

> because the tanks at the facility are designed to withstand storm surge conditions and extreme winds, the facility's storm preparation plans call for balancing the volumes of oil in the tanks to reduce likelihood of leakage or failure when a severe storm is predicted, and the storm's intensity at New Haven would need to be extreme enough such that a surge would reach the tanks at the Terminal (with a likelihood of occurring less than 1% in any given year).[92]

Continuing, based on the model, Dr. French-McCay opined that "[i]t is extremely unlikely that a large oil spill from the New Haven Terminal would cause extensive adverse impacts to coastal resources" and thus, "the volumes of the oils handled at the New Haven Terminal do not represent an imminent and substantial endangerment to the environment."[93]

Dr. Etkin developed "various spill scenarios" and, in the report, "describes the development of estimated discharge volumes for the oil spill trajectory, fate, and effects

---

[89] Opp'n to Mot. to Exclude Testimony of Edwin Levine, ECF No. 827 at 8.

[90] French-McCay Rep., ECF No. 768 at 7.

[91] *Id.* at 203

[92] *Id.* at 8.

[93] *Id.* at 9.

modeling of hypothetical storage tank spills at the New Haven Terminal as part of a risk analysis."[94] Dr Etkin's noted that his analysis describes a "highly-unlikely scenario in which multiple operational controls fail during an extreme weather event never before seen at the New Haven Terminal."[95] Dr. Etkin also noted that the model describes "*hypothetical* discharges that have not actually occurred at this facility and that are not reasonably expected to occur based on the New Haven Terminal's history and operational practices."[96]

Mr. Levine purports to rebut the expert reports of Dr. French-McCay and Dr. Etkin with the following opinions: (1) oil spills are unique,[97] (2) oil spills may cause imminent and substantial impacts to the environment,[98] (3) hurricanes and other weather-related events may cause oil spills,[99] (4) to prevent or minimize spills, facilities need to address climate change impacts.[100]

Upon review of Mr. Levine's expert report, the Court finds that these opinions constitute improper rebuttal. The Federal Rules of Civil Procedure allows for rebuttal expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party," Fed. R. Civ. P. 26(a)(2)(D)(ii), and "[a] district court has wide discretion in determining whether to permit evidence on rebuttal." *United States v. Tejada*, 956 F.2d 1256, 1266 (2d Cir. 1992). Rebuttal is not "limited to evidence that directly contradicts what it

[94] Etkin Rep., ECF No. 767 at 8.

[95] *Id.*

[96] *Id.* (emphasis in original).

[97] Levine Rep., ECF No. 759 at 6.

[98] *Id.* at 7.

[99] *Id.* at 8.

[100] *Id.* at 8–9.

opposes; rather, rebuttal encompasses any evidence that that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary." *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005). "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Geomatrix Sys., LLC*, 2023 WL 7385569, at *4 (cleaned up).

But it is apparent that Mr. Levine's opinions do not counter or cast doubt on the factual assertions made by the experts that Mr. Levine purports to rebut. Mr. Levine's opinions do not concern the same subject matter identified in the French-McCay and Etkin reports because they do not explain or criticize the models of the Terminal that are the foundation of the French-McCay and Etkin reports. While Mr. Levine references Drs. French-McCay and Etkin's reports in his opinions, his opinions go well beyond the subject matter found in those reports by describing his experience responding to unrelated oil spill incidents and hurricanes outside of Connecticut. It is unclear exactly how Mr. Levine used his experiences with unrelated events to criticize the methodology or opinions derived from the models of hypothetical oil spills or discharges at the Terminal, as described in the French-McCay and Etkin reports. Mr. Levine admits that he is not offering any opinions that pertain to the structural aspects of the Terminal,[101] nor has Mr. Levine looked at the effect of any weather on that Terminal.[102] Plaintiff attempts to sidestep these admissions with attorney argument regarding how his opinions directly call the reports of Drs. French-McCay and Etkin into question, but those arguments are not explicitly found in Mr. Levine's report.

[101] Levine Tr., ECF No. 758 at 122:24–123:3.

[102] *Id.* at 122:11–18.

Mr. Levine's air dispersion model, Plaintiff contends, provides an example of additional modeling that should be performed in assessing the risks associated with catastrophic oil spills at the Terminal.[103] Plaintiff contends that the modeling described in the French-McCay and Etkin reports do not address explosion risks or the potential for the creation of a vapor plume as the result of a spill.[104] The issue, however, is that Mr. Levine's statements regarding the air dispersion model do not directly contradict or rebut any of Dr. French-McCay or Dr. Etkin's opinions. In fact, Mr. Levine does not even reference their reports in describing the findings from his air dispersion model.[105] Later on, Mr. Levine implicitly agrees with Dr. Etkin's opinion regarding the risk of oil spills, noting that while Dr. Etkin's report "states 'oil facility spills are highly unlikely events for any particular facility or storage tank,' I would point out that the percent probability of a spill is not zero."[106] Considering that Mr. Levine provides no reasoning to rebut or contradict the reports of Drs. French-McCay and Etkin, the Court finds that Mr. Levine's report exceeds the scope of a proper rebuttal. *See Schmidt v. Conagra Foods, Inc.*, No. 14-CV-1816 (SRU), 2020 WL 7027445, at *18 (D. Conn. Nov. 30,

---

[103] ECF No. 856 at 11.

[104] *Id.* at 9.

[105] ECF No. 759 at 7 ("In addition to the liquid oil, the aerosols and vapors may have impacts on animals and people. In Appendix 2, an example air dispersion model for a 1,000,000-gallon release of gasoline on the Motiva New Haven facility was run. Under the conditions used for this model run, an air plume can be seen to extend almost six miles downwind at the odor threshold concentration (0.25 ppm). In the New Haven area, this could represent impacts on thousands of people. While the odor threshold is below any government action level criteria for direct health effects, the volume of 911 calls from concerned citizens will be great. Additionally, some sensitive populations (elderly, frail, or very young) may experience adverse effects from even this low an exposure.").

[106] *Id.*

2020) ("Rebuttal evidence is confined to new matters adduced by the defense and not to repetition of the plaintiff's theory of the case." (cleaned up)).

Because Mr. Levine is improperly designated as a rebuttal expert, Plaintiff belatedly disclosed his opinions. The Court therefore considers the four *Softel* factors in determining whether to exclude Mr. Levine's opinions under Federal Rule of Civil Procedure 37, which excuses the untimely disclosure where the late disclosure was harmless or substantially justified. *Softel*, 118 F.3d at 961. Those factors are: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.; see, e.g. Gottlieb*, 2022 WL 375525, at *7, *aff'd*, No. 22-449, 2023 WL 2879305 (2d Cir. Apr. 11, 2023) (applying the *Softel* factors).

The first factor, Plaintiff's explanation for the failure to comply with the discovery order, weighs in favor of preclusion because Plaintiff has not attempted to provide any excuse for the late disclosure beyond its assertion that Mr. Levine's opinions are proper rebuttal, which the Court has rejected. The Court cannot discern a justification for the failure to timely disclose Mr. Levine's opinions. The second factor, the importance of the testimony of the precluded witness, also weighs in favor of preclusion because the importance of Mr. Levine's testimony is lessened here. Mr. Levine was offered as a rebuttal witness, as opposed to a witness that Plaintiff intends to offer in its case in chief. The third factor, prejudice, weighs in favor of exclusion because Defendants do not have the opportunity to file a rebuttal in response to opinions that should been disclosed as affirmative opinions. Finally, the last factor weighs in favor of exclusion, because "this action has already been protracted and has resulted in Court

intervention in a number of disputes." *Russo v. Tuttnauer USA Co. Ltd.*, No. CV 21-1720, 2024 WL 4449440, at *4 (E.D.N.Y. Oct. 2, 2024).

Consequently, because all factors weigh in favor of preclusion, Plaintiff's untimely disclosures were neither substantially justified nor harmless, and the testimony of Mr. Levine is appropriately excluded.

**2. Defendants' Motion to Preclude the Testimony of Jacqueline Michel, Ph.D.**

The Court denies Defendants' motion to preclude the testimony of Jacqueline Michel, Ph.D. in its entirety.

Plaintiff seeks to offer the testimony of Dr. Jacqueline Michel as rebuttal to three reports from Defendants: Drs. Deborah French-McCay, Dagmar Etkin, and Ann Michelle Morrison. As noted previously, Drs. French-McCay and Etkin evaluated the likely discharge or impact of hypothetical oil spills at the Terminal using modeling based on potential environmental conditions about the Terminal and its operations.

Dr. Morrison evaluated "the potential risk to ecological natural resources posed by extreme weather events resulting in a hypothetical, accidental release of petroleum product from the Terminal" by applying EPA-endorsed ecological risk assessment methods to Dr. French-McCay's modeling for hypothetical petroleum releases.[107] She also examined historical oil spills to assess the potential for similar ecological impacts from a hypothetical petroleum release to the New Haven Harbor from the Terminal and, from these analyses, generated two opinions: (1) "The nature and magnitude of ecological effects from a petroleum

[107] Morrison Rep., ECF No. 769 at 11.

product release are determined by the location of the release, the type of product released, and the environmental conditions at the time of release"; and (2) "Defendants' New Haven Terminal is unlikely to present an imminent and substantial endangerment to ecological resources in the area."[108]

In her rebuttal report, Dr. Michel purports to rebut Defendants' experts with the following opinions:

> **[Rebuttal to Dr. Etkin:]** Dr. Etkin wrongly determines that in the "credible worst-case discharge" only one (1) of the largest tanks at the Shell New Haven facility will release oil as a result of damage from storm surges related to hurricanes.[109]
>
> **[Rebuttal to Dr. French-McCay:]** The spill volumes used by Dr. French McCay in her modeling scenarios are not correct. …Dr. French-McCay uses a wrong threshold in her modeling of toxic impacts of the dissolved oil fractions to water column resources. … Dr. French-McCay's oil spill model for oil fate under the conditions run for the New Haven Terminal has not been validated. … Dr. French-McCay's oil spill modeling scenarios and results for the New Haven Terminal do not reflect actual case studies.[110]
>
> **[Rebuttal to Dr. Morrison:]** Dr. Morrison bases her ecological risk assessment on the modeling results of Dr. French-McCay, which I have shown above to be flawed.[111]

Defendants challenge the admissibility of Dr. Michel's proposed testimony on several grounds, including: (1) that Dr. Michel's report is improper rebuttal under Federal Rule of Civil Procedure 26;[112] (2) that Dr. Michel fails to satisfy the qualifications, reliability, and

---

[108] *Id.* at 12–13.

[109] Michel Rep., ECF No. 766 at 3.

[110] *Id.* at 12–13.

[111] *Id.* at 18.

[112] Defs.' Mot. Preclude, ECF No. 764 at 13–17.

relevance requirements of Federal Rule of Evidence 702;[113] and (3) that the prejudicial effects of Dr. Michel's opinions substantially outweighs any potential probative value, risking confusion of the issues and unfair prejudice under Federal Rule of Evidence 403.[114]

**a. Improper Rebuttal**

None of the opinions proffered by Dr. Michel exceeds the scope of proper rebuttal testimony. "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Geomatrix Sys., LLC*, 2023 WL 7385569, at *4 (cleaned up). The argument that she does not meaningfully respond to the opinions of Defendants' experts is specious, as Dr. Michel specifically challenges the factual bases and conclusions of Defendants' experts by relying on literature and decades of professional experience. Dr. Michel concludes not only that Dr. Etkin wrongly determines that only a single tank at the Terminal will release oil as a result of damage from a storm surge, as that is inconsistent Dr. Michel's professional experience with other hurricane-related spills where multiple tanks at facilities were damaged, but also that Dr. French-McCay's modeling do not accurately reflect the expected risks to ecological resources due to multiple flaws. While a rebuttal expert need only to attack the models or methods of the other party's expert, it is also proper for a rebuttal expert to identify alternative or better methodologies. *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 140 (S.D.N.Y. 2022); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 361 (S.D.N.Y. 2023) ("[A] proper rebuttal expert's opinion is not required to be based on the same data as the expert opinion that it is offered to rebut." (cleaned up)). Unlike Mr. Levine, who

[113] *Id.* at 17–31.

[114] *Id.* at 31–32.

did not mention, much less critique, the experts he purported to rebut in his opinions, Dr. Michel sufficiently explained how her experience on unrelated oil spills and her use of case studies and historical spill data show flaws in the subject matter of Drs. Etkin, French-McCay, and Morrison's reports. Thus, because Dr. Michel's report is entirely proper rebuttal, the Court finds that there were no untimely disclosures warranting exclusion under Federal Rule of Civil Procedure 37.

**b. Rule 702**

The Court next finds that none of Defendants' objections under Rule 702 warrant exclusion. First, Defendants' argument—that Dr. Michel lacks the qualifications to offer rebuttal expert opinions because her professional background is rooted in post-spill response, not in the disciplines required to assess future risk—is inconsistent with the liberal expert qualification requirements. *See United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) ("The words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule[.]" (quoting Fed. R. Evid. 702)). Indeed, an individual "may become qualified as an expert based on practical experience, so that professional education is not a prerequisite." *CSL Silicones, Inc. v. Midsun Grp. Inc.*, No. 14-CV-1897 (CSH), 2017 WL 6055380, at *2 (D. Conn. Dec. 7, 2017) (citing *United States v. Angelilli*, 660 F.2d 23, 39–40 (2d Cir. 1981)). The Court finds that Dr. Michel is particularly qualified to understand the subject matter referenced in the expert reports that she purports to rebut. Dr. Michel, President of Research Planning, Inc., is a geochemist specializing in terrestrial and marine pollution studies, coastal geomorphology, and environmental risk

assessments.[115] Dr. Michel has been on the front line of oil spill planning and evaluation work for decades, as shown by her work on-scene for nearly 50 oil spills and assisting Federal and State trustee agencies assess the impacts of spills through the conduct of Natural Resource Damage Assessments.[116] Dr. Michel need not "satisfy an overly narrow test of [her] own qualifications," *id*. at *2 (cleaned up), and thus, Defendants' misgivings about Dr. Michel's "experiential background, 'go to the weight, not the admissibility, of the testimony.'" *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (quoting *McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1044 (2d Cir. 1995)). The Court finds Dr. Michel qualified to testify regarding pre-spill preparedness and prevention.

Next, upon review of Dr. Michel's report, the Court disagrees with Defendants' arguments that Dr. Michel's opinions are unreliable. Principally, Defendants argue that there is a methodological gap present in the report because Dr. Michel relies almost entirely on personal experiences with unrelated hurricane events without any framework to assess their relevance to conditions at the Terminal. The Court's issue with this position, however, is that it overlooks how Dr. Michel relied on her professional experience to properly rebut Defendants' experts, including by supplying critiques of the facts and assumptions used by them within their methodological frameworks. Dr. Michel not only cited to her professional experience, but also tied that experience to the conclusions made by Defendants' experts and cited publications on the same subject matter to critique their conclusions.[117] Thus, the Court

---

[115] ECF No. 766 at 20.

[116] *Id.* at 2.

[117] ECF No. 766 at 3 ("Dr. Etkin's determination of the credible worst-case discharge (WCD) is not consistent with both my decades of professional experience responding to oil spills and Dr.

concludes that Dr. Michel employed reliable methodology and her opinions are based on sufficient and reliable facts and data. The Court also rejects Defendants' argument that Dr. Michel impermissibly cherry-picked data and ignored contradictory evidence. As a rebuttal expert, Dr. Michel appropriately cited facts or data needed to rebut evidence on the same subject matter identified by Defendant's experts. Any allegations of "gaps or inconsistencies in the reasoning leading to [the expert's] opinion in this case … go to the weight of the evidence, not to its admissibility." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

Finally, the Court finds that Dr. Michel's proposed rebuttal testimony is relevant and helpful to the determination of a fact in issue in this case, including how much weight the factfinder should give to Defendants' experts. Dr. Michel's rebuttal opinions are sufficiently tied to the facts of the case, as they directly critique and explain the purported flaws in the methodology and opinions of Defendants' experts.

**c. Rule 403**

The Court finds that, at this juncture, Rule 403 does not warrant preclusion of Dr. Michel's testimony. Dr. Michel's opinions are highly relevant because they directly rebut testimony from Defendants' experts. There is no danger of unfair prejudice, confusing the issues, or misleading the jury on this record.

Consequently, the Court denies the motion to preclude Dr. Michel's testimony.

---

Etkin's recent work"); *id.* at 11–12 (Dr. Michel cites historical analog from Hurricane Katrina and her own experience responding to oil spill to disagree with Dr. Etkin's conclusion that quick response efforts to reduce further leakage will likely occur); *id.* at 13–16 (Dr. Michel cites historical analog from Hurricane Sandy and publications to critique how Dr. French-McCay's model scenarios "do not reflect what has happened during past hurricane-caused facility oil spills").

### 3. Defendants' Motion to Preclude the Testimony of James O'Donnell, Ph.D.

The Court grants in part and denies in part Defendants' motion to preclude the testimony of James O'Donnell, Ph.D., under Federal Rule of Civil Procedure 702. Specifically, Opinions One and Three shall be excluded because Defendants have shown that they are unreliable and irrelevant.

Dr. O'Donnell holds a B.Sc. in Applied Physics from the University of Strathclyde, a M.S. in Marine Sciences from the University of Delaware, and a Ph.D. in Oceanography from the University of Delaware.[118] Currently, Dr. O'Donnell is a Professor of Marine Sciences and the Executive Director of the Connecticut Institute for Resilience and Climate Adaptation ("CIRCA") at the University of Connecticut ("UConn").[119] Dr. O'Donnell was hired as an Assistant Professor at UConn in 1987, becoming an Associate Professor in 1993 and full Professor in 1999.[120] He has served as the Executive Director of CIRCA since 2014 and as the Principal Scientist of Coastal Ocean Analytics since 2011.[121] In his current role as Executive Director of CIRCA, Dr. O'Donnell provides advice to various towns and agencies in Connecticut on how to reduce the impacts of climate change.[122]

Dr. O'Donnell has been retained by the Plaintiff Conservation Law Foundation, Inc. to testify as an affirmative expert witness. In his written report, he offers four opinions:

---

[118] O'Donnell Rep., ECF No. 775 at 2.

[119] *Id.*

[120] *Id.*

[121] *Id.*

[122] *Id.* at 3.

**Opinion One:** There has been a significant increase in sea level affecting the New Haven Oil Terminal.[123]

**Opinion Two:** Causes of sea level rise at New Haven.[124]

**Opinion Three:** Shell knew or should have known about sea level rise and the consequent increase in the risks of flooding.[125]

**Opinion Four:** Sea level will continue to rise significantly.[126]

Defendants argue that all of Dr. O'Donnell's opinions should be precluded due to both their lack of relevance and their lack of reliability. Defendants state that Dr. O'Donnell's inability to properly identify the Terminal and his own research indicating no risk of flooding to the Terminal discredits the relevance and reliability of his testimony. They also express concern that allowing Dr. O'Donnell's opinions to remain will only serve to inflame the jury.

**a. Reliability**

First, the Court finds that any opinion from Dr. O'Donnell regarding the Terminal to be based on unreliable methodology, including Opinions One and Three.

In Opinion One, Dr. O'Donnell states that "there has been a significant increase in Sea Level affecting the New Haven Oil Terminal."[127] In support of this, Dr. O'Donnell references observations of sea level that have been collected by the National Oceanic and Atmospheric Administration (NOAA) sea level monitoring gage at New Haven, CT, as well as at different stations throughout Long Island Sound.[128] The gage in New Haven demonstrates an increase

---

[123] *Id*. at 16–20.

[124] *Id*. at 21–24.

[125] *Id*. at 24–26.

[126] *Id*. at 27–29.

[127] *Id*. at 16.

[128] *Id*. at 17.

in annual mean water level of 0.58 ft between 2000 and 2024, a number similar to the increase seen from the other gages around Long Island Sound.[129]

In Opinion Three, Dr. O'Donnell opines that "Shell knew or should have known about the sea level rise and the risks of flooding" to the Terminal.[130] He asserts that data has been available throughout the past eighty years and indicated sea level was on the rise.[131] This data includes Gutenberg's first analysis of water level measurements that showed sea level rise in 1941, the National Research Council's (NRC) report in 1983 that recognized "a likely consequence of the rising level of atmospheric $CO_2$ would be an increase in mean sea level", and the later NRC report in 1987 that offered advice to Government agencies to "consider the high probability of accelerated sea level rise."[132] Dr. O'Donnell also references the fact that additional reports were released from various organizations and research groups since that point, focusing not just on the fact the sea level was rising but on the rate it was doing so.[133] He states that "[a] prudent coastal scientist should have been aware of the NRC (1987) report that recognized the threat of sea level rise to coastal infrastructure and called for federal action."[134]

But "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co.*, 522 U.S. at 146. Importantly, the record

[129] *Id*. at 19.

[130] *Id*. at 24.

[131] *Id*.

[132] *Id*. at 24–25.

[133] *Id*.

[134] *Id*. at 26.

here shows that the general principle of sea level rise is not inherently pertinent to the Terminal without specific connective testimony, which Dr. O'Donnell's modeling and reasoning do not provide. If there was any doubt regarding the reliability of Dr. O'Donnell's methodology underlying his conclusions related to the Terminal, the deposition testimony resolves such doubt. At his deposition, Dr. O'Donnell was asked to identify the facilities at issue and he misidentified the Terminal, thus showing that he was entirely unfamiliar with the Terminal or any data related to it.[135] Dr. O'Donnell also conceded that his report does not address the details of any particular facility or site.[136] While Dr. O'Donnell may have been prepared to opine with regards to sea level rise in New Haven, he concedes at his deposition that he was not going to opine about the potential effects of sea level rise on the specific Terminal. Indeed, Dr. O'Donnell expressly disclaimed any evaluation or opinion relating to the Terminal, the Terminal's location, or the Terminal's operation.[137] This calls into question the reliability of the methodology used by Dr. O'Donnell to conclude that there has been an increase in sea level affecting the Terminal and whether Shell knew or should have known about the risks of flooding at the Terminal. Against this backdrop, Defendants show that Dr. O'Donnell's own model indicates that the Terminal is not at risk of flooding. "[A]n expert's methodology is not

---

[135] *See* ECF No. 774 at 14.

[136] O'Donnell Tr., ECF No. 776 at 35:18–25 ("Q: Did you conduct any site inspection of the Gulf facility that you prepared an expert report for? A: No. Pardon me. My report is not about a particular site. It is about the case. There is a Gulf case. So it is not -- I want to be clear that I didn't -- I don't address the details of any site in my report.").

[137] *Id.* at 185:13–21, 186:6–10 ("Q: You have done no evaluation of the specific Equilon terminal in this case. True? A. That is correct. Q: And you are not going to offer any opinions about the potential effects any sea level rise may or may not have on the Equilon terminal in this case? A: That is correct. …. Q: And so to the extent that your report refers to risk of flooding, you are not offering any opinions that any specific site at the port will flood under any given scenario. True? A: That is correct.").

reliable if he or she simply ignores inconvenient facts." *Oliver v. American Express Company*, No. 19-CV-566, 2024 WL 100848, at *4 (E.D.N.Y. Jan. 9, 2024). Dr. O'Donnell's model, the CIRCA Storm Surge Viewer, allows users to view different potential scenarios, including different flood events and additional levels of sea rise. Even in the most extreme scenario, the Terminal is not projected to be impacted by flooding based on Dr. O'Donnell's own CIRCA model. Dr. O'Donnell neither addresses this in his report nor discusses specifics about the Terminal.

Thus, Dr. O'Donnell's first and third opinions offered are not reliable. His opinions comment on the impact of sea level rise on the Terminal and what risks Shell should have been aware of. Regardless of the citations to numerous data sources and scholarly papers in support of his opinions, the methodology is not reliable if Dr. O'Donnell is not aware of the location of the Terminal and is disclaiming any evaluation relating to the Terminal or its operation. His opinions regarding any risk to the Terminal cannot be more than speculative when he does not even know where the Terminal is and thus, they must be excluded. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (opinions must be excluded when they are "speculative or conjectural"). Moreover, Dr. O'Donnell provides no "coherent, scientifically plausible reason" for ignoring his own model showing that the Terminal is not projected to be impacted by flooding. *Rutledge*, 182 F.4th at 191.

Dr. O'Donnell's opinions fall into two categories: his first and third relate to *a* terminal, though not the necessarily *the* Terminal, while his second and fourth are about sea level rise generally and do not comment on how that impacts or may impact any terminal. Dr. O'Donnell's second and fourth opinions, commenting on sea level rise in New Haven generally and its continued future rise, are based on reliable methodology. Dr. O'Donnell

examined past events that indicate what may happen in the future in New Haven by citing numerous data sources and scholarly papers. *See id.* at 184 (explaining that "a review of other studies and scientific literature can be enough to qualify experts to testify to make that proposed testimony reliable"); *see also Precision Trenchless, LLC v. Saertex multiCom LP*, No. 19-CV-54 (JCH), 2022 WL 594096, at *11 (D. Conn. Feb. 28, 2022) (finding an opinion was neither speculative nor conjectural where it was formed on the basis of the expert's observations of objective evidence). Thus, the Court finds sufficient bases to substantiate Dr. O'Donnell's opinions about New Haven generally and thus, Opinions Two and Four are reliable.

**b. Relevance**

The first and third opinions Dr. O'Donnell plans to offer, specifically regarding the threat to the New Haven terminals and whether Defendants knew or should have known about the risks of sea level rise, are not sufficiently relevant. As discussed, though his opinion specifically references the effect of sea level rise on the "New Haven Oil Terminal," Dr. O'Donnell states he does not plan to opine on the Terminal and was mistaken about the specific Terminal at issue. Moreover, Dr. O'Donnell's third opinion regarding the knowledge of the corporate defendants "is a conclusion that a jury may draw on its own, without the need of expert assistance" and thus, is not helpful. *See Peters v. Metro-North Commuter R.R. Co.*, No. 07-CV-1435, 2010 WL 3790720, at *3 (S.D.N.Y. Sept. 28, 2010); *see also Linde v. Arab Bank*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) ("Insofar as many of the expert reports submitted by the defendant express opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, they do not contain relevant expert evidence.). As such, these opinions are not relevant.

Dr. O'Donnell's second and fourth opinions, commenting on sea level rise in New Haven and its continued future rise, are general enough to be relevant. Evidence is relevant when "it has any tendency to make a fact more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401(a). In this case, the parties do not disagree that the Terminal is in New Haven. As such, Dr. O'Donnell's opinions on current and future sea level rise in New Haven tend to make it more probable that the Terminal would experience the effects of sea level rise, making those opinions relevant.

**c. Rule 403**

Finally, the Court finds that, at this juncture, Rule 403 does not warrant preclusion of Dr. O'Donnell's testimony. Considering the number of disclosed expert witnesses in this case, however, it may be that Dr. O'Donnell's testimony is at risk of violating Rule 403 for being needlessly cumulative. But Defendants have not made that showing at this posture.

Consequently, the Court grants in part and denies in part the motion to preclude Dr. Barlow's testimony. Specifically, Dr. O'Donnell's first and third opinions are inadmissible.

**4. Defendants' Motion to Preclude the Testimony of Bruno Pigott**

The Court grants Defendants' motion to preclude the testimony of Bruno Pigott under Federal Rule of Civil Procedure 37 and Federal Rules of Evidence 702 and 403. Several of Pigott's opinions are outside the scope of proper rebuttal opinion. Several others are unreliable. The ones that remain present risks of confusing the issues and misleading the jury that substantially outweigh their probative value.

Pigott is a former environmental compliance officer with decades of experience at state and federal agencies. From 2000 through 2021, Pigott worked for the Indiana Department of

Environmental Management (IDEM) in myriad roles.[138] Among other positions at IDEM, Pigott served as Assistant Commissioner for Water from 2005 to 2015, and then as Commissioner from 2017 through 2021.[139] Thereafter, Pigott joined the EPA, first as Deputy Assistant Administrator for Water and then as the Acting Assistant Administrator for Water.[140] Pigott was retained by Plaintiff to rebut two of Defendants' experts—Attorneys Susan Parker Bodine and David Uhlmann.[141] Both of Defendants' witnesses opined on whether the New Haven Terminal violated any requirements imposed by the CWA and RCRA via the 2018/2021 Permit.

Pigott purports to rebut the expert reports of Attorneys Bodine and Uhlmann with the following 10 opinions:

> **Opinion 1:** All terms and conditions of NPDES Permits are enforceable.
>
> **Opinion 2:** NPDES Permit effluent standards and limitations include NPDES Permits and their conditions, including standard conditions included in all permits, and may be enforced via citizen suit under the CWA.
>
> **Opinion 3:** In the context of citizen suits and government enforcement actions, courts regularly interpret NPDES Permit language.
>
> **Opinion 4:** Requiring compliance with narrative requirements such as "best industry practice" or "good engineering practice" places an affirmative burden on permittees to identify risks and underlying conditions that relate to pollutant discharges under the CWA.
>
> **Opinion 5:** The EPA has recognized that, under the industrial stormwater program, "good engineering practice" includes consideration of climate-change-driven risks such as extreme precipitation, storm surge, flooding, and sea-level rise.

---

[138] Pigott Rep., ECF No. 785 at 6.

[139] *Id.*

[140] *Id.* at 7.

[141] *Id.* at 8.

> **Opinion 6:** The EPA has long considered climate change in the context of CWA enforcement cases and permit interpretation.
>
> **Opinion 7:** The EPA has included consideration of climate change risks in permits for coastal facilities and municipalities as within the scope of the CWA industrial stormwater permitting program.
>
> **Opinion 8:** The operative permit requires consideration of climate change.
>
> **Opinion 9:** The lack of express requirements relating to climate change in the CWA does not mean that Shell does not need to consider climate change under the permit framework.
>
> **Opinion 10:** The CWA and enforcement mechanisms are appropriate tools to address climate change.[142]

Defendants argue that Pigott's opinions should be excluded as improper and untimely rebuttal under Federal Rules of Civil Procedure 26 and 37.[143] Defendants also argue that Pigott's opinions are irrelevant because he relies on another permit instead of the 2018/2021 permit at issue.[144] Defendants further contend that Mr. Pigott's methodology is unreliable because it is not based on the 2018/2021 Permit or any relevant statutory, regulatory, or legal authority.[145] Finally, Defendants assert that Pigott's opinions should be excluded under Federal Rule of Evidence 403 because they waste time, are cumulative, and prejudicial.[146] Defendants do not challenge Pigott's qualifications.

[142] *Id.* at 4–5.

[143] ECF No. 782 at 14–18.

[144] *Id.* at 18–23.

[145] *Id.* at 23–33.

[146] *Id.* at 33–35.

**a. Federal Rules of Civil Procedure 26 and 37**

Pigott's second, third, fourth, seventh, and ninth opinions are improper rebuttal testimony because they neither directly contradict nor cast doubt upon the admissible opinions proffered by Bodine and Uhlmann.

"Rebuttal evidence is admissible 'when it will explain, repel, counteract or disprove the evidence of the adverse party.'" *RVC Floor Decor, Ltd. v. Floor & Decor Outlets of Am., Inc.*, No. 18-CV-6449, 2023 WL 2838423, at *4 (E.D.N.Y. Apr. 7, 2023) (quoting *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008)). "The scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report, but district courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quoting *Allen v. Dairy Farmers of Am., Inc.*, No. 09-CV-230, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013)).

Pigott's first opinion regarding the enforceability of all NPDES permit terms rebuts Bodine's claim that only certain limitations imposed by permits issued under the Clean Water Act are enforceable.[147] It is therefore proper rebuttal opinion.

Pigott's second opinion regarding the ability to enforce NPDES permit terms via citizen suit does not rebut Uhlmann's second opinion, contrary to Pigott's assertion.[148] Uhlmann does not claim that citizens cannot bring suit based on violations of NPDES permits under the CWA.

---

[147] ECF No. 852 at 11.

[148] ECF No. 785 at 11 ("Thus, contrary to Mr. Uhlmann's assertion that a citizen suit cannot be brought where there is a failure to adequately address climate change, a NPDES permit (issued under Section 402, 33 U.S.C. § 1342), and any conditions of that permit, are explicitly included in what can be enforced by a citizen suit.").

Rather, he opines that enforcement actions charging regulated entities with violations of narrative requirements (e.g. "best industry practice," "best management practice") are made complex by the need for a broad analysis accounting for a given practice's economic practicability, feasibility, and establishment within a regulated industry.[149] That is categorically different than the claim Pigott attributes to him. In fact, at no point in his explanation of his second opinion does Uhlmann comment on citizen suits.[150] Accordingly, Pigott's second opinion is not proper rebuttal opinion.

Pigott's third opinion—that courts regularly interpret NPDES Permit language in the context of citizen suits and government enforcement actions—does not rebut any opinion proffered by Bodine or Uhlmann. Neither of those witnesses expressed an opinion on the ability of the Court to interpret NPDES permit language. Accordingly, Pigott's third opinion is not proper rebuttal opinion.

Pigott's fourth opinion—that NPDES permits' narrative requirements (i.e., "best industry practice," or "good engineering practice") place an affirmative burden on permittees to identify risks and underlying conditions that relate to discharges—rebuts Bodine's first opinion (i.e., climate assessment and other measures to adapt to increased flood risks are not valid requirements imposed by the CWA), Bodine's second opinion (i.e., climate assessment and adaptation measures are not "best industry practices"), and Uhlmann's third opinion (i.e., the adaptation measures recommended by Plaintiff's expert Wendi Goldsmith are not enforceable "best industry practices"). However, according to the analysis taken up later in

[149] ECF 1010-1 at 14.

[150] *See generally* ECF 1010-1.

this opinion, only the portion of Pigott's fourth opinion relating to the requirements imposed by the phrase "good engineering practice" is reliable. Accordingly, the only opinion rebutted by Pigott's fourth opinion is Bodine's first. And, because Bodine's first opinion has been precluded by the Court,[151] Pigott's fourth opinion has nothing to rebut and therefore must be excluded. *See, e.g.*, *Mehta v. DLA Piper LLP*, No. 23-CV-4757, 2026 WL 836677, at *6 (S.D.N.Y. Mar. 26, 2026) (excluding a rebuttal report that rebutted portions of an excluded expert's report); *Med. Depot, Inc. v. Med Way US, Inc.*, No. 22-CV-1272, 2024 WL 1835374, at *5 (E.D.N.Y. Apr. 26, 2024) (same); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 581 B.R. 370, 384 (Bankr. S.D.N.Y. 2017) (same).

Pigott's fifth opinion—that, under the industrial stormwater program, "good engineering practice" includes consideration of climate change risks such as extreme precipitation, storm surge, flooding, and sea-level rise—does not directly contradict any opinion of Bodine or Uhlmann because neither of those witnesses opined on the requirements imposed by the EPA's 2021 Multi-Sector General Permit's "good engineering practice" language; Bodine and Uhlmann discussed only the 2018/2021 CT DEEP permit's "best industry practice" requirement. However, it does cast doubt on Bodine's first and second opinions because it counters one of her factual bases. In her report, Bodine claims that no person ever suggested bringing a CWA enforcement action based on a facility's failure to assess climate change or adapt in preparation for the impacts of climate change during her tenure as an EPA Assistant Administrator (December 2017 to January 2021).[152] Pigott's

[151] *See supra* p. 21.

[152] ECF No. 852 at 13.

opinion rebuts that claim by demonstrating that the EPA (the agency charged with administering the CWA) believed the failure to adapt to climate change could violate the Act. Accordingly, Pigott's fifth opinion constitutes proper rebuttal opinion.

Pigott's sixth opinion—that the EPA has long-considered climate change in the context of CWA enforcement cases and permit interpretation—rebuts the same factual basis as his fifth opinion. Accordingly, Pigott's sixth opinion constitutes a proper rebuttal opinion.

Pigott's seventh opinion—that the EPA considered climate change adaptation measures as within the scope of measures required by the CWA—tends to rebut Bodine's first opinion (i.e., Defendants could not have violated the CWA because a climate assessment and other measures to adapt to increased flood risks are not valid requirements imposed by the Act). However, because Bodine's opinion has been excluded, Pigott's seventh opinion has nothing to rebut and, therefore, must also be excluded.

Pigott's eighth opinion—that the 2018/2021 CT DEEP Permit requires consideration of climate change—directly contradicts Bodine's second opinion (i.e., the 2018/2021 CT DEEP Permit contains no requirement to implement climate assessment and adaptation measures). Because Pigott's opinion is the opposite of Bodine's, it constitutes proper rebuttal opinion.

Pigott's ninth opinion—that the lack of express requirements relating to climate change in the CWA does not mean that the permit does not require Defendants to consider climate change—does not contradict or rebut the opinions of either Bodine or Uhlmann. Neither of those witnesses claim that Defendants were bound only by the express terms of the CWA. In fact, both Bodine and Uhlmann acknowledge that legal duties not expressly found in the CWA

may still arise through governing permits.[153] Accordingly, Pigott's ninth opinion is not a proper rebuttal opinion and is therefore precluded.

Pigott's tenth opinion—that the CWA and enforcement mechanisms are appropriate tools to address climate change—does not directly contradict the opinions of Bodine or Uhlmann, but it does rebut Uhlmann's second opinion (i.e., Clean Water Act permits requiring "best industry practices" are a poor fit for enforcement except in cases where specific practices are well-established). Accordingly, Pigott's tenth opinion constitutes proper rebuttal opinion.

Therefore, Pigott's second, third, fourth, seventh, and ninth opinions exceed the proper scope of a proper rebuttal because they neither directly contradict nor cast doubt upon the admissible opinions proffered by Bodine and Uhlmann.

Because portions of Pigott's report are outside the scope of proper rebuttal, Plaintiff's disclosure of his opinions was untimely. The Court therefore considers the four factors enumerated in *Softel* to determine whether those opinions should be excluded under Federal Rule of Civil Procedure 37. *See Softel*, 118 F.3d at 961. Those factors are: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.*

The first factor weighs in favor of preclusion because, just as it did not with regard to Mr. Levine, *supra*, Plaintiff has not attempted to justify the late disclosure beyond claiming that Pigott's opinions are proper rebuttal. The second factor also weighs in favor of preclusion

[153] *Id.* at ¶ 25; ECF No. 735 at 8–9.

because, as was the case with regard to Mr. Levine's testimony, the importance of Pigott's testimony is lessened because he is offered as a rebuttal witness.

The third factor weighs against preclusion. Where an opposing party has the opportunity to depose the untimely disclosed expert and thereby probe any deficiencies in the report or bases upon which the opinions are formed, they suffer little prejudice. *See RVC Floor Decor, Ltd.*, 2023 WL 2838423, at *5. Here, Defendants were able to depose Pigott and probe his report for deficiencies. Thus, the third factor weighs against preclusion.

Finally, the last factor weighs in favor of preclusion because "this action has already been protracted and has resulted in Court intervention in a number of disputes." *Russo*, 2024 WL 4449440, at *4.

Consequently, the Court finds that consideration of the *Softel* factors weighs in favor of preclusion. Pigott's second, third, fourth, seventh, and ninth opinions are precluded.

**b. Reliability**

The Court finds that several of Pigott's opinions are unreliable. Each remaining opinion is addressed in turn.

Pigott first opines that all terms and conditions of NPDES permits are enforceable.[154] To support this broad conclusion, Pigott draws on his "more than two decades" of experience as the Assistant Commissioner of the Indiana Department of Environmental Management (IDEM) and his professional judgment.[155] Pigott explains that his IDEM experience authorizing enforcement actions based on terms and conditions of NPDES permits leads him

[154] ECF No. 785 at 8.

[155] *Id.*

to believe that the terms and conditions of such permits are enforceable and have been enforced.[156] Pigott claims that he has authorized enforcement actions against permittees for failures to implement "best management practices" and other specific permit requirements.[157] Finally, Pigott cites three consent decrees from Illinois, Guam, and Massachusetts as proof that permit conditions can be used to require climate-change adaptation measures.[158] Pigott does not, however, explain how his experiences enforcing permit terms (even narrative permit terms such as "best management practices") and his knowledge of the three consent decrees necessitates the conclusion that "all" NPDES permit terms and conditions are enforceable. While those bases could rationally lead one to conclude that the *enforced* terms contained in *enforced* permits were enforceable, there does not appear to be any logical explanation for how they could support the weight of a conclusion as hefty as Pigott's. What's more, Pigott did not cite any enforcement action against an entity, governed by an NPDES permit that required "best industry practices," for its failure to implement climate resilience measures. Without that basis, Pigott's opinion is unreliable. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) ("[W]hen an expert opinion is based on data . . . that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.") (quoting *Amorgianos*, 303 F.3d at 266). Accordingly, Pigott's testimony as to the enforceability of "all" NPDES permit terms and conditions is precluded.

---

[156] *Id.*

[157] *Id.* at 9.

[158] *Id.* at 9–10.

In his fifth opinion, Pigott claims that the EPA has recognized that the industrial stormwater program requires consideration of climate-change-driven risks as "good engineering practice."[159] In support of his conclusion, Pigott cites Ms. Goldsmith's expert report and the EPA's 2021 Multi-Sector General Permit (MSGP).[160] In Pigott's view, Ms. Goldsmith's report establishes consideration of climate-related risks as a "good engineering practice."[161] And, as for EPA's 2021 MSGP, Pigott claims that the permit and accompanying documents "reflect[] the agency's position that climate adaptation is not optional but integral to compliance with NPDES permitting requirements."[162] Pigott says the MSGP and accompanying documents achieved this by noting that "[a]s part of good engineering practices, facilities should assess potential impacts from climate change, such as more intense storm events or increased flooding, to ensure that stormwater control measures remain effective."[163] Pigott also explains earlier in his report that EPA guidance is an "authoritative source" that state and municipal entities use to determine the Agency's position on enforcement standards, guidance, and practice.[164] Expert witnesses are permitted to draw on professional experience and observations to reach a general truth when their conclusion is based upon sufficient data. *See, e.g.*, *Nicholas*, 376 F. Supp. 3d at 290 ("[W]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis, courts recognize that experts

[159] *Id.* at 14–15.

[160] *Id.*

[161] *Id.*

[162] *Id.*

[163] *Id.*

[164] *Id.* at 7.

of all kinds tie observations to conclusions through general truths derived from specialized experience." (cleaned up)). Thus, by relying on his experiences and the EPA's 2021 MSGP (and its accompanying guidance), Pigott employs a reliable methodology to reach a reliable conclusion: the EPA has expressed a position that "good engineering practice" entails adaptation to climate change. Although it is unclear whether or how Ms. Goldsmith's report factored into Pigott's conclusion, his reference thereto does not render his ultimate conclusion unreliable.

In his sixth opinion, Pigott claims that the EPA has "long considered climate change in the context of CWA enforcement and permit interpretation."[165] To support this conclusion, Pigott relies on several EPA documents and investigations.[166] First, Pigott claims that the EPA's 2016 Climate Change Adaptation Implementation Plan for the Office of Enforcement and Compliance Assurance explicitly committed the Agency to integrating climate-adaptation considerations into enforcement and permitting oversight by emphasizing that staff should consider whether climate-change effects could compromise permit compliance.[167] Second, Pigott claims that the EPA's 2021 Framework for Protecting Public and Private Investment in Clean Water Act Enforcement Remedies "indicated that the EPA would consider relevant climate risks in appropriate enforcement matters and include, where suitable, injunctive relief that accounts for such risk and include requirements for the facilities to conduct vulnerability assessments."[168] Third, Pigott cites the 2024 memorandum issued by EPA Acting Director for

---

[165] *Id.* at 15.

[166] *Id.* at 15–16.

[167] *Id.* at 15.

[168] *Id.*

the Water Enforcement Division Joseph Theis to Enforcement and Compliance Directors which, according to Pigott, stated that "case teams in enforcement actions are expected to consider climate vulnerability in all cases, with very limited exceptions."[169] Fourth, Pigott cites the EPA's 2021 MSGP, which he claims tied climate adaption to permit compliance by advising facilities to assess how climate risks could undermine best management practices.[170] Fifth, Pigott claims that "specific enforcement contexts" in which infrastructure vulnerability to climate risks "informed compliance expectations" demonstrate that the EPA views climate change as a "present, material factor in interpreting NPDES permit obligations and enforcing the CWA's protective standards."[171] Sixth, Pigott says that two resources provided by the EPA and the National Oceanographic and Atmospheric Administration reflect the Agency's recognition that adapting to climate change is an enforceable obligation.[172] For the same reasons that Pigott's prior opinion as to the meaning ascribed by the EPA to the phrase "best management practices" was reliable, so too is his opinion that the EPA considers climate change in the context of CWA and NPDES permit enforcement. Pigott draws on his experience and familiarity with the EPA and his informed interpretations of the Agency's guidance and enforcement actions to reach his conclusion about the Agency's views. An expert's application of their experience to facts is an accepted methodology. *See McCullock*, 61 F.3d at 1043; *Kumho Tire Co.*, 526 U.S. at 148, 150; Fed. R. Evid. 702 advisory committee's notes to 2000 amendment ("In certain fields, experience is the predominant, if not sole, basis for a great deal

---

[169] *Id.* at 15–16.

[170] *Id.* at 16.

[171] *Id.*

[172] *Id.*

of reliable expert testimony."). However, to the extent that Pigott claims that the EPA has "long considered" climate change when enforcing the CWA and NPDES permits, his testimony is unreliable. At his deposition, Pigott was unable to identify when the EPA first espoused the position he ascribes to it.[173] Pigott never elsewhere identifies any metric that could give meaning to that vague description, and the materials he cited in his report at most establish that the EPA has held this position since 2016. Accordingly, Pigott's sixth opinion is reliable except to the extent it characterizes the position of the EPA as long-held.

As to his eighth opinion regarding the requirements of the "operative permit," Defendants argue that Pigott's testimony is unreliable because his ultimate opinion is entirely untethered from the facts it purports to be based upon.[174] According to Defendants, because Pigott did not review the 2018/2021 CT DEEP Permit at issue in this case prior to developing his expert report, his opinion pertaining to the requirements of that specific permit is not the product of a reliable methodology based upon sufficient data.[175] The Court agrees. Although experts are often permitted to draw on their professional experiences to form an opinion admissible under Rule 702, expert testimony relying on that sort of methodology must still be the product of reliable application to the facts of the case. Here, Pigott's opinion as to the requirements of the "operative permit" is not such a product. As Defendants point out, Pigott admitted in his deposition that he did not review the 2018/2021 CT DEEP permit.[176] Plaintiff

---

[173] Pigott Dep. Tr., ECF No. 786 at 187:13–188:11.

[174] ECF No. 782 at 23–26.

[175] *Id.* at 18.

[176] ECF No. 786 at 92:20–24 ("Q: I'll represent to you that this is the permit that was in effect at the time CLF filed its lawsuit in this case; okay? Have you reviewed this permit? A: I have not reviewed this permit.").

provides no explanation for this failure in its opposition memorandum. Accordingly, the Court finds that Plaintiff has failed to carry its burden to demonstrate the reliability of Pigott's testimony concerning the precise obligations imposed by the 2018/2021 CT DEEP permit's "best industry practice" language. Any testimony from Pigott as to this matter is precluded. *See, e.g.*, *Colwell v. Sig Sauer, Inc.*, 177 F.4th 382, 390–91 (2d Cir. 2026) (concluding that district court was within its discretion to exclude expert testimony when experts did not consider the circumstances of the case and therefore lacked reliable foundation for their conclusions); *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 470–71 (S.D.N.Y. 2023) (excluding expert testimony where expert "specifically disclaimed performing a comprehensive review" of the "very documents" that the plaintiff argued established a fact at issue).

In his tenth opinion, Pigott claims that the CWA and enforcement mechanisms are appropriate tools to address climate change.[177] To support this opinion, Pigott claims that the evolution of technology has made compliance easier for regulated entities.[178] He then states that the claim of Defendants' expert David Uhlmann—that narrative requirements are a poor fit for targeting climate change—is directly contradicted by the EPA's Climate Enforcement and Compliance Strategy.[179] Pigott claims that that document contradicts Uhlmann when it states "[c]onsistent with EPA's legal authorities, we must take concrete steps to enhance adaptation and resilience within the regulated community by considering climate change

[177] ECF No. 785 at 22.

[178] *Id.*

[179] *Id.*

adaptation and resilience concepts in all enforcement and compliance activities."[180] Pigott, however, cites no specific examples to support his conclusory claim that the evolution of technology has made permit-compliance easier. *See Ruggiero*, 424 F.3d at 255 (holding that expert opinion is properly excluded when it is not based on sufficient data). Further, the Court is unable to discern how Uhlmann's claim is contradicted by the language Pigott cites. That language at no point refutes Uhlmann's point that narrative requirements are difficult to enforce absent well-established practices. Accordingly, Pigott's tenth opinion is unreliable and, therefore, precluded.

Therefore, only Pigott's fifth and sixth opinions remain (subject to the limitations explained in this section).

**c. Relevance and Rule 403**

Here, whether Pigott's testimony regarding "good engineering practice" is relevant is a question of whether his testimony tends to make it more or less likely that the measures allegedly required were "best industry practice." Conceivably, then, Pigott's remaining opinions might be relevant. Pigott opines on the EPA's interpretation of the CWA and permits issued within the same program as the 2018/2021 CT DEEP permit at issue here, and also on the requirements imposed by such permits. As the Court recognized in its discussion of Susan Parker Bodine's opinions *supra*, the EPA's interpretation of the CWA is entitled to some weight when determining whether a given practice violates the terms of the Act. Indeed, even when its statutory interpretations are incorrect, an enforcement authority's choices to pursue (or not to pursue) perceived violations can influence behavior within a regulated industry.

[180] *Id.*

Thus, whether the EPA or other permitting authorities view the failure to adapt to foreseeable climate change as a violation of the CWA for one reason or another could, ostensibly, be relevant to the issue before the jury here, even if an expert's opinion as to those views is based upon permits and permit-language not at issue.[181] But Plaintiff has not provided proof of a premise necessary to support this inference. For example, Pigott does not identify any specific enforcement action for a permittee's failure to consider climate change during his time at IDEM or EPA.[182] Nor does he explain how agency views unmanifested by enforcement actions influenced NPDES permittees. A conceptually similar circumstance was encountered in *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736 (2d Cir. 1998). There, the Second Circuit affirmed the district court's decision to exclude the testimony of two experts for their failure to connect their testimony to the facts of the case. *Nora Beverages*, 164 F.3d at 746. The experts had explained that agreements could be entered into by means other than executing a formal contract, such as by manufacturing a product. *Id.* However, because the proponent of the experts offered no proof that it had manufactured the product at issue, the Circuit Court found no manifest error in the district court's decision to exclude the experts' testimony as irrelevant. *Id.* As was the case in *Nora Beverages*, Plaintiff here fails to substantiate a premise necessary to make Pigott's testimony relevant. The Court is therefore left to surmise the possible relevance of his opinions.

Even assuming, *arguendo*, that the above theory of relevance is tenable, the Court believes that any probative value Pigott's opinions may have is substantially outweighed by

[181] The Court notes, however, that this conceived theory of relevance was not claimed by Pigott in his report or by Plaintiff in its opposition to Defendants' motion to preclude.

[182] ECF No. 782 at 28–29.

the danger they present of confusing the issues and misleading the jury. In *Nora Beverages*, the Second Circuit also observed that the experts' testimony could have misled rather than assisted the factfinder. *Id.* Similarly, here, Pigott's opinions are removed from the facts of the case and therefore do not lend assistance sufficient to outweigh their confusing effect. Because Pigott's opinions are largely based upon permits that are not at issue, and contain language differing from the CT DEEP permit, they encourage a fact-finder to conflate the requirements of all NPDES permits without supplying a principled reason for doing so. *See also Berkovich v. Hicks*, 922 F.2d 1018, 1024 (2d Cir. 1991) (affirming a district court's exclusion of fact evidence whose relevance was "speculative" and therefore only had "slight probative value" relative to its tendency to confuse issues or mislead jury). Accordingly, the Court excludes Pigott's testimony under Rule 403.[183]

Therefore, Defendants' motion to preclude the testimony of Bruno Pigott is granted.

---

[183] The Court also notes that Pigott's fifth opinion—that the EPA has recognized that "good engineering practice" requires the consideration of climate-change impacts—could be construed as a mere recitation of fact (i.e. that the EPA issued the MSGP). So construed, his testimony on the matter would be inappropriate. It is well-settled that expert witnesses are unnecessary when the factfinder is capable of comprehending the facts through the presentation of direct evidence. *E.g.*, *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ("[E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation." (cleaned up)). Further, to the extent that Pigott's fifth opinion merely restates the findings of the Goldsmith Report without further analysis, his testimony would be cumulative.

#### 5. Defendants' Motion to Preclude the Testimony of Joshua Macey

The Court grants in part and denies in part Defendants' motion to preclude the testimony of Joshua Macey under Federal Rule of Evidence 702 because portions of Macey's opinions constitute impermissible legal conclusions.

Plaintiff retained Mr. Macey, an Associate Professor at Yale Law School, to describe the corporate structure and interrelationship of Defendants, specifically with regard to the operation of their New Haven bulk petroleum storage terminal, located in New Haven, Connecticut.[184] In his Opening Report, Mr. Macey provides three affirmative opinions: (1) Defendants all exerted operational control over the Terminal; (2) Throughout Motiva and Equilon's involvement in the New Haven Terminal, Defendants all exerted operational control over the Terminal in furtherance of Shell environment and climate policy, and (3) Shell has a healthy balance sheet and is capable of paying a large fine.[185]

In his Rebuttal Report, Mr. Macey purports to respond to the opinions of Defendants' experts, including Ms. Bodine's statement that "deep pockets are not a consideration" in determining civil penalties, and Mr. Kovich's similar claim, based on his view that Connecticut's Civil Penalty Policy should guide any penalty determination in this case.[186] Mr. Macey provides three rebuttal opinions:

> **[Rebuttal] Opinion 1:** Defendant's strong balance sheet is relevant in establishing any civil penalty because it relates to the "economic impact of the penalty" and to the "economic benefit" the Defendant obtained as a result of any environmental violations, both of which are listed in the text of the CWA and RCRA as factors in establishing civil penalties.

[184] Macey Opening Rep., ECF No. 761 at 4.

[185] *Id.* at 3.

[186] Macey Rebuttal Rep., ECF No. 762 at 4.

> **[Rebuttal] Opinion 2:** The Connecticut Civil Penalty Policy (CPP) does not limit the amount that can be pursued in litigation. It is a guidance document that is intended for use by the Connecticut Department of Energy and Environmental Protection (DEEP). It establishes the "range within which the Department will either settle or recommend that the Attorney General seek in litigation." Civil penalties for citizen suits are governed by federal environmental statutes and EPA regulations, and the CPP itself authorizes DEEP to "assess penalties that are at variance with the policies or procedures contained in this document if appropriate in a specific case, and may change this policy at any time without public notice."
>
> **[Rebuttal] Opinion 3:** At the very least, Shell's deep pockets are evidence that any penalty levied should not be adjusted downwards based on financial hardship.[187]

Taken together, Mr. Macey's opinions fall into two categories: the first category includes opinions on operational control, including who owned, operated, participated in, controlled, and managed the Terminal, while the second category includes the financial viability of Shell plc, which Mr. Macey argues is relevant to the statutory penalty factors and renders Connecticut's Civil Penalty Policy not relevant.

Defendants argue that Mr. Macey's opinions should be excluded under Rule 702 on several grounds. Principally, Defendants argue that the opinions include legal conclusions.[188] They further challenge Mr. Macey's qualifications and argue that his opinions are not the result of a reliable methodology and cannot assist the fact finder.[189] Finally, Defendants argue that Mr. Macey's opinions are inadmissible under Rule 403.[190]

---

[187] *Id.*

[188] Defs.' Mot. Preclude, ECF No. 760 at 12–15.

[189] *Id.* at 15–23.

[190] *Id.* at 23–25.

**a. Legal Conclusions**

As previously discussed, it is well-established in this Circuit that expert testimony on issues of law is inadmissible, *e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), and a court has discretion to exclude impermissible portions of opinions.

First, contrary to Defendants' arguments, the Court finds that Affirmative Opinion 3 and Rebuttal Opinions 1, 2, and 3 do not constitute legal opinions or legal conclusions. These opinions include context on the financial viability of Shell plc, which Mr. Macey asserts is relevant to whether Defendants can afford to pay any civil penalties levied in this case, but they do not usurp the role of the factfinder in concluding that Defendants should pay civil penalties.

Second, with respect to Mr. Macey's opinions concerning Defendants' alleged operational control over the terminal, the Court finds that portions of Affirmative Opinions 1 and 2 are inadmissible legal conclusions. Mr. Macey may not testify as to whether Defendants exerted operational control over the Terminal in furtherance of Shell environment and climate policy because this is in effect, a legal conclusion and would trespass the province of the jury in applying the law to the facts before it. "Notwithstanding the usual rule that an expert should not testify about the law or ultimate conclusions that a jury will be asked to decide, an expert may properly testify on background legal concepts and related practices that are important to the jury's determination of facts[.]" *United States v. Rankin*, No. 18-CR-272 (JAM), 2021 WL 5563996, at *2 (D. Conn. Nov. 27, 2021) (cleaned up). Testimony regarding general corporate governance principles and the concept of veil piercing can be crucial in helping the jury to understand complex issues. *Cary Oil Co. v. MG Refin. & Mktg., Inc.*, No. 99-CV-1725, 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003) (admitting an expert's analysis of evidence

and "his identification of how such evidence may indicate that the relation between the Defendants exceeded the control a parent ordinarily exercises over its subsidiary so as to justify veil-piercing"). Thus, Mr. Macey is permitted to opine, based on his specialized expertise and review of the record, as to whether there are indicia of Defendants all exerting operational control over the Terminal.

**b. Qualifications**

The Court concludes that Mr. Macey's specialized professional experience as a law professor renders him qualified to offer his opinions, including opinions on operational control of the Terminal and the financial viability of certain corporation entities. Mr. Macey is an Associate Professor at Yale Law School, where his teaching and research specialties include bankruptcy, corporate law, corporate governance, energy and environmental law, and the regulation of financial institutions.[191] He has written in the areas of corporate governance and corporate law, including in law review articles and a casebook.[192] Prior to attending law school, Mr. Macey worked as an Analyst at Morgan Stanley. The Court thus finds that Mr. Macey's expertise fits within his proposed testimony and the general subject matter concerning corporate structure and financial positions. The arguments that Mr. Macey lacks experience outside of an academic setting fail to move the Court because "[a]ssertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of the testimony.'" *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282 (quoting *McCullock*, 61 F.3d at 1044).

---

[191] ECF No. 761 at 4.

[192] *Id.*

### c. Reliability

Next, the Court rejects Defendants' contentions that Mr. Macey's opinions are unreliable as a matter of law. Defendants argue that Mr. Macey cherry-picked evidence by relying on certain publicly available materials and documents selected by counsel, that Mr. Macey relied on documents with no connection to the terminal, and that Mr. Macey failed to consider or obtain information that bears on the opinions he offers. While it may be that Mr. Macey did not review certain transcripts of depositions, discovery responses, or other relevant Terminal documents, the list of materials considered by Mr. Macey adequately shows that Mr. Macey's conclusions are "based on sufficient facts analyzed in a reliable manner" here, where Defendants have not meaningfully identified how Mr. Macey overlooked certain documents. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 479 (S.D.N.Y. 2009) (holding expert's methodology reliable where "[defendant] implies that the [plaintiff's] attorneys may have skewed [the expert's] report by selectively providing him internal corporate studies obtained through discovery"). It is sufficient here for Mr. Macey to base his testimony on his academic research, professional experience, and documents provided by a party in discovery. *See United States v. Hoskins*, No. 12-CR-238 (JBA), 2019 WL 5556092, at *2–4 (D. Conn. Oct. 28, 2019). Defendants' critique of Mr. Macey's "research go to the weight, not admissibility, of his testimony." *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 200 (D. Conn. 2014).

### d. Relevance

The Court also disagrees with the contention that Mr. Macey's opinions about nonparties are irrelevant. Evidence "need not be sufficient by itself to prove a fact in issue" in order to meet the "very low standard" of relevancy. *United States v. Litvak*, 889 F.3d 56, 68

(2d Cir. 2018) (cleaned up). While some of the proposed testimony may not align identically with the parties in the case, the remaining defendants are wholly owned subsidiaries of non-party Shell plc. As such, their finances are rolled up with those of Shell plc and are reported as one entity. Thus, Professor Macey's opinions on the financial health of the non-party parent corporation may bear light on the financial health of the named defendants in this case. Additionally, information about Shell plc and its policies may be necessary to explain how the remaining defendants operated the Terminal.

**e. Rule 403**

Finally, the Court finds that, at this juncture, Rule 403 does not warrant preclusion of Mr. Macey's testimony. As limited by the Court's order, Professor Macey is not offering any legal conclusions that would allow the jury to believe that his opinions are more authoritative than the Court's instructions on the law. And considering that the finances of the remaining defendants are rolled up with those of non-party Shell plc and are reported as one entity, the probative value of Mr. Macey's proposed testimony on nonparties is not substantially outweighed the danger of unfair prejudice, confusing the issues, or misleading the jury.

Consequently, the Court grants in part and denies in part the motion to preclude Mr. Macey's testimony. Specifically, portions of Affirmative Opinion 1 and 2 are excluded as impermissible legal conclusions.

**6. Defendants' Motion to Preclude the Testimony of Matthew Barlow, Ph.D.**

The Court denies Defendants' motion to exclude the testimony of Matthew Barlow, as Defendants have failed to show that Dr. Barlow's analysis is not helpful to the jury or that Dr. Barlow's opinions violate Federal Rule of Evidence 403.

Dr. Barlow, a professor of climate science at University of Massachusetts Lowell who holds a Doctor of Philosophy in meteorology from the University of Maryland,[193] was retained by Plaintiff to assess the potential impact of human-caused climate change on precipitation intensity and storm strength for the Terminal.[194] Dr. Barlow seeks to provide the following opinions:

> **Opinion One:** The climate is warming, with observed and predictable effects based on science and computer models of the climate system, including a rise in sea level, increased precipitation, and more frequent and severe storms.[195]
>
> **Opinion Two:** Climate change has made coastal New England, including New Haven, more vulnerable to severe storms and flooding due to an increase in intensity of storms and rising relative sea levels.[196]

Defendants contend that Professor Barlow's opinions are inadmissible under Federal Rule 702 because they do not fit the facts of the case on multiple grounds. Specifically, Defendants argue that Professor Barlow makes no attempt to help the jury understand Defendants' obligation under the 2018/2021 Permit, that his opinions are not tethered to the Terminal, that his opinions do not help the jury because the effects he discusses are too far in the future, and that his opinions are not relevant to Plaintiff's RCRA claim. [197] Defendants also argue that Dr. Barlow's opinions are inadmissible under Rule 403.[198]

The problem with the Defendants' arguments under Rule 702 is that they rely on an unduly narrow view of relevance to the case. "[E]vidence need not be sufficient by itself to

---

[193] Barlow Rep., ECF No. 747 at 4.

[194] *Id.* at 10.

[195] *Id.*

[196] *Id.* at 12.

[197] Defs.' Mot. Preclude, ECF No. 732-1 at 9–20.

[198] *Id.* at 21–22.

prove a fact in issue" in order to meet the "very low standard" of relevancy." *Litvak*, 889 F.3d at 68 (cleaned up). Dr. Barlow's opinions regarding what climate change is and how it affects New Haven generally address predicates about the impact of climate change on the Terminal, which is located in New Haven. Plaintiff has alleged Defendants have engaged in unlawful conduct under the CWA because the Permit places affirmative duties on Defendants to evaluate the risks posed to the Terminal by weather events—including purported foreseeable effects of climate change—and to take action to address those risks, but that Defendants have neglected to do so. By failing to take severe weather and climate change into account, Plaintiff argues, Defendants are violating the Permit requirements, and therefore the CWA. To illustrate, Plaintiff alleges that Defendants have failed to comply with the Permit's Best Management Practices requirements by failing to consider climate change in the following ways: (**Count I)** Defendants violated the CWA by failing to eliminate non-stormwater discharges, as the SWPPP does not refer to the potential for flooding at the Terminal from storm surge and sea-level rise, despite the past incidences of storm surge flooding, **(Count V)** Defendants violated the CWA by failing to implement practices to reduce pollutants and ensure permit compliance, as the SWPPP does not refer to the potential storm surge and increased rainfall exacerbated by climate change, **(Count VI)** Defendants violated the CWA by failing to implement measures to manage runoff, as Defendants did not consider the potential impact of climate change on increased pollutants in stormwater discharges, and **(Count VII)** Defendants violated the CWA by failing to minimize the potential for leaks and spills, as Defendants did not consider factors that increase the likelihood of leaks and spills such as sea

level rise.[199] Consequently, while the anticipated testimony regarding the risks of climate change to New Haven is not sufficient to prove Defendants' duties to consider climate change under the Permit, it is helpful for the jury to understand how climate change purportedly affects New Haven to determine a core issue in this case, whether the Permit requires Defendants to consider the effects of climate change. Dr. Barlow's opinions are therefore relevant.

Next, the Court finds that, at this juncture, Rule 403 does not warrant preclusion of Dr. Barlow's testimony. Under Rule 403, relevant expert testimony may be precluded if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see Nimely*, 414 F.3d at 397. The proffered testimony from Dr. Barlow has probative value regarding the risks of climate change to New Haven in the area where the Terminal is located, and the value of that testimony would not confuse the issues. Considering the number of disclosed expert witnesses in this case, however, it may be that Dr. Barlow's testimony is at risk of violating Rule 403 for being needlessly cumulative. But Defendants have not made that showing at this juncture.

Consequently, the Court denies the motion to preclude Dr. Barlow's testimony.

#### 7. Defendants' Motion to Preclude the Testimony of Richard Horner, Ph.D.

The Court denies Defendants' motion to preclude the testimony of Richard Horner. But Defendants are granted leave to renew their motion on the issue of relevance during summary judgment motion practice.

[199] *See generally* ECF No. 47.

Plaintiff retained Dr. Richard Horner, a former research professor at the University of Washington's Department of Civil and Environmental Engineering, to offer opinions on the stormwater management system at the New Haven Terminal. Dr. Horner offers twelve opinions:

- Shell operates under regulatory requirements to provide impermeable tank secondary containments that hold at least 100 percent of the volume of the largest tank or 10 percent of the total volume of all tanks, whichever is larger, and to contain discharged petroleum product until being cleaned up.

- Shell's tank secondary containments are not lined, lie on soils predominant in sand and gravel through which liquids rapidly infiltrate and percolate downward to groundwater, and are thus not impermeable.

- The soil has been documented in two investigations over the years to be heavily contaminated with many constituents of concern associated with Shell's products.

- Groundwater beneath the Shell Terminal is subject to regulations requiring that the entire volume of infiltrated runoff be treated prior to infiltration and that the treatment system for this purpose have an impermeable liner. The water infiltrating from Shell's unlined tank secondary containments is not treated, nor are the treatment basins to which stormwater runoff is directed.

- Groundwater at the site is within a very few feet of the surface; is highly subject to contamination owing to the highly infiltrative soils and lack of stormwater treatment or liners in tank secondary containments and the treatment basins; and, like the soil, has been documented in two investigations over the years to be heavily contaminated with many constituents of concern associated with Shell's products.

- Groundwater movement at the Terminal is in the direction of New Haven Harbor, about a quarter mile away, and moving at a rate that can transport contaminants in groundwater to the harbor in a few years or less. The groundwater table also intersects a drainage channel through the Terminal that flows to the harbor.

- I assessed the implications of making the secondary containments impermeable with liners and concluded that lining them is entirely feasible and should be done to alleviate the ongoing contamination of groundwater and transport of pollutants to New Haven Harbor.

- Shell was informed of the inadequacies of the tank secondary containments in 2017 but failed to inform the state regulator as required by the Stormwater Permits.

- I assessed the operation of a bypass pipe installed in 2022 to drain the contents of the inadequately sized Containment Area 1 into Containment Area 2 in the event of a large, rapid product release. I found that it would not transfer the released products in time to avoid overflow into the drainage channel leading to New Haven Harbor.

- Shell's stormwater treatment basins do not meet the requirement of the Stormwater Permits to use control measures at the level of best industry practice. They should be replaced with a form of advanced stormwater treatment.

- The certification of Shell's 2017 stormwater pollution prevention plan is not compliant with the requirements of the Stormwater Permits because of: (1) a lack of proper verification of tank containment area capacity and impermeability; (2) failure to immediately implement a Corrective Action Plan and report deficiencies to CT DEEP within the requisite five-day period; (3) lack of consideration of relevant policies and guidelines in development of the plan; (4) no attention to meteorological and climatological factors, including climate change effects, that have strong influences on how well a stormwater management system functions; and (5) no demonstration that the discharge from the stormwater drainage system is comprised solely of stormwater.

- The stormwater pollution prevention plans developed in 2011, 2020, and 2023 are deficient in numerous important respects. Furthermore, the latter two versions were not properly certified as required. The 2017 plan is therefore the operative one, despite the inadequacy of its certification.[200]

Defendants argue that Dr. Horner's testimony is inadmissible under Federal Rule of Evidence 702, arguing that (1) Dr. Horner lacks the scientific, technical, or other specialized knowledge necessary to offer the opinions stated in his Report,[201] (2) Dr. Horner's opinions are irrelevant and do not meet the "fit" requirement for admissibility,[202] and (3) Dr. Horner does not employ a discernible or reliable methodology in reaching his opinions.[203] Defendants also argue that Dr. Horner's opinions should be excluded under Rule 403.[204]

---

[200] Horner Rep., ECF No. 753 at 6–8.

[201] Defs.' Mot. Preclude, ECF No. 752 at 18–27

[202] *Id.* at 27–33.

[203] *Id.* at 33–43.

[204] *Id.* at 43–45.

**a. Qualification**

The Court is persuaded that Dr. Horner has the requisite education and experience to be a qualified expert in engineering and to render expert opinions on the industry, the permit, and the facilities that this matter encompasses. Dr. Horner holds a bachelor's and master's degree in mechanical engineering from the University of Pennsylvania.[205] He also holds a Ph.D. in civil engineering from University of Washington, Seattle.[206] He worked as a Project Engineer over five decades ago at an Exxon Research facility, and has worked as a professor at Northampton Community College and the University of Washington, Seattle.[207] Dr. Horner has retired from teaching and is currently an Emeritus Research Associate Professor at the University of Washington and a consultant offering services in environmental engineering and science.[208] His research, teaching, and consulting have encompassed "aspects of stormwater management, including determination of pollutant sources; their transport and fate in the environment; physical, chemical, and ecological impacts; and solutions to these problems through better structural and non-structural management practices."[209] He was a member of the National Academy of Sciences-National Research Council (NASNRC) committee on Reducing Stormwater Discharge Contributions to Water Pollution, the first national committee on the subject of stormwater, and contributed to a

[205] ECF No. 753 at 68.

[206] *Id.*

[207] *Id.* at 68–69.

[208] *Id.*

[209] *Id.* at 9.

chapter of the final report presenting the committee's recommendations for broadly revamping the nation's stormwater program.[210]

Notably relevant here, Dr. Horner is familiar with stormwater permits and measures industries can take to reduce pollutants in storm water to comply with their permits. He has provided analyses in more than 80 legal cases involving industrial storm water permits, including expert testimony in two appeals involving Washington State's Industrial Stormwater General Permits.[211] He was appointed as a special master in the United States District Court for the District of California to offer advice on bringing a Los Angeles automobile recycling yard into compliance with the terms of a consent decree and has served on a panel that developed an industry-specific stormwater permit for metal recyclers in California.[212] Dr. Horner has inspected four other industrial sites that receive and distribute petroleum products by land and, at those sites, analyzed sources of storm water contamination and adherence to stormwater general and individual permit terms.[213]

Considering Dr. Horner's extensive experience in multiple states, spanning over more than five decades, the Court concludes that Dr. Horner has the specialized knowledge, skill, and experience to be qualified as an expert to offer the opinions in his report. Defendants' arguments that Dr. Horner has retired from teaching and that he has never worked on a project in Connecticut or with bulk petroleum storage facilities do not change this conclusion, as Dr. Horner need not "satisfy an overly narrow test of his own qualifications," *CSL Silicones, Inc.*,

---

[210] *Id.* at 10.

[211] *Id.* at 11.

[212] *Id.*

[213] *Id.*

2017 WL 6055380, at *2 (cleaned up). Indeed, where "well-trained people with somewhat more general qualifications are available, it is error to exclude them." *Stagl, Inc.*, 117 F.3d at 82.

**b. Reliability**

The Court concludes that the methodology employed by Dr. Horner is reliable and the opinions are based on sufficient facts and data.

First, while Dr. Horner did not independently test the soils at the Terminal, Defendants' argument that Dr. Horner's opinions—including that the Terminal's secondary containment area is not impermeable—are based on personal opinion and *ipse dixit* conclusion, as opposed to data, mischaracterizes the record. Defendants are correct that an opinion supported only by an expert's *ipse dixit* is inadmissible. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146. Thus, opinion testimony must be excluded as unreliable where there are "data, a methodology, or studies that are simply inadequate to support the conclusions reached. *Rutledge*, 182 F.4th at 184 (cleaned up). But that is not what Dr. Horner's report reveals. To evaluate the soil at the Terminal, Dr. Horner primarily relied on historical data found in a report from Sovereign Consulting, Inc., who reported on an investigation of the Terminal's soils and hydrogeologic environment in 2022 and issued a remediation plan in 2023.[214] That report provided a description of soil conditions at the Terminal through 67 soil borings that were done throughout the Terminal in

[214] ECF No. 753 at 19.

October 2003.[215] Dr. Horner then compared these findings to the Soil Survey of New Haven County, and also personally inspected the surface soil in his site visit in April 2025.[216] After reviewing these materials, Dr. Horner concluded that conditions at the Terminal do not comply with the "impermeable" terms of the Stormwater Permits or the "sufficiently impervious" requirements of the SPCC guidance because "the Terminal's soils, including in the tank secondary containments, are relatively coarse in texture, formations known to infiltrate water through the surface readily and rapidly percolate it downward through the soil profile."[217] This is sufficient to show that Dr. Horner employed reliable methodology, as "a review of other studies and scientific literature can be enough to qualify experts to testify and to make that proposed testimony reliable." *Id.* (cleaned up).

The Court next rejects the argument that Dr. Horner provided no basis for his understanding of "best industry practice," as used in his report.[218] Dr. Horner's report includes several pages on his professional background, which was detailed above.[219] He appropriately cites to his own experiences to support his conclusion that considering climate change is best industry practice.[220] *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132 (2d Cir. 2006) (permitting expert testimony on custom and practice in the property

---

[215] *Id.*

[216] *Id.* at 19–20.

[217] *Id.* at 20.

[218] ECF No. 753 at 32 ("The Stormwater Permit at sections 2 and 5(b) requires implementing stormwater controls that are technologically available and economically practicable and achievable at the level of "best industry practice.").

[219] *Id.* at 8–12.

[220] *Id.* at 32. ("In my experience, considering the modifications forecast to accompany climate change is best industry practice in specifying stormwater quantity and quality control BMPs.").

insurance industry where the expert's experience provided a basis for his opinion and testified that "he was familiar with practices in the industry" and "explained that through [his] experiences, he was able to identify" practices within it).

Third, Defendants are incorrect in asserting that Dr. Horner's failure to consider alternative sources of contamination renders inadmissible his opinion that the Terminal's failure to comply with the Permit has led to contamination of the New Haven Harbor. Arguments that Dr. Horner failed to consider all available data or failed to conduct his own testing go to the weight of evidence and not to its overall unreliability. *Du*, 731 F. Supp. 3d at 402.

Finally, Defendants unpersuasively argue that reliance on a document that post-dates the applicable time period, the Connecticut Stormwater Quality Manual, renders the entirety of Dr. Horner's report inadmissible. The Court cannot conclude that "there is simply too great an analytical gap between the data and the opinion proffered," *Joiner*, 522 U.S. 136, 146 (1997), where, as here, Dr. Horner's deposition testimony is that the use of that manual was supplementary to other sources for his opinions concerning a liner requirement.[221] Dr. Horner also relied on his professional experience in interpreting the "impermeability" requirement from under the Permit.[222]

**c. Relevance**

At this juncture, the Court concludes that it must reserve judgment on Defendants' contention that Dr. Horner's opinions are irrelevant because they do not "fit" the facts of the

[221] *See* Horner Tr., ECF No. 855 at 212:16–220:3.

[222] ECF No. 753 at 16–18.

case. Defendants argue that many of Dr. Horner's opinions are not included the Notices of Intent to Sue ("NOI"), which Plaintiff was required by statute to serve on Defendants and other regulatory agencies before filing suit. The Court finds that Defendants go too far in asserting that any opinions about alleged violations not explicitly identified in the NOI are irrelevant. Indeed, the Second Circuit has held that there is no requirement for "a plaintiff—who may possess little information about a particular violation or have limited access to a potential defendant's property prior to initiating suit—to detail the specifics of their claim in a manner that would typically appear in an expert report following discovery." *Mid-New York Env't & Sustainability Promotion Comm., Inc. v. Dragon Springs Buddhist, Inc.*, 152 F.4th 413, 425 (2d Cir. 2025). There must, however, be a notice that is "sufficient to notify a reasonable person" of a plaintiff's claims and "must reasonably inform a defendant of the basis of a plaintiff's claims and include the information set forth in 40 C.F.R. § 135.3(a)." *Id.* at 424, 428. Therefore, the Court agrees with Defendants that an expert's opinion could be deemed irrelevant in this action arising under the CWA and RCRA if the theory of liability underlying that opinion was not sufficiently disclosed in the NOI. *See, e.g.*, *Jones Creek Invs., LLC v. Columbia Cnty.*, No. CV 111-174, 2013 WL 12141348, at *14–15 (S.D. Ga. Dec. 23, 2013) (considering whether an expert's testimony was admissible under Daubert in part based on whether the alleged violations were sufficiently contained in the NOI). The Court finds the record to be insufficiently briefed on this issue and will allow further briefing during summary judgment motion practice. *See Cohalan v. Genie Indus., Inc.,* No. 10-CV-2415, 2013 WL 829150, at *2 (S.D.N.Y. Mar. 1, 2013) ("Because on a summary judgment motion a district court properly considers only evidence that would be admissible at trial, a court may—

and sometimes must—decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment." (cleaned up)).

#### d. Rule 403

The Court finds that, at this juncture, Rule 403 does not warrant preclusion of Dr. Horner's testimony. Dr. Horner's opinions are highly relevant because they directly relate to Plaintiff's theories of liability. Defendants have not shown a danger of unfair prejudice, confusing the issues, or misleading the jury on this record.

Consequently, the Court denies the motion to preclude Dr. Horner's testimony.

### 8. Defendants' Motion to Preclude the Testimony of Phillip Pasteris, M.S.

The Court grants Defendants' motion to exclude the testimony of Phillip Pasteris under Federal Rule of Civil Procedure 37(c)(1), as Plaintiff's omitted disclosures were neither substantially justified nor harmless.[223]

Mr. Pasteris, a meteorologist and former industry consultant with more than fifty years of experience, was retained by Plaintiff to review and rebut the reports of Susan Bodine, Craig Jones, Eric Kovich, and David Uhlmann, which purportedly minimized the projected impacts of climate at the Terminal and failed to account for factors outlined in Mr. Pasteris's report.[224] Mr. Pasteris seeks to provide two opinions:

[223] Because the Court holds that Mr. Pasteris's testimony should be excluded under Federal Rule of Civil Procedure 37, it does not reach the other issues.

[224] Pasteris Rep., ECF No. 742-2 at 4.

> **Opinion 1** – Best Industry Practice requires Shell to consider and protect against reasonably foreseeable risks, including risks from climate change such as the increasing risk of extreme precipitation events
>
> **Opinion 2** - Climate change does in fact pose risks to the facility, including projected changes in precipitation extremes.[225]

As relevant here, it is undisputed that Plaintiff did not disclose materials related to a roundtable, which was referenced in Mr. Pasteris's report, to Defendants. In the present case, Mr. Pasteris relies on experience as an industry consultant, including that he worked on projects focused on climate adaptation, to formulate his opinion involving industry consideration of climate change—namely that adherence to best industry practices necessitates the integration of climate change risks into the Terminal's infrastructure planning and risk assessment processes.[226] Mr. Pasteris specifically references a 2009 roundtable where various industry members learned of "potential impacts across the oil and gas value chain and identified innovative ways in which businesses have, and can, design resiliency to the anticipated physical impacts that will result from climate change."[227] During his deposition, Mr. Pasteris confirmed that he had materials from the 2009 roundtable, including an email containing a follow-up discussion and a PowerPoint summarizing the topics covered in the roundtable.[228]

The question, then, is whether Mr. Pasteris considered any "facts or data" that were not disclosed to Defendants under Rule 26. Witnesses who are specially employed to provide

---

[225] *Id.*

[226] *Id.* at 7.

[227] *Id.* at 7–8.

[228] Pasteris Tr., ECF No. 742-3 at 101:6–12, 104:7–13, 120:22–121:10.

expert testimony in a case have an affirmative duty to provide a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them;" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). The obligation to disclose "facts or data" considered by an expert under Rule 26 is "interpreted broadly to require disclosure of **any material considered by the expert, from whatever source, that contains factual ingredients**." Fed. R. Civ. P. 26 advisory committee's note, 2003 amend (emphasis added).

The Court finds that the record shows that Mr. Pasteris considered facts referenced in a PowerPoint presentation that was not disclosed to Defendants. At his deposition, Mr. Pasteris testified that he presented at the 2009 roundtable on topics referenced in his expert report, that he possessed a PowerPoint presentation related to the roundtable, and that the PowerPoint analyzed topics listed in his expert report.[229] That testimony affirmatively shows Mr. Pasteris considered the "factual ingredients" in that PowerPoint presentation in connection with forming the opinions found in his expert report and thus, Mr. Pasteris and Plaintiff were obligated to disclose the PowerPoint to Defendants.[230] In an attempt to sidestep this finding, Plaintiff argues that Mr. Pasteris did not fail to disclose anything required by Rule 26 because he did not rely upon those particular documents to form his opinions.[231] But arguing that disclosure was unwarranted under Rule 26 because Mr. Pasteris did not "rely" on documents is legally flawed, as the text of the Rule 26 requires disclosure of facts "considered" by an

[229] *Id.* at 102:16–21, 104:5–19.

[230] *Id.*

[231] ECF No. 865 at 14–15.

expert. Fed R. Civ. P. 26(a)(2)(B)(ii). District courts within the Second Circuit analyzing whether experts have "considered" a document have interpreted Rule 26 expansively to include documents that experts have not relied on, such as documents that the expert has reviewed or generated in connection with formulating an opinion. *See, e.g.*, *Clark v. Quiros*, No. 19-CV-575 (VLB)(RAR), 2022 WL 3716355, at *2 (D. Conn. Aug. 29, 2022) ("Testifying experts are obligated to disclose information that was relied upon in forming their opinions, as well as information that was not relied upon, but was considered by the expert." (cleaned up)); *Sec. & Exch. Comm'n v. Rio Tinto PLC*, No. 17-CV-7994, 2021 WL 2186433, at *5 (S.D.N.Y. May 28, 2021) (holding that "documents reviewed by an expert in his role as a consultant" are subject to discovery when they "appear to also inform his expert report supporting his proposed testimony"); *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, No. 12-CV-220 (WWE)(HBF), 2014 WL 655206, at *6 (D. Conn. Feb. 20, 2014) (collecting cases); *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 293 F.R.D. 568, 574 (S.D.N.Y. 2013) ("It is irrelevant whether the expert ultimately relies upon the facts or data in forming her expert opinion; instead, the test is whether the expert 'considered' the materials."). Because Plaintiff has not clearly established that Mr. Pasteris did not consider facts referenced in the undisclosed PowerPoint presentation, the Court agrees with Defendants that Mr. Pasteris failed to disclose key materials he considered in developing in his opinions. *See Thieriot v. Jaspan Schlesinger Hoffman LLP*, No. 07-CV-5315, 2011 WL 4543308, at *4 (E.D.N.Y. Sept. 29, 2011) ("The burden of showing that an expert did not consider certain documents in forming his opinion rests with the party resisting the disclosure.").

The Court therefore considers the *Softel* factors in determining whether to exclude Mr. Pasteris's rebuttal expert report due to the omitted expert disclosure under Federal Rule of

Civil Procedure 37: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel*, 118 F.3d at 961; *see also Patterson*, 440 F.3d at 117. Plaintiff has not contested Defendants' argument that the omitted disclosure was neither substantially justified nor harmless, nor can it. The first and third *Softel* factors weigh in favor of preclusion because Mr. Pasteris's belief that the materials might be confidential does not counter the disclosure obligation under Rule 26. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 473 (finding that a party should not be unfairly prejudiced when the opposing party retains an expert who cannot discuss the bases of the opinions). The second factor also weighs in favor of preclusion because the importance of Mr. Pasteris's testimony is lessened here, where Plaintiff acknowledges that it has other experts offering opinions regarding best industry practice and precipitation risks.[232] Moreover, it bears noting that Mr. Pasteris is a rebuttal witness, as opposed to a witness that Plaintiff intends to offer in its case in chief. Finally, the last factor weighs in favor of exclusion, because "this action has already been protracted and has resulted in Court intervention in a number of disputes." *Russo*, 2024 WL 4449440, at *4.

Consequently, because all of the *Softel* factors weigh in favor of preclusion, and Plaintiff's omitted disclosures were neither substantially justified nor harmless, the testimony of Mr. Pasteris is appropriately excluded.

---

[232] ECF No. 831 at 10.

### 9. Defendants' Motion to Preclude the Testimony of Wendi Goldsmith, Ph.D

The Court grants in part and denies in part Defendants' motion to preclude the testimony of Wendi Goldsmith, Ph.D., under Federal Rule of Evidence 702. Specifically, a portion of opinion ten and the entirety of opinions four, five, six, and seven shall be excluded because Defendants have shown that Dr. Goldsmith is not qualified to opine on engineering-focused issues and that these opinions are unreliable. Defendants are granted leave to renew their motion on the issue of relevance during summary judgment motion practice.

Plaintiff retained Dr. Goldsmith, a licensed professional geologist, to investigate the Terminal site.[233] Dr. Goldsmith provides ten opinions relating to purported gaps and shortcomings in the current design and operational plans for the Terminal.[234] Her opinions fall into two categories: (1) engineering-focused opinions related to the Terminal, and (2) non-engineering opinions related to best industry practice and environmental risks. The engineering-focused opinions include opinions four, five, six, seven and a portion of opinion ten:

> **Opinion 4** – The New Haven oil terminal is not engineered or operated pursuant to best industry practice.
>
> **Opinion 5** – The New Haven Terminal's stormwater management system is not sufficient to mitigate the risks of potential flood hazards and severe storms.
>
> **Opinion 6** – The New Haven oil terminal's berms and containment areas are insufficient to contain the petroleum in the event of oil spills.
>
> **Opinion 7** – The New Haven oil terminal is not engineered or operated to prevent the discharge of pollutants.

[233] Goldsmith Rep., ECF No. 751 at 4, 11.

[234] *Id.* at 5.

> **Opinion 10** – The Terminal is not prepared to prevent a catastrophic failure by severe storm.[235]

And the non-engineering opinions, which relate to best industry practice and environmental risks, include opinions one, two, three, eight, nine, and a portion of opinion ten:

> **Opinion 1** – Best industry practice requires Shell to consider and protect against reasonably foreseeable risks, including risks due to climate change.
>
> **Opinion 2** – More severe weather, precipitation, storm surge, and sea level rise created reasonably foreseeable risks to the New Haven oil terminal.
>
> **Opinion 3** – Past storms put Shell on notice of the increased risks to coastal facilities from severe weather, storm surges, precipitation, and sea level rise.
>
> **Opinion 8** – Adequate decision support frameworks currently exist to guide engineering of infrastructure measures to effectively manage flood risk at the New Haven oil terminal.
>
> **Opinion 9** – Shell fails to apply best industry practice in its risk management program.
>
> **Opinion 10** – The Terminal poses a threat to the surrounding community.[236]

Defendants argue that Dr. Goldsmith's testimony is inadmissible under Federal Rule of Evidence 702, arguing that (1) Dr. Goldsmith lacks expertise in engineering and the petroleum bulk fuel industry, which are the subject of her opinions,[237] (2) Dr. Goldsmith's methodology is unreliable,[238] and (3) Dr. Goldsmith's opinions are irrelevant.[239] Defendants also argue that Dr. Goldsmith's opinions should be excluded under Rule 403.[240]

---

[235] *Id.* at 3, 5

[236] *Id.*

[237] Defs.' Mot. Preclude, ECF No. 749 at 17–21.

[238] *Id.* at 22–35

[239] *Id.* at 36–42.

[240] *Id.* at 42–44.

### a. Qualification

First, the Court finds that Dr. Goldsmith is not qualified to offer any engineering-focused opinions related to the Terminal. It is well settled that an expert may be qualified "based on one's practical experience notwithstanding a lack of professional education or one's formal education despite a lack of practical experience." *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 16-CV-544 (JCH), 2018 WL 3752878, at *4 (D. Conn. Aug. 8, 2018) (cleaned up) (collecting cases). Here, Dr. Goldsmith has no formal education, much less licensure, in engineering.[241] Dr. Goldsmith holds a bachelor's degree in earth and planetary sciences, environmental studies and advanced degrees in landscape design, plant and soil science, and business and social science.[242] Dr. Goldsmith has no practical experience from which the Court could conclude that she has "superior knowledge, education, experience, or skill" in engineering. *Tin Yat Chin*, 371 F.3d at 40. Dr. Goldsmith concedes that she is "not an engineer at all."[243] She has neither operational experience in the oil and gas industry, nor expertise in operating a petroleum bulk storage terminal, and has never worked for a party on environmental compliance for operating a petroleum bulk storage terminal.[244] Therefore, the Court finds that opinions four, five, six, seven, and the portion of opinion ten where Dr.

---

[241] Goldsmith Dep. Tr., ECF No. 743-2 at 16:3–7 ("Q. Do you have a degree in engineering? A. No. Q. Have you ever been a licensed engineer in any state? A. No").

[242] ECF No. 751 at 65.

[243] ECF No. 743-2 at 28:1–3 ("Q. I think you testified earlier you're not a licensed engineer in Connecticut, correct? A. I am not an engineer at all."); *id.* at 107:21–22 ("Q. And you are not a civil engineer? A. Correct").

[244] *Id.* at 20:13–15 ("Q. Do you have operational experience in the oil and gas industry? A. No"); *id.* at 24:12–15 ("Q. Have you ever worked for any party on environmental compliance for operating a petroleum bulk storage terminal? A. No"); *id.* at 30:2–5 ("Q. Do you have any expertise in operating a petroleum bulk storage terminal? A. No").

Goldsmith opines that the Terminal is not prepared to prevent a catastrophic failure by severe storm, are inadmissible under Rule 702, because Dr. Goldsmith "strayed" from the scope of her expertise. *See United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004); *see also Restivo v. Hessemann*, 846 F.3d 547, 578 (2d Cir. 2017) (affirming exclusion of testimony where a topic was "clearly outside" an expert's "area of expertise").

As to the non-engineering opinions, which relate to best industry practice and environmental risks, the Court finds that Dr. Goldsmith is sufficiently qualified to offer those opinions based on her work on disaster resilience infrastructure projects, including projects involving LaGuardia Airport, the Metropolitan Transportation Authority/New York City Transit, the Panama Canal Expansion Project, the Federal Reserve Bank Climate Risk Study, the Commonwealth of Dominica's nationally owned utility company, and the United States Department of Defense.[245]

**b. Reliability**

Notwithstanding the qualifications of Dr. Goldsmith, the Court finds that Dr. Goldsmith's engineering-focused opinions on the Terminal were not based upon reliable principles or methodology. These opinions are based, in part, on Dr. Goldsmith's observations during her visits to the Terminal. But Dr. Goldsmith fails to cite any methodology or engineering principles that she used to draw her conclusions during the site visits. Instead, there are unsupported statements which are untethered from any principles or methodology.[246]

[245] ECF No. 751 at 9–10.

[246] *E.g.*, ECF No. 751 at 44–45 ("Based on my knowledge of the site and relevant information, it is my opinion that the New Haven Terminal is not engineered or operated pursuant to best industry practice."); *id.* at 46 ("During the last site inspection, I observed the location of the emergency power generator and its 50-gallon diesel fuel tank, and they are subject to flooding without

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. An expert who purports to rely on her expertise for conclusions based on observations must provide some methodology or explanation of the principles used for the Court to evaluate reliability under Rule 702. Therefore, the Court finds that opinions four, five, six, seven, and the portion of opinion ten where Dr. Goldsmith opines that the Terminal is not prepared to prevent a catastrophic failure by severe storm, are inadmissible as unreliable under Rule 702, because Dr. Goldsmith failed to support her conclusions with sound methodology and the Court cannot conclude that her opinions are based on "reliable principles and methods."

The Court finds that Defendants' arguments on the remaining opinions go to the weight of the evidence. The arguments that Dr. Goldsmith ignored industry guidance and selectively relied on three sources as "best industry practice" are not sufficient for the Court to conclude that "there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Instead, in opining on best industry practice requirements, Dr. Goldsmith has persuasively shown that she used information set forth in guidelines from organizations such as the American Society of Civil Engineers (ASCE),[247] and the United

mitigation by elevation or positioning behind any type of berm."); *id.* at 48 ("I have not seen any evidence from Shell for planning or engineering towards achieving flood management function. My visual observations confirm lack of maintenance suitable for containment or flood protection functions . . . .").

247 *Id.* at 18.

States Army Corps of Engineers,[248] as well as Shell's internal documents.[249] Defendants' criticisms regarding the alleged subjectivity of her methodology and the selection of sources are appropriate "subject for cross-examination, not admissibility." *Du*, 731 F. Supp. 3d at 402.

**c. Relevance**

Defendants argue that Dr. Goldsmith's opinions about climate change obligations are irrelevant because the opinions were never stated in the pre-suit NOIs.[250] In response, Plaintiff claims that whether Plaintiff's notices of intent provided adequate notice is improper for resolution under Rule 702.[251]

As the Court explained when discussing Defendants' motion to preclude the testimony of Richard Horner, *supra*, the Court concludes that it must reserve judgment on Defendants' claim that Goldsmith's testimony is irrelevant. To reiterate, the Court believes that Defendants go too far in asserting that any opinions about alleged violations not explicitly identified in the NOI are irrelevant. *See Mid-New York Env't & Sustainability Promotion Comm., Inc.*, 152 F.4th at 425 (explaining that plaintiffs are not required to detail in their NOI "the specifics of their claim in a manner that would typically appear in an expert report following discovery"). However, because a pre-suit NOI must be "sufficient to notify a reasonable person" of a plaintiff's claims and must "reasonably inform a defendant of the basis of a plaintiff's claims and include the information set forth in 40 C.F.R. 135.3(a)," *id.* at 424, 428, the Court agrees that an expert's opinion could be deemed irrelevant if the underlying theory of liability was

---

[248] *Id.* at 20.

[249] *Id.* at 19.

[250] ECF No. 749 at 36–40.

[251] Pl.'s Mem. Opp'n, ECF No. 853 at 23.

not sufficiently disclosed in the NOI, *see, e.g.*, *Jones Creek Invs., LLC*, 2013 WL 12141348, at *15. The Court finds that the record is insufficiently briefed on this issue and will allow further briefing during summary judgment motion practice.

**d. Rule 403**

The Court finds that, at this juncture, Rule 403 does not warrant preclusion of Dr. Goldsmith's testimony. As limited by the Court, Dr. Goldsmith's opinions are highly relevant to the scope of Defendants' obligations under the permit at issue. Defendants have not shown a danger of unfair prejudice, confusing the issues, or misleading the jury on this record.

Consequently, the Court grants in part and denies in part the motion to preclude Dr. Goldsmith's testimony.

**10. Defendants' Motion to Preclude the Testimony of Dr. Robert B. Nairn**

Defendants' motion to preclude the testimony of Robert Nairn is, at this juncture, denied. But Defendants are granted leave to renew their motion on the issue of relevance during summary judgment motion practice.

Dr. Robert B. Nairn is a coastal engineering expert with more than forty years of experience in hydrodynamics, sediment transport, and scour processes in water bodies.[252] Nairn holds a Ph.D. in coastal processes and engineering, an M.S. in coastal engineering, and a B.S. in civil engineering.[253] At the time he compiled his expert report in this matter, Nairn led the Hazards, Risk, and Resilience Sector at Baird, a coastal engineering and consulting

---

[252] Ex. A to Pl.'s Mem. Opp'n, ECF No. 823-1 at 1.

[253] *Id.*

firm.[254] Nairn has authored or co-authored over 100 technical papers on issues of environmental or civil engineering.[255] Plaintiffs retained Nairn to opine on the adequacy of flood protection at the Terminal under existing and future sea-level conditions.[256]

In his report, Nairn explains that both the North and South Terminal yards would be "completely inundated" under the "500-year storm surge event."[257] Therefore, in his opinion, the Terminal does not meet the ASCE or FEMA standards for flood protection.[258] Nairn also opines that the Terminal would be "fully inundated and unable to withstand catastrophic flooding" during a 100-year event with current sea-level conditions.[259] Nairn then explains that, by his analysis, the Terminal's coastal berms would need to be raised by "at least 5.5 to 8.5" feet to protect against the 500-year flood condition (when accounting for 1.64 feet of sea-level rise).[260] Nairn further opines that, under current and potential sea-level conditions, the Terminal's ingress/egress route would be completely inundated at peak storm-surge for all storms considered.[261] Finally, Nairn opines that the Terminal's berms were not sufficiently protected to prevent a "failure of the containment system and complete flooding."[262]

---

[254] *Id.*

[255] *Id.* at 15–22.

[256] Nairn Rep., ECF No. 771 at 4.

[257] *Id.* at 6. "In other words, under the 500-year event water freely flows into and out of the containment areas without any inspection or treatment." *Id.*

[258] *Id.*

[259] *Id.*

[260] *Id.* at 7.

[261] *Id.*

[262] *Id.*

Defendants argue that Nairn's testimony should be precluded as irrelevant because his opinions inject theories of liability not contained in Plaintiff's Notice of Intent or Complaint.[263] Defendants also claim that Nairn's methodology is unreliable and inadmissible because he "makes up his own implied 'best industry standard.'"[264] Finally, Defendants argue that Nairn should be precluded from testifying under Federal Rule of Evidence 403 because whatever probative value his opinions have is substantially outweighed by the danger of misleading the jury, confusing the issues, and unfairly prejudicing the Defendants.[265] Defendants do not formally challenge Nairn's qualifications.[266]

**a. Reliability and Rule 403**

The Court first addresses Defendants' reliability and Rule 403 arguments.

Defendants argue that Nairn's opinions are not reliable because "they create a definition of 'best industry practice' not found in the 2018/2021 Permit or associated guidance.[267] Among other things, Defendants claim that Nairn could not point to any example of a "bulk storage facility" that considered the "hundred-year return period" or the "500-year return period storm event in conducting its risk assessment operations" in Connecticut.[268] Therefore, in Defendants' view, Nairn's opinions regarding the flood risks at the Terminal "fail[] to provide

[263] Defs.' Mot. Preclude, ECF No. 770 at 4.

[264] *Id.* at 4–5.

[265] *Id.* at 5.

[266] *See generally id.*

[267] *Id.* at 15 (cleaned up).

[268] *Id.* at 16.

any methodology that reasonably connects [Nairn's] ideas of what should be implemented at the Terminal to the 2018/2021 Permit itself."[269]

First, Defendants' reliability arguments largely rehash their position that the 2018/2021 CT DEEP permit does not include a requirement to prepare for climate-change flooding.[270] The Court is unpersuaded by these arguments—arguments which address the factual issue at the center of this case.[271] For the reasons identified in Plaintiff's opposition to the motion to preclude,[272] the Court will not hold Dr. Nairn's testimony unreliable on this basis.

Many of Defendants' other reliability arguments are based on an incorrect characterization of Nairn's testimony. For example, Defendants argue that Nairn "manufacture[d] his own 'best industry practice' standard without having data to define the industry and industry 'practice.'"[273] Essentially, they claim that Nairn opined as to whether the flood-control measures identified in his report are "best industry practices."[274] But that is not how the Court interprets Nairn's reports. Instead, Nairn draws on his engineering expertise to opine on whether the Terminal's existing infrastructure could withstand storms of varying severity. Whether the deficiencies Nairn identified subject Defendants to CWA liability is an issue for the factfinder, and one which Nairn leaves to it. The Court is unable to find any place

---

[269] *Id.* at 21.

[270] *E.g.*, *id.* at 23.

[271] *See* Omnibus Order, ECF No. 641 at 4 ("[Judge Meyer] held that the term 'industry best practice' as used in the definition of 'minimize' in fact adduced additional requirements, and further held that whether consideration of climate change was an 'industry best practice' remained an issue of material fact that could not be resolved as a matter of law.").

[272] Pl.'s Mem. Opp'n, ECF No. 860 at 17–18.

[273] ECF No. 770 at 26.

[274] *See, e.g.*, *id.* at 30, 33, 34.

in Nairn's report where he claims that the failure to adopt his identified measures are violations of the CWA or CT DEEP Permit, and Defendants point to none. Defendants even concede that Nairn's affirmative report does not expressly label the measures he identified as "best industry practices."[275] Thus, the Court also declines to hold Nairn's opinions unreliable on this basis.

Defendants also claim that Dr. Nairn's failure to perform "geotechnical investigation, modeling with actual Terminal-specific data, or any other type of field testing" rendered his opinion about the ability of containment berms to resist flooding or storm surge unreliable.[276] They offer no proof or reason, however, demonstrating that such measures are necessary for an expert to give a reliable opinion of the sort offered by Nairn. Similarly, Defendants do not adequately explain why the standards Nairn cites (or his application thereof) are unreliable. Instead, they make conclusory allegations that Nairn "cherry-picked" sources to support pre-conceived opinions[277] without identifying what other information (which would be relevant to analyses of the sort conducted by Nairn) he should have addressed.[278] Thus, the Court also declines to hold Nairn's testimony unreliable on these bases.

Finally, the Court has reviewed Defendants' arguments that Nairn's testimony should be precluded under Federal Rule of Evidence 403 and finds them to be without merit, subject to the limitations explained below. Defendants again re-visit their claim that the 2018/2021

[275] *Id.* at 32.

[276] *Id.* at 35–36.

[277] *Id.* at 23–24, 32.

[278] *See generally id.* at 34–38. Defendants do claim that Nairn did not review "any SWPPPs or SPCCs for other industrial facilities in Connecticut," but fail to show how those sources would be necessary to a reliable engineering analysis. *See id.* at 35.

CT DEEP Permit does not mandate consideration of climate change,[279] a claim that is to be resolved by a jury at trial and therefore does not properly bear on the admissibility of Nairn's testimony. Moreover, Defendants' suggestion that admitting Dr. Nairn's testimony would be a violation of constitutional due process—which is briefed in one sentence and an accompanying string of cases cited for general propositions[280]—is not sufficiently developed. Thus, the Court declines to rule on it. *See, e.g.*, *Gonzalez v. City of Schenectady*, 728 F.3d 149, 160 (2d Cir. 2013) (explaining that courts need not determine whether a constitutional right was violated where the briefing of constitutional issues is "woefully inadequate" (quoting *Pearson v. Callahan*, 555 U.S. 223, 239 (2009)).

The Court therefore declines to preclude the testimony of Nairn on the foregoing bases. The Court next addresses Defendants' relevance arguments.

**b. Relevance**

Defendants argue that Nairn's testimony is irrelevant because certain climate-resiliency measures discussed by Nairn in his expert report were not identified in the pre-suit NOIs issued by Plaintiff.[281] In response, Plaintiff claims that a *Daubert* motion is the incorrect vehicle for resolving the adequacy of the notices.[282]

---

[279] *Id.* at 39.

[280] *Id.* at 39–40.

[281] *See, e.g.*, *id.* at 14 ("Because the NOIs do not include Dr. Nairn's opinions, CLF cannot pursue any claim(s) premised upon them at trial. Extraneous opinions about claims that do not exist and other issues outside the scope of this trial are irrelevant and cannot assist the jury in resolving the questions before it.").

[282] ECF No. 860 at 15.

As the Court explained when discussing Defendants' motion to preclude the testimony of Richard Horner, *supra*, the Court concludes that it must reserve judgment on Defendants' claim that Nairn's testimony is irrelevant. To reiterate, the Court believes that Defendants go too far is asserting that any opinions about alleged violations not explicitly identified in the NOI are irrelevant. *See Mid-New York Env't & Sustainability Promotion Comm., Inc.*, 152 F.4th at 425 (explaining that plaintiffs are not required to detail in their NOI "the specifics of their claim in a manner that would typically appear in an expert report following discovery"). However, because a pre-suit NOI must be "sufficient to notify a reasonable person" of a plaintiff's claims and must "reasonably inform a defendant of the basis of a plaintiff's claims and include the information set forth in 40 C.F.R. § 135.3(a)," *id.* at 424, 428, the Court agrees that an expert's opinion could be deemed irrelevant if the underlying theory of liability was not sufficiently disclosed in the NOI, *see, e.g., Jones Creek Invs., LLC*, 2013 WL 12141348, at *14–15. The Court finds that the record is insufficiently briefed on this issue and will allow further briefing during summary judgment motion practice.

Accordingly, Defendants' motion to preclude the testimony of Robert Nairn is, at this juncture, denied.

## IV. CONCLUSION

For the reasons described above, the Court holds the following:

- Plaintiff's motion to exclude the testimony of Susan Bodine is **granted in part** and **denied in part**;
- Plaintiff's motion to exclude the testimony of Deborah French-McCay is **denied**;
- Plaintiff's motion to exclude the testimony of Craig Jones is **granted in part** and **denied in part**;

- Plaintiff's motion to exclude the testimony of David Uhlmann is **granted in part** and **denied in part**;
- Plaintiff's motion to exclude the testimony of Renee Bourdeau is **denied**;
- Defendants' motion to exclude the testimony of Edwin Levine is **granted**;
- Defendants' motion to exclude the testimony of Jacqueline Michel is **denied**;
- Defendants' motion to exclude the testimony of James O'Donnell is **granted in part** and **denied in part**;
- Defendants' motion to exclude the testimony of Bruno Pigott is **granted**;
- Defendants' motion to exclude the testimony of Joshua Macey is **granted in part** and **denied in part**;
- Defendants' motion to exclude the testimony of Matthew Barlow is **denied**;
- Defendants' motion to exclude the testimony of Richard Horner is **denied**;
- Defendants' motion to exclude the testimony of Phillip Pasteris is **granted**;
- Defendants' motion to exclude the testimony of Wendi Goldsmith is **granted in part** and **denied in part**;
- Defendants' motion to exclude the testimony of Robert Nairn is **denied.**

**SO ORDERED.**

Hartford, Connecticut
September 30, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge